**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

STAMPEDE MEAT, INC.,                )
                                     )
        Plaintiff,                   )
                                     )
            v.                       )
                                     )
MICHELLE LUJAN GRISHAM, in her official )
capacity as GOVERNOR OF THE STATE OF )
NEW MEXICO, HECTOR BALDERAS, in his )
official capacity as the ATTORNEY GENERAL )
FOR THE STATE OF NEW MEXICO, BILLY )
J. JIMENEZ, in his official capacity as the )     Case No.:  20-cv-1160
ACTING CABINET SECRETARY OF THE )
NEW MEXICO DEPARTMENT OF HEALTH, )
JAMES C. KENNEY, in his official capacity as )
the CABINET SECRETARY OF THE )
NEW MEXICO ENVIRONMENT )
DEPARTMENT, THE NEW MEXICO )
ENVIRONMENT DEPARTMENT and THE )
NEW MEXICO DEPARTMENT OF HEALTH, )
                                     )
        Defendants.                  )

**EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER,**
**PRELIMINARY INJUNCTION AND DECLARATORY JUDGMENT**

COMES NOW, Plaintiff, Stampede Meat, Inc., ("Stampede Meat" or the "Company"), by

and through its counsel of record, and moves this Court on an emergency basis under Federal Rule

of Civil Procedure 65 for a temporary restraining order, preliminary injunction and declaratory

relief as to Defendants' issuance of a Closure Order on November 3, 2020, specific to shuttering

the Company's ongoing operations.  In support of this Motion, Plaintiff states the following:

**INTRODUCTION**

Plaintiff Stampede Meat, Inc., a Delaware corporation with its principal place of business

in Bridgeview, Illinois, is one of the United States' largest manufacturers of portion-controlled

proteins (including beef, chicken, turkey and pork) and meals (which include vegetables, soups and alternative proteins).[1]

Defendant Michelle Lujan Grisham is the Governor of the State of New Mexico and is named in her official capacity.  Defendants New Mexico Departments of Health and Environment are cabinet-level state agencies within the Executive Branch.  Defendant Hector Balderas is the Attorney General for the State of New Mexico, Defendant Billy J. Jimenez is the Acting Cabinet Secretary of the New Mexico Department of Health and Defendant James C. Kenney is the Cabinet Secretary of the New Mexico Environment Department.  All three individuals are also named in their official capacities.

Stampede Meat specializes in custom-made, center-of-the-plate beef, pork and chicken products for the needs of restaurants, hospitality, retail, supermarket, casino, home delivery, and other industries.  Its customers include Costco, Wal-Mart, Firehouse Subs, Applebee's, Panda Express, International House of Pancakes, Denny's, Schwan's Foods and other major restaurants and food retailers throughout New Mexico and the country.  In many instances, Stampede is the exclusive supplier of its products, leaving the aforementioned customers without a supply source in the event of a shut down.  The Company's Sunland Park, New Mexico facility opened in December 2018 and has an annual capacity of 100 million pounds of meat.  The Sunland Park workforce varies depending on production needs but during the past two weeks, between 550-575 team members worked at this facility.  *See, e.g.* Exhibit 1-1, pp. 5-7.

The State of New Mexico has consistently shared the view of the Federal Government that Stampede Meat is critical to the Nation's response to this pandemic, repeatedly designating

---

[1] Stampede Meat incorporates by reference the extensive body of facts and legal authorities relied upon for relief and as enumerated within its *Verified Complaint and Application for Declaratory Judgment and Injunctive Relief*, previously filed on November 6, 2020 [Doc. 1], *a true and correct copy of the same is herein attached as Exhibit 1-1.*

Stampede Meat an "Essential Business."  Yet on November 3, 2020, Defendants sought to immediately close Stampede Meat for fourteen days pursuant to a recently issued public health order purportedly requiring closure of certain businesses experiencing four or more positive COVID-19 tests in a fourteen-day period.  In the case of Stampede Meat, that number represents less than one percent (1%) of its Sunland Park workforce.  *See*, *e.g.* Exhibit 1-1, pp. 8-13.

Despite repeated attempts to ascertain their basis for the Closure Order, Defendants' determination appears to rest entirely upon an unsupported assertion that Stampede Meat is a "business that poses a significant health risk, as determined by the Department of Health."  Despite repeated inquiries and intervention by the United States Department of Agriculture, Defendants continue to avoid providing a scientific-basis for their determination.  *Id.*

Regardless, Defendants' closure action is clearly preempted by an April 28, 2020 Presidential Executive Order prohibiting state authorities from directing meat and poultry processing facilities such as Stampede Meat to close when that facility is in compliance with applicable federal guidelines.  The Stampede Closure Order also violates the U.S. Constitution because without a basis, it has been issued in an arbitrary and capricious manner, and without due process.

Stampede Meat, its workforce, and the nation will suffer irreparable harm absent an immediate temporary restraining order freezing the *status quo ante*.  Further, in support of its request that his Court issued a permanent injunction and provide for declaratory relief, Stampede Meat asserts that it is likely to succeed on the merits of its claims and the balance of equities favors a restraining order  preventing the Defendants from closing Stampede Meat's operations.

## LEGAL ARGUMENT AND POINTS OF AUTHORITY

Unless this Court enters a Temporary Restraining Order, Stampede Meat will suffer irreparable harm. Absent such an Order, Defendants' arbitrary and capricious prohibition on the continuation of the Company's operations will substantially undermine the safety and security of the food supply distribution network, not only within New Mexico, but throughout the Southwest.

1. Temporary and Preliminary Injunction Standard of Review

This Court may issue a temporary restraining order (TRO) without written or oral notice to the adverse party (or their attorney) only if:

(A) Specific facts in an affidavit or verified complaint clearly show the immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) The movant's attorney certifies in writing any efforts made to give notice and the reasons why is should not be required.

Fed.R.Civ.P. 65(b)(1). Notwithstanding the requirements or notice under the rule, in this case, the filing of Stampede Meat's Verified Complaint and Application for Declaratory Judgment and Injunctive Relief, filed on November 6, 2020, and conveyance of the same to Defendant Jimenez on the same day, is sufficient to provide notice to Defendants relative to the pending action. Further, as of this writing, all Defendants have been served with the aforementioned Complaint and thus the issues raised herein are well-known by the adverse parties. As such, issuance of a TRO by this Court without further notice is warranted.

A moving party may obtain a Temporary Restraining Order and Preliminary Injunction if: (1) the movant will be irreparably harmed by denial of the relief sought; (2) the movant's injury outweighs any damage the injunction may cause the opposing party; (3) granting the preliminary relief will not be adverse to the public interest, and (4) there is a substantial likelihood of success on the merits. *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*,

805 F.2d 351, 355 (10th Cir. 1986); *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1254-55 (10th Cir. 2006); *Keirnan v. Utah Transit Auth.*, 339 F.3d 1217, 1220 (10th Cir. 2003); *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1139 (D.N.M. 2018). Additionally, if a moving party can establish the first, third and fourth elements above, the party "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Oklahoma, ex rel., OK Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006).  In this case and given the reasons enunciated below, the standards for granting both a temporary and preliminary injunction have been met.

    2.  <u>Stampede is Substantially Likely to Succeed on the Merits Given Clear Application of Federal Preemption Relative to the Company's Operations.</u>

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2.  State laws that conflict with federal laws are necessarily preempted. *Arizona v. United States*, 567 U.S. 387, 399 (2012).  Executives order also apply with preemptive force.  *See*, *e.g.*, *Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 273, n.5 (1974) (valid executive orders may preempt state law through the Supremacy Clause); *United States v. Am. Tel. & Tel. Co.*, 552 F.Supp. 131, 154-55 (D.D.C. 1982) (state law preempted by federal court decree).

Preemption applies even where federal and state laws "share the same goals."  *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 379 (2000).  For, "[t]he fact of a common end hardly neutralizes conflicting means," and "'conflict is imminent' whenever 'two separate

remedies are brought to bear on the same activity.'" *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 286 (1986). This is especially so where the state law threatens to undermine the federal government's flexibility and discretion to address a particular subject matter. *Crosby* illustrates that point. There, the Supreme Court concluded that a Massachusetts law prohibiting state agencies from purchasing goods or services from companies doing business with Burma was preempted by a federal law imposing sanctions on that country. *Crosby*, 530 U.S. at 388. In doing so, the Court recognized that "[b]ecause the state Act's provisions conflict with Congress's specific delegation to the President of flexible discretion, with limitation of sanctions to a limited scope of actions and actors, and with direction to develop a comprehensive, multilateral strategy under the federal Act, it is preempted, and its application is unconstitutional, under the Supremacy Clause." *Id.*

Stampede Meat is part of the nation's critical food supply chain and has a responsibility to continue providing meat, poultry, turkey, pork, alternative proteins and other food to Americans in New Mexico and throughout the country during the COVID-19 pandemic. Pursuant to the U.S. Cybersecurity & Infrastructure Security Agency ("CISA") guidance, Stampede Meat is an essential business, and its workforce is part of the "Critical Infrastructure Workforce. This means that Stampede Meat must remain open and continue in-person work during the COVID-19 pandemic. *See*, *Advisory Memorandum from Christopher C. Krebs, Director of Cybersecurity and Infrastructure Security Agency on Guidance on Essential Critical Infrastructure Workers*, herein attached as Exhibit 2-1.

Further, and in response to the closure of meat and poultry processing plants throughout the country, the President of the United States invoked the Defense Production Act ("DPA") and issued an Executive Order on April 28, 2020 requiring meat and poultry plants such as Stampede

Meat, to remain open to prevent food shortages during the pandemic.  *See*, *Presidential Executive Order No.* 13,917, 85 C.F.R. 26313 (2020), herein attached as Exhibit 3-1.    In issuing his April 28 Executive Order, the President emphasized that,

> "[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans.  Such closures [of beef, pork, and poultry processors] threaten the continued functioning of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency. Given the high volume of meat and poultry processed by many facilities, any unnecessary closures can quickly have a large effect on the food supply chain. Similarly, under established supply chains, closure of a single meat or poultry processing facility can severely disrupt the supply of protein to an entire grocery store chain."

*Id*.

Through the DPA, Congress gave the President discretion to determine the "manner," "conditions," and "extent" of the operations of critical infrastructure industries, including meat processors like Stampede Meat, during a national emergency.  50 U.S.C. § 4511.  The DPA grants the President "great flexibility" in doing so, including "informal means of persuasion" or more "formal and technical acts."  *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 993-94 (5th Cir. 1976).  As a result, any state law (or directive) that is in conflict with the President's determinations as to the manner, conditions and extent of Stampede Meat's operations is "naturally" preempted.  *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000).  As such, the Department of Health's October 22, 2020 Order and the Stampede Closure Order are preempted by the President's April 28 Executive Order and must be struck down.

3. The Federal Meat Inspection Act Preempts the October 22, 2020 Order and the Stampede Closure Order

Similar to the President's April 28 Executive Order, the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601, *et seq.*, also preempts Defendants' mandate that Stampede Meat cease operations.  Stampede Meat's New Mexico facility is subject to regulation under FMIA, which

requires that all meat processing facilities, including Stampede Meat, satisfy "rules and regulations of sanitation" that are "prescribe[d]" by the U.S. Secretary of Agriculture.  21 U.S.C. § 608; *see also*, *FSIS Meat, Poultry and Egg Product Inspection Director* at 494 (Oct. 13, 2020) (identifying Stampede Meat's Sunland Park facility as establishment number M19113N, P19113N).[2]  FMIA's Food Safety and Inspection Service ("FSIS") is responsible for promulgating regulations implementing the FMIA.  *See* 9 C.F.R. §§300.2(a), (b)(1).  To this end, FSIS issued regulations regarding the prevention of infectious diseases within meat processing facilities in 9 C.F.R. § 416.5(c), which provides that "[a]ny person who has or appears to have an infectious disease . . . must be excluded from any operations which could result in product adulteration and the creation of insanitary conditions. . . ."  Further, FMIA expressly prohibits any state from imposing regulations that are "in addition to, or different than" those promulgated by the FSIS.  21 U.S.C. §678.  As recognized by the Supreme Court in *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459-60 (2012), the FMIA "sweeps widely" and "prevents a State from imposing any additional or different" requirements.

Defendants' October 22, 2020 Order and November 3, 2020 Closure Order impose requirements different from and in addition to those imposed by the FSIS (*i.e.*, closure of meat processing plants where a certain threshold of employees test positive for COVID-19).  As such, both are preempted by the express terms of the FMIA and cannot stand.  *See*, *e.g.*, *American Meat Institute v. Leeman*, 180 Cal. App. 4th  728, 762 (Cal. Ct. App. 2009) (California Proposition 65's requirement that meat products include point of sale warning labels preempted by FMIA as "in

---

[2]https://www.fsis.usda.gov/wps/wcm/connect/bf8d9766-9767-4eOc-a9f1-efeaOb2a42bc/MPI_Directory-by_Establishment_Name.pdf?MOD=AJPERES.

addition to, or different than" the labels required by the FMIA). Accordingly, the October 22, 2020 Order and the Stampede Closure Order must also be struck down as preempted by the FMIA.

4. <u>Defendants' Actions as to Stampede Meat Are Undertaken Arbitrarily, Absent Scientific Basis, and as Such Violate Notions of Fairness and Due Process</u>

"A statute will be held unconstitutional in violation of due process of law, if the statute either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess at its meaning and differ as to its application." *Tri-State Generation & Transmission Ass'n, Inc. v. D'Antonio*, 2012-NMSC-039, ¶ 52, 289 P.3d 1232, 1244 New Mexico courts apply the vagueness doctrine as it applies to statutes to regulations as well. *Id*. ¶ 53. Moreover, a ruling by an administrative agency is deemed arbitrary and capricious if it "provides no rational connection between the facts found and the choices made, or if it entirely omits consideration of relevant factors or important aspects of the problem at hand." *Atlixco Coal. v. Maggiore*, 1998-NMCA-134, ¶ 24, 125 N.M. 786, 965 P.2d 370.

Defendants do not assert that in the course of their workday, Stampede Meat's employees have contact with the general public. This is because their operations are conducted within a secure production environment and in a manner far different than other types of essential workers in the state. The Company's employees, for example, do not perform work in a manner comparable to employees of other essential businesses, *i.e.* food, retail and other establishments for which Defendants have not issued a closure order. Such other establishments also encompass governmental departments and municipalities, media outlets, offices, dry cleaners, gas stations and large retailers. All such entities, regardless of whether employees have tested positive for COVID-19, continue to welcome patrons and provide services.

Yet, notwithstanding Defendants' decision to single out Stampede Meat's facility for closure, the general public continues to roam the aisles of retail establishments with no barriers

between them, so long as they maintain a distance of six feet from one another while they purchase clothing, home improvement supplies and alcohol. Defendants' failure to issue a closure order for those other essential businesses, despite more than four positive COVID-19 tests, highlights the arbitrary nature of their action. Plainly, Defendants are ignoring less restrictive available means to further the state's public health interest.

Stampede Meat does not dispute that Defendants have a governmental interest in providing a response to COVID-19. Defendants closure action, however, undermines the State's interest even as it exceeds its constitutionally permissible powers because of the arbitrary and capricious manner in which the Closure Order has been applied as to the Company.

The October 22, 2020 Order states that a business falling into one of five categories "must close" for a period of two weeks following the occurrence of four positive COVID-19 tests in a fourteen day period: 1) "food and drink establishment[s];" 2) "close-contact business[es],"; 3) "place[s] of lodging,"; 4) "retail space[s];" and 5) "other business[es] that pose a significant public health risk, as determined by the Department of Health." The first four categories are specifically defined types of businesses. The fifth is not.

In addition, the fifth category provides no guidance or standards by which the Department of Health will determine if a business "poses a significant public health risk," nor any way for such a business to challenge such a determination (or even be involved in the determination process). Accordingly, no reasonable person can read the statute and understand whether it would apply to their business, as no standards are laid out. Importantly, as of November 9, 2020, Defendants have only ordered eight businesses including Stampede Meat to cease operations. Yet, as of that same date, more than 120 businesses were included on the Rapid Response COVID-19 Watchlist for having two or more positive COVID-19 tests within the last fourteen days. With only eight

businesses receiving closure orders, it must be the case that the October 22, 2020 Order is being applied arbitrarily.

It is somewhat ironic, in fact, that the very retail and food service facilities that Defendants are allowing to stay open to the public despite more than four positive COVID-19 tests may actually have fewer products to sell to the public if Defendants are allowed to shutter Stampede Meat. Not only is such an application arbitrary and capricious, it is discriminatory. The arbitrary and discriminatory application of the October 22, 2020 Order is further demonstrated on the face of Section 15 of that order, which states that certain "retail spaces" may be allowed to stay open even after four positive tests if it is determined that the "business is a necessary provider of goods and services" within the community. If a determination that a business is a "necessary provider of goods and services" renders the closure order null, then it only stands to reason that a business such as Stampede Meat—designated as Essential in the very same order, already meets the test of a "necessary provider of goods and services" such that the closure mandate does not apply.

The arbitrary and discriminatory manner in which Defendants are enforcing the October 22, 2020 Order, made plain from the both the face of that order as well as its actual application, renders the order unconstitutional and it should be struck down.

5. Stampede Meat Will Suffer Irreparable Injury if Injunctive Relief Is Denied

The 10th Circuit has recognized several factors that may support a finding of irreparable harm, including the "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004). Each element is present here.

Stampede Meat will suffer irreparable harm if a TRO and preliminary injunction is not entered. Irreparable injury is "harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Tribune Pub. Col., LLC v. AT&T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003). The status quo in this matter is Stampede Meat being permitted to safely and appropriately continue to operate its facility, providing critical food supply to this country.

Defendants' action seeks to upend that status quo by shuttering Stampede Meat for (at least) fourteen days, with no guarantee of if or when Stampede Meat will be allowed to re-open. In just that fourteen days, millions of pounds of meat will be lost and rendered useless, not to mention the countless employees who will be without work and numerous downstream consumers and businesses that will suffer. Stampede Meat has no adequate remedy at law because, absent an injunction, the harm will be done and will be incapable of being remedied, even by a monetary recovery against Defendants.

Further, the harm that will come to Stampede Meat (and downstream consumers) far outweighs any harm to Defendants or the public. Indeed, Stampede Meat has repeatedly attempted to work with Defendants to address any concerns they may have and has diligently implemented a safety protocol already approved by Defendants. In issuing the Stampede Closure Order, Defendants could not and would not provide an answer as to why they determined that Stampede Meat's operations posed a "significant public health risk." Plainly, it does not. Defendants will suffer no harm from an injunction, although the public will be harmed if an injunction is not issued, as the national food supply will be immediately impacted, and critical infrastructure—designated as much by both the Federal Government and the State of New Mexico—will be significantly weakened.

6. <u>The Balance of Harms Favors Issuance of Injunctive Relief</u>

Although Stampede Meat establishes both a likelihood of success on the merits as well as a clear irreparable injury, the balance of harms also tips decidedly in favor of Plaintiff. In the Tenth Circuit, the [government's] potential harm must be weighed against [plaintiffs'] actual injury." *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1056 (10th Cir. 2007), *rvs'd other grounds by* 555 U.S. 460 (2009).   This means that where the government's perception of harm is speculative and when the state permits the same speculative harm in other places, as it does here, such speculative harm cannot outweigh an injury to the rights of plaintiffs who have established a substantial likelihood of success on the merits.

Yet, if a TRO and preliminary injunctive relief is not granted, and the Court later finds that the challenged Orders have been impermissibly applied, Stampede Meat will have suffered irreparable harm.   By contrast, if this Court grants preliminary injunctive relief and later finds against the Plaintiff, the Defendants will not have suffered any hardship that the Secretary does not currently countenance in the operation of other essential businesses.

Because the Defendants will not suffer more than speculative harm if an injunction is granted, and the Plaintiff will suffer certain harm in the absence of injunctive relief, the balance of hardships favors Stampede Meat.

7.  <u>A TRO and Preliminary Injunction Is in the Public Interest</u>

Given the above, it is clear that Stampede Meat has established that issuance of a TRO and preliminary injunction is in the public interest.   Stampede Meat has industry-leading safety protocols, and a COVID-19 plan approved by the Department of Health.   There are no studies or other guidance that remotely suggest that the public health is endangered by workers at a facility such as Stampede.   It is, therefore, inconceivable that Stampede Meat poses any more of a "significant public health risk" than, for example, a shopping mall or big-box-store where members

of the public gather in large groups.  To the contrary, Stampede Meat is a private facility, closed to the public, and enforces strict distancing, personal protective equipment, and other measures to maximize safety.  It does all that while also providing essential, critical food supplies to the nation.

### SPECIFICS OF TEMPORARY RESTRAINING ORDER REQUESETD

WHEREAS, having enunciated a legal basis for the relief requested, Stampede Meat requests that this Court grant a Temporary Restraining Order that prohibits Defendants from enforcing the Closure Order issued on November 3, 2020 and from imposing any monetary fines or other punitive measures against Stampede Meat, its owners and employees.  Stampede Meat thus, seeks a temporary restraining order to enjoin and restrain Defendants, and any individuals acting at their direction, on their behalf, or with actual notice of this order, from:

A) enforcing the Public Health Order issued by Defendant Billy J. Jimenez, Acting Secretary of the New Mexico Department of Health, on October 22, 2020 against Stampede Meat (the "October 22, 2020 Order");

B) enforcing the Notice of Immediate Closure Pursuant to Public Health Order issued to Stampede Meat on November 3, 2020 (the "Stampede Closure Order"), thereby allowing Stampede Meat to continue its meat processing operations at its Sunland Park, New Mexico facility, and

C) issuing any civil or criminal fine, penalty or encumbrance upon Stampede Meat arising out of the October 22, 2020 Order or Stampede Closure Order.

Date:   November 9, 2020                    Respectfully submitted,

                                           RAY | PEÑA | McCHRISTIAN, P.C.

                          By:    _/s/ Christopher J. Tebo_____
                                 Christopher J. Tebo
                                 Moses B. Winston
                                 6501 Americas Pkwy NE, Ste. 820
                                 Albuquerque, NM 87110
                                 (505) 855-6000
                                 ctebo@raylaw.com
                                 mwinston@raylaw.com
                                 *Attorneys for Plaintiff Stampede Meat, Inc.*

                                 Michael P. Palmer  (*pro hac* pending)
                                 BARNES & THORNBURG LLP
                                 201 S. Main St., Suite 400
                                 South Bend, IN  46601
                                 Direct: (574) 237-1135
                                 michael.palmer@btlaw.com

                                 Thomas G. Haskins, Jr. (*pro hac* pending)
                                 BARNES & THORNBURG LLP
                                 2121 North Pearl Street, Suite 700
                                 Dallas, TX  75201-2469
                                 Direct: (214) 258-4111
                                 thaskins@btlaw.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

STAMPEDE MEAT, INC.,          )
                                 )
     Plaintiff,            )
                                 )
       v.                )
                                 )
MICHELLE LUJAN GRISHAM, in her official )
capacity as GOVERNOR OF THE STATE OF )
NEW MEXICO, HECTOR BALDERAS, in his )
official capacity as the ATTORNEY GENERAL )
FOR THE STATE OF NEW MEXICO, BILLY )
J. JIMENEZ, in his official capacity as the )   Case No.: _____
ACTING CABINET SECRETARY OF THE )
NEW MEXICO DEPARTMENT OF HEALTH, )
JAMES C. KENNEY, in his official capacity as )
the CABINET SECRETARY OF THE )
NEW MEXICO ENVIRONMENT )
DEPARTMENT, THE NEW MEXICO )
ENVIRONMENT DEPARTMENT and THE )
NEW MEXICO DEPARTMENT OF HEALTH, )
                                 )
     Defendants.         )

## VERIFIED COMPLAINT AND APPLICATION FOR
## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

COMES NOW, Plaintiff, Stampede Meat, Inc., ("Stampede Meat" or the "Company"), and

in conjunction with its Emergency Request for Hearing, files this Verified Complaint against

Defendants Michelle Lujan Grisham, in her official capacity as Governor of the State of New

Mexico, Hector Balderas, in his official capacity as the Attorney General for the State of New

Mexico, Billy J. Jimenez, in his official capacity as Acting Cabinet Secretary of the New Mexico

Department of Health, James C. Kenney, in his official capacity as the Cabinet Secretary of the

New Mexico Environment Department, the New Mexico Environment Department and the New

Mexico Department of Health (collectively, "Defendants"), and states as follows:



EXHIBIT
1-1

## INTRODUCTION

1.      Stampede Meat is one of the United States' largest manufacturer of portion-controlled proteins (including beef, chicken, turkey and pork) and meals (which include vegetables, soups and alternative proteins).  Stampede Meat takes seriously its critical role in helping feed the nation during the coronavirus ("COVID-19") pandemic.  From the outset of the pandemic, however, Stampede Meat has focused not just on providing critical food resources to the nation—it has also prioritized the health and safety of Stampede Meat's significant workforce. Indeed, Stampede Meat developed and implemented a COVID-19 response plan well before any governmental body required it to do so, and Stampede Meat has repeatedly updated its plan to ensure it fully complies with—and in many instances exceeds—all applicable federal, state and local COVID-19 guidelines. In fact, the New Mexico Department of Health, including Defendant Jimenez personally, and the New Mexico Occupational Safety and Health Administration ("New Mexico OSHA") *approved* Stampede Meat's COVID-19 plan in early May 2020.  Throughout the pandemic, Stampede Meat has deftly balanced its role as a vital piece of critical national infrastructure with its commitment to the safety and wellbeing of its employees and local community.

2.      The State of New Mexico has consistently shared the view of the Federal Government that Stampede Meat is critical to the Nation's response to this pandemic, repeatedly designating Stampede Meat an "Essential Business." Yet three days ago, the Defendants sought to immediately close Stampede Meat for fourteen days pursuant to a recently issued public health order purportedly requiring closure of certain businesses experiencing four or more positive COVID-19 tests in a fourteen day period—which for Stampede Meat represents less than 1% of its Sunland Park workforce.  The Defendants seem to have based this determination on an unsupported (and unstated) assertion that Stampede Meat is a "business that poses a significant

2

health risk, as determined by the Department of Health." Despite repeated inquiries, Defendants have failed to provide the basis of that determination. Additionally, even when the United States Department of Agriculture ("USDA") offered to speak with the Department of Health about lending testing resources to Stampede Meat to enable it to more efficiently and effectively identify potentially infected employees, while still remaining operational to address the nation's food supply, the Department of Health, through Defendant Jimenez, declined.

3. Defendants' action is preempted by an Executive Order signed by the President on April 28, 2020, prohibiting state authorities from directing meat and poultry processing facilities—like Stampede Meat—to close when that facility is in compliance with applicable federal guidelines, as is Stampede Meat. The Stampede Meat Closure Order also violates the U.S. Constitution and New Mexico Constitution because it has been issued in an arbitrary and capricious manner, absent due process.

4. Stampede Meat, its workforce, and the nation will suffer irreparable harm absent an order freezing the *status quo ante*. Further, Stampede Meat is likely to succeed on the merits of its claim for a declaratory judgment and the balance of the equities favors a restraining order in this case; one preventing Defendants from closing Stampede Meat's operations, even as it will allow time for Stampede Meat to address any concerns Defendants may have regarding the safety of its operations and compliance with applicable COVID-19 guidance. Stampede Meat has already attempted—repeatedly—to work with the Defendants to address any legitimate concerns. It has been met with silence aside from this most recent direction to fully shut down operations—direction that ignores the express orders of the President of the United States and the Secretary of Agriculture—or risk civil and criminal penalties.

3

## PARTIES

5.     Plaintiff Stampede Meat, Inc., a Delaware corporation with its principal place of business in Bridgeview, Illinois, is one of the United States' largest manufacturer of portion-controlled proteins (including beef, chicken, turkey and pork) and meals (which include vegetables, soups and alternative proteins).   Stampede Meat specializes in custom-made, center-of-the-plate beef, pork and chicken products for the needs of restaurants, hospitality, retail, supermarket, casino, home delivery, and other industries.  Its customers include Costco, Wal-Mart, Firehouse Subs, Applebee's, Panda Express, International House of Pancakes, Denny's, Schwan's Foods and other major restaurants and food retailers throughout New Mexico and the country.  In many instances Stampede is the exclusive supplier of these products, leaving the aforementioned customers without a supply source in the event of a shut down.   Stampede Meat serves its customers through four production facilities, including one in Sunland Park, New Mexico – which Stampede Meat opened in December 2018.  That facility has an annual capacity of **100 million pounds of meat**.  Nationwide, Stampede Meat's team consists of approximately 1600 employees and temporary workers.   Stampede Meat's Sunland Park workforce varies depending on production needs.   During the past two weeks, between 550-575 team members worked at Stampede Meat's Sunland Park facility.

6.     Defendant Michelle Lujan Grisham is the Governor of the State of New Mexico and is named in her official capacity. Defendant Lujan Grisham may be served at the New Mexico State Capital, 490 Old Santa Fe Trail, Room 400, Santa Fe, New Mexico 87501.

7.     Defendant Hector Balderas is the Attorney General for the State of New Mexico and is named in his official capacity. Defendant Balderas may be served at 408 Galisteo Street, Santa Fe, New Mexico 87501.

4

8.     Defendant Billy J. Jimenez is the Acting Cabinet Secretary of the New Mexico Department of Health and is named in his official capacity.  He may be served at 1190 S. St. Francis Drive, Santa Fe, New Mexico 87505.

9.     Defendant James C. Kenney is the Cabinet Secretary of the New Mexico Environment Department and is named in his official capacity. He may be served at 1190 St. Francis Drive, Santa Fe, New Mexico 87505.

10.    Defendant New Mexico Environment Department may be served at 1190 S. St. Francis Drive, Santa Fe, New Mexico 87505

11.    Defendant New Mexico Department of Health may be served at 1190 S. St. Francis Drive, Santa Fe, New Mexico 87505.

**JURISDICTION AND VENUE**

12.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Stampede Meat's claims arise under the Constitution and laws of the United States of America.

13.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because all defendants are residents of the State of New Mexico and a substantial part of the events or omissions giving rise to the claims occurred in the District of New Mexico.

**FACTUAL BACKGROUND**

A. **Stampede Meat is an Essential Business Providing Food Supplies to the Nation**

14.    Stampede Meat is part of the nation's critical food supply chain and has a responsibility during the ongoing pandemic to continue providing meat, poultry, turkey, pork, alternative proteins and other food to Americans in New Mexico and throughout the country. Pursuant to the U.S. Cybersecurity & Infrastructure Security Agency ("CISA") guidance, Stampede Meat is an essential business, and its workforce is part of the "Critical Infrastructure

5

Workforce," meaning that Stampede Meat must remain open and continue in-person work during this COVID-19 pandemic. *See,* Advisory Memorandum from Christopher C. Krebs, Director of Cybersecurity and Infrastructure Security Agency on Guidance on Essential Critical Infrastructure Workers, *herein attached as Exhibit 1.*

15.    In response to the closure of meat and poultry processing plants throughout the country, President Trump invoked the Defense Production Act ("DPA") and issued an Executive Order on April 28, 2020 requiring meat and poultry plants, like Stampede Meat, to remain open to prevent food shortages during the pandemic. *See*, Exec. Order No. 13,917, 85 C.F.R. 26313 (2020), *herein attached as Exhibit 2.* Additionally, New Mexico deemed Stampede an "essential business" under its COVID-19 public health orders, including the Department of Health's October 22 Order ( the "October 22, 2020 Order"). See, New Mexico Department of Health, Public Health Order (Oct. 22, 2020), *herein attached as Exhibit 3.*

16.    In issuing the April 28 Executive Order, the President emphasized that "[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans." *Ex. 2.* Importantly, the President wrote:

> Such closures [of beef, pork, and poultry processors] threaten the continued functioning of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency. Given the high volume of meat and poultry processed by many facilities, any unnecessary closures can quickly have a large effect on the food supply chain. For example, closure of a single large beef processing facility can result in the loss of over 10 million individual servings of beef in a single day. Similarly, under established supply chains, closure of a single meat or poultry processing facility can severely disrupt the supply of protein to an entire grocery store chain.

*Id.*

17.    On April 28, 2020, the Secretary of Agriculture issued a statement regarding the President's April 28 Executive Order, affirming that the Department of Agriculture would operate

in accordance with Centers for Disease and Prevention Control ("CDC") and U.S. Occupational

Safety and Health Administration ("federal OSHA") guidance:

> The Centers for Disease Control and Prevention (CDC) of the Department of Health and Human Services and the Occupational Safety and Health Administration (OSHA) of the Department of Labor have put out guidance for plants to implement to help ensure employee safety to reopen plants or to continue to operate those still open. Under the Executive Order and the authority of the Defense Production Act, *USDA will work with meat processing to affirm they will operate in accordance with the CDC and OSHA guidance,* and then work with state and local officials to ensure that these plants are allowed to operate to produce the meat protein that Americans need. USDA will continue to work with the CDC, OSHA, FDA, and state and local officials to ensure that facilities implementing this guidance to keep employees safe can continue operating.

*See*, Statement from Sonny Perdue, U.S. Secretary of Agriculture, USDA to Implement President

Trump's Executive Order on Meat and Poultry Processors (Apr. 28, 2020), *emphasis added*, *herein*

*attached as Exhibit 4.*

### B. <u>Stampede Meat Has Remained A Leader in Responding to the COVID-19 Pandemic</u>

18.     Stampede Meat recognizes its responsibility to help feed the public and takes great

pride in being able to serve the country during its time of need. Stampede Meat is also firmly

committed to providing a safe work environment for its team members, who are heroes on the

front line of sustaining operations during a worldwide pandemic.

19.     Accordingly, Stampede Meat has been at the forefront of the COVID-19 response.

In early March 2020, before New Mexico, Illinois or even the federal government issued any

significant directives regarding operations during the pandemic, Stampede Meat formed a COVID-

19 response team—consisting of, among others, its human resources, safety, supply chain and

operations departments—and released its first COVID-19 response plan.

20.     Stampede Meat's COVID-19 response team meets each week, and regularly

consults with outside advisors to monitor evolving CDC, federal OSHA, United States Department

of Agriculture ("USDA"), as well as guidelines issued by New Mexico, Illinois, and applicable

7

local entities. As a result, Stampede Meat has revised its response plan numerous times to ensure it complies with applicable guidelines and to protect the Stampede Meat family and anyone who enters its facilities. *See*, Stampede Meat's Current COVID-19 Response Plan, revised October 30, 2020, *herein attached as Exhibit 5*. This response plan includes more than 80 safety measures, including, for example:

- conducting daily screening and temperature checks;

- requiring employees to wear three-tiered facial protection (including face masks, neck warmers pulled over their nose and mouth, *and* plexiglass face shields);

- sanitizing high touch-point areas every 30 minutes;

- modifying procedures to increase social distancing throughout its facilities;

- providing plastic dividers in cafeteria area;

- implementing aggressive contact tracing (including through the use of video to trace interactions) and quarantining protocols;

- nightly CDC-compliant sanitizing of the entire facility; and

- taking various steps to maximize social distancing, including reconfiguring some areas of production.

*Id*.

## C. Stampede Meat Complies With—and Often Exceeds—All Applicable COVID-19 Health and Safety Protocols

21. The CDC and federal OSHA have issued joint guidance outlining the protocols meat and poultry processors should follow to protect their workforces from COVID-19. See, Center for Disease Control & Occupational Safety and Health Administration, Joint Meat Processing Guidance, herein attached as Exhibit 6. Stampede Meat's COVID-19 response plan meets and, in many areas, goes beyond this joint guidance. For example, Stampede Meat's production employees wear three-tiered facial protection. Moreover, Stampede Meat's Sunland

Park facility is not a cramped, close-quartered operation, as is the case with many other meat processing facilities. On the contrary, photos taken during operations on November 4 show the Sunland Park facility and operations are configured to allow for employees to socially distance the majority of the time. *See*, Stampede Meat Facility Photograph Depictions, *herein attached as Exhibit 7*.

22.    In early May 2020, the Department of Health *and* New Mexico OSHA reviewed Stampede Meat's COVID-19 response plan. Stampede Meat provided both agencies with the CDC and federal OSHA's Joint Meat Processing Guidance and encouraged them to compare Stampede Meat's response plan to these federal requirements in addition to analyzing the plan in the context of New Mexico's guidelines. *See,* Email between Michael Palmer, Stampede Meat's Attorney, Andrew P. Knight, Assistant General Counsel for the New Mexico Environment Department, and Billy Jimenez, former Department of Health General Counsel and current Acting Secretary, May 5, 2020, *herein attached as Exhibit 8*.

23.    New Mexico OSHA and the Department of Health *approved* Stampede Meat's response plan in early May 2020 and has never revoked that approval or raised any concerns with Stampede Meat or its counsel about the Company's COVID-19 response plan. To the contrary, even after that approval was received, Stampede Meat continued to add more safety protocols above and beyond those required.

24.    In addition, Stampede Meat partnered with the Department of Health to conduct diagnostic COVID-19 testing of its entire workforce three times in May 2020 to identify infected, asymptomatic team members and further reduce potential exposure in the workplace. During the first round of testing, 7.5% of employees tested positive, of which 93% were asymptomatic. During the second round of testing, 4.7% of employees tested positive; all were asymptomatic.

The final test resulted in only one new positive case. The Department of Health effectively ended its testing protocol with Stampede Meat. In doing so, Aja Sanzone, MD, Infectious Disease Bureau Medical Director, praised Stampede Meat's collaboration with the Department of Health and its testing protocol, writing that it "was instrumental in the prevention of further spread within the facility and the community and I believe your success will serve as a model to other businesses not only locally but even nationally." *See*, Email from Aja Sanzone, Infectious Disease Bureau Medical Director, to Michael Palmer, Stampede's Attorney, *herein attached as Exhibit 9*.

**D. The Department of Health's October 22, 2020 Public Health Order**

25. On October 22, 2020 the Department of Health, through Defendant Jimenez and under authority provided by Defendant Grisham, issued a revised Public Health Order (the "October 22, 2020 Order", Ex. 3). In it, Defendants reiterated the designation of "Essential businesses" to include "food cultivation, processing, or packaging operations," such as Stampede Meat. The October 22 Order also defines a host of other categories of business, including "food and drink establishments," "close-contact businesses," "places of lodging" and "retail spaces." None of those categories include Stampede Meat.

26. The October 22, 2020 Order also states that any "food and drink establishment," "close-contact business," "place of lodging," "retail space" or "other business that poses a significant public health risk, as determined by the Department of Health" must close when four employees receive positive rapid response COVID-19 tests within a rolling 14-day period. (Ex. 3, ¶ 15.). The October 22, 2020 Order does not provide that such a 14-day closure mandate is applicable to "Essential businesses." It further does not define how the Department of Health and Defendant Jimenez will determine if a business "poses a significant public health risk," or how such a determination can be challenged. The October 22, 2020 Order does, however, state that

10

certain "retail spaces" may be allowed to stay open even after four positive tests if it is determined that the "business is a necessary provider of goods and services" within the community.

### E.   The Department of Health Sends a Closure Order to Stampede Meat

27.     Despite (1) Stampede Meat's continued efforts to be a leader in the response to the COVID-19 pandemic; (2) the State of New Mexico's designation of Stampede Meat as an essential business; (3) the President of the United States' designation of Stampede Meat as an essential business; (4) the Department of Health's explicit praise of Stampede Meat's health and safety protocols; and (5) the exclusion of "Essential businesses" from the October 22, 2020 Order's mandate of closures after certain positive tests, on November 3, 2020, Defendants served Stampede Meat with a "Notice of Immediate Closure Pursuant to Public Health Order" ("Stampede Closure Order").  *See*, Letter from Billy Jimenez, Acting Cabinet Secretary of the New Mexico Department of Health, to Stampede Met, Inc. regarding closure notice, *herein attached as Exhibit 10*.

28.     In the Stampede Closure Order, the Department of Health does not state that Stampede Meat poses a "significant public health risk," or that it fits into any of the other defined businesses to which the closure directive applies.  At this writing Defendants have, at no point, notified Stampede Meat of any basis to change its prior departmental determination that Stampede Meat's response to COVID-19 was not only approved, but worthy of praise.

29.     And while it is true that during the 14 days prior to November 4, more than four Stampede Meat team members tested positive for COVID-19, each of those individuals are currently quarantining and not present in Stampede Meat's workplace.  Moreover, Stampede Meat has conducted contact tracing and required all of those who came in exposed close contact with the infected individuals to also quarantine.   To Stampede Meat's knowledge, none of its current, active workforce has been infected with COVID-19.

11

30. Moreover, there is no indication that the Stampede Meat facility is either a source of COVID-19 spread, nor a significant public health risk. To the contrary, given the significant safety protocols, the Stampede Meat facility is likely a *safer* location than outside of the facility. Inside the facility, three layers of Personal Protective Equipment are required, plastic dividers are utilized and significant cleaning and sanitizing is undertaken.

**F. The Department of Health Refuses to Engage with Stampede Meat Regarding the Stampede Closure Order**

31. The Stampede Closure Order conflicts with, and is therefore preempted by, President Trump's invocation of the DPA and his April 28, 2020 Executive Order requiring the Secretary of Agriculture to take all appropriate measures to ensure that meat and poultry processors continue operations consistent with CDC and federal OSHA's Joint Meat Processing Guidance.

32. Indeed, The Solicitor of Labor at the U.S. Department of Labor and the Principal Deputy Assistant Secretary for OSHA made a joint statement explaining that "because of the President's invocation of the DPA, no part of the Joint Meat Processing Guidance should be construed to indicate that state and local authorities may direct a meat and poultry processing facility to close, to remain closed, or to operate in accordance with procedures other than those provided for in this Guidance." *See*, Press Release, U.S. Department of Labor, Statement of Enforcement Policy by Solicitor of Labor Kate O'Scannlain and Principle Deputy Assistant Secretary for OSHA Loren Sweatt Regarding Meat and Poultry Processing Facilities (April 28, 2020), herein attached as Exhibit 11.

33. Yet the new Stampede Closure Order puts Stampede Meat in the potential dilemma of having to determine whether it will comply with Defendants' state-issued directive, or whether it should comply with the plain meaning (and superior) order from the President of the United

States to comply with federal regulations and **stay open**, providing critical resources for the nation's food supply.

34.     On November 4, Stampede Meat reminded the Department of Health of the above context, including the Department of Health's and New Mexico OSHA's approval of its COVID-19 response plan, the Company's compliance with CDC and federal OSHA's Joint Meat Processing Guidance, and the fact that the relevant infected employees appear to have contracted the virus outside of work. Stampede Meat also invited the Department of Health to review its response plan and come to its Sunland Park facility to analyze in person all of the Company's safety protocols. Stampede Meat offered to again partner with the Department of Health to test its entire Sunland Park workforce every two weeks to identify any asymptomatic, but infected team members, so they, too, could be quarantined. Finally, Stampede Meat offered to reduce its operations by 30% to allow for increased social distancing at work, while minimizing any negative impact to the food supply that Stampede Meat provides as an essential business. *See,* Email between Michael Palmer, Attorney for Stampede Meat, and Christopher Woodward, Acting General Counsel for New Mexico Department of Health (Nov. 5, 2020), *herein attached as Exhibit 12*.

35.     Proactively, on November 5, Stampede Meat operated with a 30% reduction in its workforce, seeking to assuage any concerns that Defendants may have, but also seeking to avoid catastrophic losses to the Company, its customers, consumers, and the community—not to mention the significant negative impact on the nation's food supply. However, after Stampede Meat's operations began on November 5, the Department of Health and Defendant Jimenez rejected the Company's proposal for continuing reduced operations, testing, and additional oversight as a

13

method for resolving any of Defendants' concerns about the health risks posed by Stampede Meat continuing to operate.  (Ex. 12.).

36.     During discussions with the Defendants about implementing an aggressive testing protocol as a possible solution here, the Department of Health indicated that it did not have sufficient resources to conduct testing at Stampede Meat.  In response, Stampede Meat, through counsel, contacted Shawna Newsome, Chief of Staff, Office of Food Safety at USDA.  Ms. Newsome said the federal government may be able to assist with testing resources, which would allow Stampede Meat to test its entire workforce, identifying any asymptomatic, but infected workers, so they can quarantine, and continue operating.  Stampede Meat's counsel communicated this suggestion to the Department of Health during the afternoon of November 5 and offered to arrange a call between the Department of Health, Ms. Newsome and Stampede Meat's counsel to explore this option.  The Department of Health and Defendant Jimenez did not participate (though other Defendants did).  (Ex. 12.)

**G.  Defendants are Issuing Closure Orders in an Arbitrary and Capricious Manner**

37.     Defendants have taken an *ad hoc*, arbitrary approach to its closure notices.  Indeed, its Rapid Response Watch List, which details businesses and the number of positive COVID-19 tests at each, contains a host of other businesses with more than 4 positive tests, yet only three—including Stampede Meat—have been ordered to close.  Other businesses which handle food have been allowed to stay open despite such positive tests—yet Defendants proceeded to shut down a critical element of the local, regional and national food supply chain.  Moreover, because the October 22, 2020 Order places the same positive test threshold (four) on businesses regardless of size, nature or without consideration of their efforts to meet applicable federal and state guidelines, Defendants' closure action necessarily causes a disparate impact to one entity.  Indeed, for a

company like Stampede Meat, it could be well below the State's COVID-19 infection rate and yet *still* exceed the four-test threshold just because it employs more than 500 people.

## H. **Stampede Meat—and Many Others—Will Suffer Irreparable Harm If Forced to Close**

38.     Closing Stampede Meat's operations until November 17 will undoubtedly cause irreparable harm.  Millions of pounds of meat will need to be destroyed if Stampede Meat is forced to close.  Stampede Meat manufactures a million pounds of meat and poultry each week in its Sunland Park facility for major restaurants, grocery stores, and other food distributors in New Mexico and throughout the country.  Closing Stampede Meat's plant will leave orders unfilled or shorted.  Given that many of these products are exclusively produced by Stampede, this will lead to Stampede losing customers, as it has in the past.  For example, Stampede Meat complied with the Department of Health's demands that it significantly reduce its operations prior to the first round of COVID-19 testing in May 2020.  That reduction forced Stampede Meat to short orders, which led to Sam's Club pulling its business from the Company.  New Mexico has resisted efforts to reimburse companies for losses resulting from COVID-19 shutdowns.  Similarly, Stampede Meat's insurance has rejected business interruption claims.  Accordingly, Stampede Meat would have no reasonable ability to recoup its losses and, therefore, no adequate remedy at law.

39.     Closing Stampede Meat will also have detrimental impacts on the food supply available in New Mexico and throughout the country.  As the country has already experienced, shuttering food processing plants leads to food shortages.  Indeed, that is precisely why the President issued the April 28 Executive Order and invoked the DPA—to prevent a scenario in which citizens in this country have to fight both a pandemic *and* a shortage of critical food supplies.  The Department of Health is attempting to countermand that federal order, in the process causing unnecessary and unwarranted damage.

40.     Closing Stampede Meat will also negatively impact consumers, Stampede Meat's workforce and their families, the Sunland Park community, New Mexico and the nation.  It is well-documented that in May 2020, Costco and Wal-Mart—both Stampede Meat customers—and many other supermarkets rationed meat and poultry as a result of supplier shutdowns.     Allowing the Department of Health to ignore the President's Executive Order and close Stampede Meat and other meat and poultry processing companies will lead to similar food shortages and rationing.  Moreover, Stampede Meat's loss of business will force it to reduce its workforce and reduce employment opportunities for the surrounding community.

## COUNT I
## VIOLATION OF THE UNITED STATES CONSTITUTION

### A.  The April 28, 2020 Executive Order Preempts the October 22, 2020 Order and the Stampede Closure Order

41.     Stampede Meat incorporates by reference and re-alleges the allegations contained in Paragraphs 1 through 38 as if fully stated herein.

42.     The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2.  State laws that conflict with federal laws are necessarily preempted. *Arizona v. United States,* 567 U.S. 387, 399 (2012).  Federal laws with preemptive force are not limited to statutes and include executive orders.  *See, e.g., Old Dominion Branch No. 496, Nat. Ass'n of Letter Carriers, AFL-CIO v. Austin,* 418 U.S. 264, 273, n.5 (1974) (valid executive orders may preempt state law through the Supremacy Clause); *United States v. Am. Tel. & Tel. Co.,* 552 F.Supp. 131, 154-55 (D.D.C. 1982) (state law preempted by federal court decree).

43.     Significantly, preemption applies even where federal and state laws "share the same goals." *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 379 (2000).  For, "[t]he fact of

a common end hardly neutralizes conflicting means," *id.,* and, in fact, "'conflict is imminent' whenever 'two separate remedies are brought to bear on the same activity.'" *Wisconsin Dept. of Industry v. Gould Inc.,* 475 U.S. 282, 286 (1986) (citations omitted). This is especially so where the state law threatens to undermine the federal government's flexibility and discretion to address a particular subject matter. *Crosby* illustrates that point. There, the Supreme Court concluded that a Massachusetts law prohibiting state agencies from purchasing goods or services from companies doing business with Burma was preempted by a federal law imposing sanctions on that country. *Crosby,* 530 U.S. at 388. In doing so, the Court recognized that "[b]ecause the state Act's provisions conflict with Congress's specific delegation to the President of flexible discretion, with limitation of sanctions to a limited scope of actions and actors, and with direction to develop a comprehensive, multilateral strategy under the federal Act, it is preempted, and its application is unconstitutional, under the Supremacy Clause."

44. Through the DPA, Congress gave the President discretion to determine the "manner," "conditions," and "extent" of the operations of critical infrastructure industries (including meat processors like Stampede Meat) during a national emergency. 50 U.S.C. § 4511. The DPA grants the President "great flexibility" in doing so, including "informal means of persuasion" or more "formal and technical acts." *E. Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 993-94 (5th Cir. 1976). Any state law that is in conflict with the President's determinations as to the manner, conditions and extent of operations is "naturally" preempted. *Crosby,* 530 U.S. 363, 372 (2000).

45. Here, the President's April 28 Executive Order directed the Secretary of Agriculture "to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." Executive Order No. 13,917,

85 Fed. Reg. 26,313 (April 28, 2020).  In doing so, the President emphasized that "[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans."  *Id*.  Importantly, the President wrote:

> Such closures [of beef, pork, and poultry processors] threaten the continued functioning of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency. Given the high volume of meat and poultry processed by many facilities, any unnecessary closures can quickly have a large effect on the food supply chain. For example, closure of a single large beef processing facility can result in the loss of over 10 million individual servings of beef in a single day. Similarly, under established supply chains, closure of a single meat or poultry processing facility can severely disrupt the supply of protein to an entire grocery store chain.

*Id*.

46.     On April 28, 2020, the Secretary of Agriculture issued a statement regarding the President's April 28 Executive Order, affirming that the Department of Agriculture would operate in accordance with CDC and federal OSHA guidance:

> The Centers for Disease Control and Prevention (CDC) of the Department of Health and Human Services and the Occupational Safety and Health Administration (OSHA) of the Department of Labor have put out guidance for plants to implement to help ensure employee safety to reopen plants or to continue to operate those still open. Under the Executive Order and the authority of the Defense Production Act, ***USDA will work with meat processing to affirm they will operate in accordance with the CDC and OSHA guidance,*** and then work with state and local officials to ensure that these plants are allowed to operate to produce the meat protein that Americans need. USDA will continue to work with the CDC, OSHA, FDA, and state and local officials to ensure that facilities implementing this guidance to keep employees safe can continue operating.

(Ex. 4, emphasis added).

47.     The Department of Health's October 22, 2020 Order, purportedly authorizing it to shut down meat processors—and, of course, the Stampede Closure Order—fly directly in the face of the President's April 28 Executive Order, and accordingly is unconstitutional.  And while the Department and the President share the same goals of curbing the spread of COVID-19, the public

18

health order interferes with and frustrates the President's priority that meat processors continue to operate.  As such, the Department of Health's October 22, 2020 Order and the Stampede Closure Order are preempted by the President's April 28 Executive Order and must be struck down.

**B. The Federal Meat Inspection Act Preempts the October 22, 2020 Order and the Stampede Closure Order**

48.    Like the President's April 28 Executive Order, and per the requirements of the Supremacy Clause, the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601, *et seq.*, also preempts the Department of Health's mandate that Stampede Meat cease operations.

49.    Stampede Meat's New Mexico facility is subject to regulation under FMIA.  *See* FSIS Meat, Poultry and Egg Product Inspection Director at 494 (Oct. 13, 2020) (identifying Stampede Meat's Sunland Park facility as establishment number M19113N, P19113N).[1]  The FMIA requires that all meat processing facilities, including Stampede Meat, satisfy "rules and regulations of sanitation" that are "prescribe[d]" by the U.S. Secretary of Agriculture.  21 U.S.C. § 608.  FMIA's Food Safety and Inspection Service ("FSIS") is responsible for promulgating regulations implementing the FMIA.  *See* 9 C.F.R. §§300.2(a), (b)(1).  The FMIA expressly prohibits any state from imposing regulations that are "in addition to, or different than" those promulgated by the FSIS.  21 U.S.C. §678.  As recognized by the Supreme Court in *Nat'l Meat Ass'n v. Harris,* 565 U.S. 452, 459-60 (2012), the FMIA "sweeps widely" and "prevents a State from imposing any additional or different" requirements.

50.    FSIS issued regulations regarding the prevention of infectious diseases within meat processing facilities in 9 C.F.R. § 416.5(c), which provides that "[a]ny person who has or appears

---

[1]    https://www.fsis.usda.gov/wps/wcm/connect/bf8d9766-9767-4eOc-a9f1-efeaOb2a42bc/MPI_Directory-by_Establishment_Name.pdf?MOD=AJPERES.

to have an infectious disease . . . must be excluded from any operations which could result in product adulteration and the creation of insanitary conditions. . . ." By its October 22, 2020 Order, the Defendants likewise attempt to prevent the spread of infectious disease in meat processing facilities. However, because Defendants' October 22, 2020 Order imposes requirements different from and in addition to those imposed by the FSIS (*i.e.,* closure of meat processing plants where a certain threshold of employees test positive for COVID-19), it is preempted by the express terms of the FMIA and cannot stand. *See, e.g., National Meat Ass'n,* 565 U.S. 452, 467-68, n. 10 (2012) (holding that California penal code regarding the treatment of non-ambulatory pigs in a slaughterhouse was preempted by the FMIA as being "in addition to, or different than" regulations governing non-ambulatory animals issued under the FMIA); *American Meat Institute v. Leeman,* 180 Cal. App. 4th 728, 762 (Cal. Ct. App. 2009) (California Proposition 65's requirement that meat products include point of sale warning labels was preempted by the FMIA where point of sale warnings were within its purview; the Proposition 65 point of sale warnings were "in addition to, or different than" the labels required by the FMIA).

51.     Accordingly, the October 22, 2020 Order and the Stampede Closure Order must be struck down as preempted by the FMIA.

**C.  The October 22, 2020 Order is an Unconstitutional Due Process Violation**

52.     "A statute will be held unconstitutional in violation of due process of law, if the statute either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess at its meaning and differ as to its application." *Bokum Res. Corp. v. New Mexico Water Quality Control Comm'n*, 93 N.M. 546, 549, 603 P.2d 285, 288 (1979).  New Mexico courts apply the vagueness doctrine as it applies to statutes to regulations as well. *See id.*

53.     The United States Supreme Court has identified two main concerns with vague laws: (1) putting individuals on notice as to what is prohibited and (2) eliminating arbitrary and

20

discriminatory enforcement of laws by providing explicit standards for those who apply them. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). A party can show that a regulation, such as the one at issue here, is an unconstitutional violation of due process by demonstrating that it "permits police officers, prosecutors, judges, or juries to engage in arbitrary and discriminatory enforcement of the statute, which occurs because the state has no standards or guidelines and therefore allows, if not encourages, subjective and ad hoc application." *State v. Laguna*, 128 N.M. 345, 350, 992 P.2d 896, 901 (1999) (citing *City of Chicago v. Morales*, 527 U.S. 41, 63 (holding ordinance unconstitutionally vague because it afforded too much discretion to authorities and too little notice to citizens). Moreover, a ruling by an administrative agency is deemed arbitrary and capricious if it "provides no rational connection between the facts found and the choices made, or if it entirely omits consideration of relevant factors or important aspects of the problem at hand." *Atlixco Coal. v. Maggiore*, 125 N.M. 786, 793, 965 P.2d 370, 377 (Ct. App. 1998) (citing *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. 29, 43 (1983)).

54.     The October 22, 2020 Order states that a business falling into one of five categories "must close" for a period of two weeks following the occurrence of four positive COVID-19 tests in a fourteen day period: 1) "food and drink establishment[s];" 2) "close-contact business[es],"; 3) "place[s] of lodging,"; 4) "retail space[s];" and 5) "other business[es] that pose a significant public health risk, as determined by the Department of Health." The first four categories are specifically defined types of businesses. The fifth is not. In addition, the fifth category provides no guidance or standards by which the Department of Health will determine if a business "poses a significant public health risk," nor any way for such a business to challenge such a determination (or even be involved in the determination process). Accordingly, no reasonable person can read the statute and understand whether it would apply to their business, as no standards are laid out.

55.     Moreover, Defendants' application of the October 22, 2020 Order demonstrates that it *is* being applied on a "subjective and ad hoc" basis, in violation of the Constitution. Stampede Meat is a business that is plainly within the category of "Essential Businesses," as defined in the October 22, 2020 Order.  "Essential Businesses" are plainly *excluded* as an enumerated category of businesses to which the mandatory closure provision applies and, therefore, a reasonable person would naturally read the October 22, 2020 Order as allowing Essential Businesses to remain open, even with four positive COVID-19 tests in a fourteen day period.  Yet, based upon exactly zero enumerated standards or guidelines, Defendants ordered Stampede Meat—an Essential Business—to shutter.

56.     Importantly, as of November 5, 2020, Defendants have only ordered three businesses to cease operations:  1) Stampede Meat; 2) Deming Manufactured Homes, LLC; and 3) Chaparral Materials, Inc.  Yet, as of that same date, *nineteen* businesses were included on the Rapid Response COVID-19 Watchlist for having four or more positive COVID-19 tests within the last fourteen days.  With only *three* of those businesses receiving closure orders, it must be the case that the October 22, 2020 Order is being applied arbitrarily.

57.     Included in that nineteen businesses are other food suppliers, big-box retail stores and distribution centers, restaurants and government agencies.  Given that Stampede Meat has industry-leading safety protocols, and a COVID-19 plan approved by Defendant Jimenez and the Department of Health, it is inconceivable that Stampede Meat poses any more of a "significant public health risk" than, for example, a retail operations where members of the public gather in large groups.  To the contrary, Stampede Meat is a private facility, closed to the public, and enforces strict distancing, personal protective equipment, and other measures to maximize safety. And it does so while providing essential, critical food supplies to the country.  It is somewhat

ironic, in fact, that the very retail and food service facilities that Defendants are allowing to stay open to the public despite more than four positive COVID-19 tests may actually have fewer products to sell to the public if Defendants are allowed to shutter Stampede Meat. Not only is such an application arbitrary and capricious, it is discriminatory.

58.     The arbitrary and discriminatory application of the October 22, 2020 Order is further demonstrated on the face of Section 15 of that order, which states that certain "retail spaces" may be allowed to stay open even after four positive tests if it is determined that the "business is a necessary provider of goods and services" within the community. If a determination that a business is a "necessary provider of goods and services" renders the closure order null, then it only stands to reason that a business such as Stampede Meat—designated as Essential in the very same order—would already meet the test of a "necessary provider of goods and services" such that the closure mandate does not apply. Otherwise, the October 22, 2020 Order is internally contradictory and not susceptible to interpretation by a person of common intelligence—in other words, unconstitutional.

59.     The arbitrary and discriminatory manner in which Defendants are enforcing the October 22, 2020 Order, made plain from the both the face of that order as well as its actual application, renders the order unconstitutional and it should be struck down.

## COUNT II
## DECLARATORY JUDGMENT
### 22 U.S.C. § 2201  and NM Stat § 44-6-12

60.     Stampede Meat incorporates by reference and re-alleges the allegations contained in Paragraphs 1 through 57 as if fully stated herein.

61.     The October 22, 2020 Order and the Stampede Closure Order are unconstitutional and should be invalidated. Accordingly, Stampede Meat is entitled to an order declaring both orders null and void as to Stampede Meat.

62.     Stampede Meat is further entitled to a declaration that Defendants do not have the power or authority to order the closure of Stampede Meat, to impose any restrictions or limitations on Stampede Meat's operations in excess of those contained in the FMIA or as directed by the President of the United States or the Secretary of Agriculture, or to impose any civil or criminal fine, penalty or encumbrance upon Stampede Meat arising out of the October 22, 2020 Order or the Stampede Closure Order.

**COUNT III**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

63.     Stampede Meat incorporates by reference and re-allege the allegations contained in Paragraphs 1 through 59 as if fully stated here.

64.     The United States Supreme Court has stated that the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986) ("In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits."). Although injunction is a substantial remedy, it should be granted "where the necessity for it is clearly established." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009 (internal citation omitted).

65.     The 10th Circuit identifies four elements that a plaintiff must establish to demonstrate it is entitled to a temporary restraining order: (1) there is a substantial likelihood the movant ultimately will prevail on the merits; (2) the movant will suffer irreparable harm unless the injunction issues; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest. *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1254-55 (10th Cir. 2006); *People's Tr.*

*Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1139 (D.N.M. 2018). If a moving party can establish the first, third and fourth elements for a TRO, the party "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Oklahoma, ex rel., OK Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006).

66.     Stampede Meat has pleaded a sufficient factual basis for a temporary restraining order, for the purpose of maintaining the *status quo ante*, until such time as the Court can rule on Stampede Meat's claim for declaratory judgment.

67.     First, Stampede Meat has shown a likelihood of success on the merits, as the October 22, 2020 Order is preempted by both the April 28 Executive Order, as well as the FMIA. It is the Federal Government that has exclusive authority to regulate the safety protocols at a meat processing facility such as Stampede Meat, and Defendants are not authorized to impose restrictions upon Stampede Meat greater than those imposed by the Federal Government. With the October 22, 2020 Order and the Stampede Closure Order, Defendants are attempting to do just that. Moreover, the October 22, 2020 Order is vague on its face, and being applied in an unconstitutionally arbitrary and capricious manner, as demonstrated by the disparate treatment of those entities on the Rapid Response COVID-19 Watchlist.

68.     Second, Stampede Meat has demonstrated that it will suffer irreparable harm if an injunction is not entered. Irreparable injury is "harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Tribune Pub. Col., LLC v. AT&T Corp*, 320 F.3d 1081, 1105 (10th Cir. 2003) (internal citation omitted). The status quo in this matter is Stampede Meat safely and appropriately operating its facility, providing critical food supply to

this country. Defendants are seeking to upend that status quo by shuttering Stampede Meat for (at least) fourteen days, with no guarantee of if or when Stampede Meat will be allowed to re-open. In just that fourteen days, **millions of pounds** of meat will be lost and rendered useless, not to mention the countless employees who will be without work and the countless downstream consumers and businesses that will suffer. Stampede Meat has no adequate remedy at law because, absent an injunction, the harm will be done and will be incapable of being remedied, even by a monetary recovery against Defendants.

69.     The 10th Circuit has recognized several factors that may support a finding of irreparable harm, including the "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004). Each element is present here.

70.     Third, the harm that will come to Stampede Meat (and the downstream consumers across this country) far outweighs any harm to Defendants or the public. Indeed, Stampede Meat has repeatedly attempted to work with Defendants to address any concerns they may have, and has diligently implemented a safety protocol *already approved* by Defendants. In issuing the Stampede Closure Order, Defendants could not and would not provide an answer as to why they determined that Stampede Meat's operations posed a "significant public health risk." Plainly, it does not. To the contrary, the public will be harmed if an injunction is *not* issued, as the national food supply will be immediately impacted, and critical infrastructure—designated as much by both the Federal Government and the State of New Mexico—will be significantly weakened.

71.     The elements required to establish that a party is entitled to a preliminary injunction are similar to the elements required for a TRO. In order to obtain a preliminary injunction, a party

must show (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits. *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir. 1986).

72.    The harm to Stampede Meat substantially outweighs any harm to Defendants or the public. In other words, Defendants will suffer no harm from an injunction. On the other hand, as discussed above, Stampede Meat will be left without an adequate remedy at law absent an injunction.

73.    Accordingly, Stampede Meat respectfully requests that this Court enter a temporary restraining order enjoining Defendants, and any individuals acting at their direction, on their behalf, or with actual notice of this order: (1) from enforcing the Public Health Order issued by Defendant Billy J. Jimenez, Acting Secretary of the New Mexico Department of Health, on October 22, 2020 against Stampede Meat; (2) from enforcing the Notice of Immediate Closure Pursuant to Public Health Order issued to Stampede Meat on November 3, 2020, thereby allowing Stampede Meat to continue its meat processing operations at its Sunland Park, New Mexico facility; and (3) from issuing any civil or criminal fine, penalty or encumbrance upon Stampede Meat arising out of the October 22, 2020 Public Health Order or the Notice of Immediate Closure Pursuant to Public Health Order issued to Stampede Meat on November 3, 2020.

74.    Stampede Meat further requests that, after a hearing on this matter, such temporary restraining order be made a preliminary injunction and remain in effect until a final trial on the merits.

27

## REQUESTED RELIEF

WHEREFORE, premises considered, Stampede Meat, Inc. respectfully requests the Court:

1. Enter a Temporary Restraining Order Enjoining Defendants, and any individuals acting at their direction, on their behalf, or with actual notice of this order:

    a. from enforcing the Public Health Order issued by Defendant Billy J. Jimenez, Acting Secretary of the New Mexico Department of Health, on October 22, 2020 against Stampede Meat;

    b. from enforcing the Notice of Immediate Closure Pursuant to Public Health Order issued to Stampede Meat on November 3, 2020, thereby allowing Stampede Meat to continue its meat processing operations at its Sunland Park, New Mexico facility; and

    c. from issuing any civil or criminal fine, penalty or encumbrance upon Stampede Meat arising out of the October 22, 2020 Public Health Order or the Notice of Immediate Closure Pursuant to Public Health Order issued to Stampede Meat on November 3, 2020;

2. Upon further hearing of this matter, issue a Preliminary Injunction, to be in place pending final trial of this matter enjoining Defendants, and any individuals acting at their direction, on their behalf, or with actual notice of this order:

    a. from enforcing the Public Health Order issued by Defendant Billy J. Jimenez, Acting Secretary of the New Mexico Department of Health, on October 22, 2020 against Stampede Meat;

    b. from enforcing the Notice of Immediate Closure Pursuant to Public Health Order issued to Stampede Meat on November 3, 2020, thereby allowing Stampede Meat

to continue its meat processing operations at its Sunland Park, New Mexico facility; and

   c. from issuing any civil or criminal fine, penalty or encumbrance upon Stampede Meat arising out of the October 22, 2020 Public Health Order or the Notice of Immediate Closure Pursuant to Public Health Order issued to Stampede Meat on November 3, 2020

3. Upon final trial, issuing a declaration that the October 22, 2020 Order is unconstitutional and unenforceable;

4. Upon final trial, issuing a declaration that the Stampede Closure Order is unconstitutional and unenforceable;

5. Awarding Stampede Meat all costs and expenses, including reasonable attorney's fees, incurred in prosecuting this action; and

6. Awarding Stampede Meat any other and further relief to which the Court may find Stampede entitled.

Date:  November 6, 2020                           Respectfully submitted,

                                                 RAY | PEÑA | MCCHRISTIAN, P.C.


                              By:     /s/ Christopher J. Tebo
                                      Christopher J. Tebo
                                      Moses B. Winston
                                      6501 Americas Pkwy NE, Ste. 820
                                      Albuquerque, NM 87110
                                      (505) 855-6000
                                      ctebo@raylaw.com
                                      mwinston@raylaw.com
                                      *Attorneys for Plaintiff Stampede Meat, Inc.*

Michael P. Palmer  (*pro hac* pending)
BARNES & THORNBURG LLP
201 S. Main St., Suite 400
South Bend, IN  46601
Direct: (574) 237-1135
michael.palmer@btlaw.com

Thomas G. Haskins, Jr. (*pro hac* pending)
BARNES & THORNBURG LLP
2121 North Pearl Street, Suite 700
Dallas, TX  75201-2469
Direct: (214) 258-4111
thaskins@btlaw.com

## **VERIFICATION**

Under penalty of perjury, I verify that the statements of fact set forth in this VERIFIED COMPLAINT AND APPLICATION FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF are true and correct to the best of my knowledge, information and belief, and based upon a review of records available to me, except as to matters therein stated to be on information and belief.

Executed on:  November 6, 2020.

Name:  *BROCK FURLONG*
Title:  *PRESIDENT & CEO*



**U.S. Department of Homeland Security**
Cybersecurity & Infrastructure Security Agency
*Office of the Director*
Washington, DC 20528

August 18, 2020

## ADVISORY MEMORANDUM ON ENSURING ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS ABILITY TO WORK DURING THE COVID-19 RESPONSE

FROM:     Christopher C. Krebs
          Director
          Cybersecurity and Infrastructure Security Agency (CISA)

As the Nation continues to come together to respond to COVID-19, the March 16th updated Coronavirus Guidance for America that highlighted the significance of the critical infrastructure workforce remains important.

The Cybersecurity and Infrastructure Security Agency (CISA) executes the Secretary of Homeland Security's authorities to secure critical infrastructure. Consistent with these authorities, CISA has developed, in collaboration with other federal agencies, State and local governments, and the private sector, an "Essential Critical Infrastructure Workforce" advisory list.

This list is intended to help State, local, tribal, territorial officials and organizations endeavor to protect their workers and communities as they continue to reopen in a phased approach, coupled with the need to ensure continuity of functions critical to public health and safety, as well as economic and national security. Decisions informed by this list should also take into consideration worker safety, workplace settings, as well as additional public health considerations based on the specific COVID-19-related concerns of particular jurisdictions.

**This list is advisory in nature. It is not, nor should it be considered, a federal directive or standard. Additionally, this advisory list is not intended to be the exclusive list of critical infrastructure sectors, workers, and functions that should continue to work safely during the COVID-19 response across all jurisdictions.**

The advisory list identifies workers who conduct a range of operations and services that are typically essential to continued critical infrastructure viability, including staffing operations centers, maintaining and repairing critical infrastructure, operating call centers, working construction, and performing operational functions, among others. It also includes workers who support crucial supply chains and enable functions for critical infrastructure. The industries they support represent, but are not limited to, medical and healthcare, telecommunications, information technology systems, defense, food and agriculture, transportation and logistics, energy, water and wastewater, and law enforcement.

**EXHIBIT**

_____

The earlier versions of the list were meant to assist officials and organizations identify essential work functions and to allow essential workers access to their workplaces during times of community restrictions. Now, several months into the pandemic, it is commonly acknowledged that essential workers have access to their workplaces. The list can now be most useful in identifying the universe of essential workers that may require specialized risk management strategies to ensure that they can work safely. Furthermore, the list can be used to begin planning and preparing for the allocation of scarce resources used to protect essential workers against COVID-19.

State, local, tribal, and territorial governments are responsible for implementing and executing response activities in their communities, while the Federal Government is in a supporting role. Officials should use their own judgment in issuing implementation re-opening directives and guidance. Similarly, while adhering to relevant public health guidance, critical infrastructure owners and operators are expected to use their own judgement on issues of the prioritization of business processes and workforce allocation to best ensure worker safety and the continuity of the essential goods and services they support. All decisions should appropriately balance public safety, the health and safety of the workforce, and the continued delivery of essential critical infrastructure services and functions.

CISA will continue to work with our partners in the critical infrastructure community to update this advisory list, if necessary, as the Nation's response to COVID-19 evolves.

Should you have questions about this list, please contact CISA at CISA.CAT@CISA.DHS.GOV.

**Attachment:** "Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response Version 4.0"

**Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response**

## Version 4.0 (August 18, 2020)

## ENSURING ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS HAVE THE ABILITY TO WORK SAFELY

Functioning critical infrastructure is imperative during the response to the COVID-19 emergency for both public health and security as well as community well-being. While stopping the spread of the virus and protecting the most vulnerable among us rightfully remain national priorities, a degradation of infrastructure operations and resilience only makes achieving those missions more difficult. Recognizing this, CISA published guidance identifying Essential Critical Infrastructure Workers at the outset of the COVID-19 pandemic. This guidance was adopted broadly across the country and was subsequently updated as the response evolved.  This update, Version 4.0, continues to advance the guidance considering developments in pandemic response to support a risk-based approach towards worker safety to ensure the continuity of critical functions.

CISA appreciates the partnership with the critical infrastructure community in developing the guidance. The Nation's infrastructure resilience was undoubtedly enhanced by a common approach to, and prioritization of, essential critical infrastructure workers being able to work during periods of community restrictions. As with previous guidance, this list is advisory in nature. It is not, nor should it be considered, a federal directive or standard. Additionally, this advisory list is not intended to be the exclusive list of critical infrastructure sectors, workers, and functions that should continue during the COVID-19 response across all jurisdictions. Individual jurisdictions and critical infrastructure owners and operators should add or subtract essential workforce categories based on their own requirements and discretion.

Central to the value of the guidance in the early months of the pandemic was the discrete problem it was intended to support solutions for – enabling essential workers to work during community restrictions. While CISA continues to engage with stakeholders to identify workforce limitations that may impact infrastructure resilience, it is our assessment that, for the most part, essential workers are able to work – what is now most important is that essential workers are able to work in a safe environment.

Recognizing this, the Essential Critical Infrastructure Workers guidance can add the most value going forward by illuminating the universe of workers that require particularly thoughtful and deliberate risk management strategies so that they can continue to *work safely*.

CISA recognizes that states and localities across the country have undergone a phased re-opening of businesses, public lands, and other places of community and civic importance. Previous versions of the list did not include essential workers in critical infrastructure work settings, such as schools, that were presumed to be closed at the time of publication. Reflecting ongoing national discussions around reopening, this version includes these workers, in addition to other adjustments.  As we enter the next stage in the pandemic response and schools and additional businesses reopen, CISA encourages jurisdictions and critical infrastructure owners to use the list to assist in prioritizing the ability of essential workers to work safely to ensure ongoing infrastructure operations and resilience.

Doing so will require looking at the universe of workers on the Essential Critical Infrastructure Workforce list and identifying tailored risk mitigation strategies for specific workplace settings. These could include:

**Creating a Risk Categorization Methodology for Worker Safety.**  We recommend that organizations continue to categorize their employees against a risk factor matrix so that mitigation strategies can be implemented to enhance safety.  The risk categorization factors that should be considered include:

> **Setting:**  Are workers indoors or outdoors?
> **Proximity:** How physically close are workers (and customers) to each other?
> **Type of contact:** Do workers touch shared surfaces, common items, and other workers or customers?
> **Duration:** How long does an average interaction last?

    

**Number of different contacts:** How many interactions occur daily?
**Employee risk factors:** Which workers face heightened risk due to their age or underlying medical conditions?
**Capability to assess possible infection:** Are there screening protocols that protect workers (and customers) from interactions with contagious people?
**Cleaning:** How frequently can the facility be sanitized and cleaned?

Based on the responses to these risks, organizations can categorize the conditions that their workers face and continue to implement measures to increase worker well-being. In other words, increased protective measures should be based on those with high risk factors. Risk categorization guidance assistance can be found at OSHA.

**Identifying those workers that can potentially transition to working from home based on the lessons learned over the past few months from the unprecedented number of teleworkers.** We encourage employers to take a fresh look at the job functions of their workforce to determine if it is necessary for workers to be in the office given the technology breakthroughs that have eased some of the roadblocks to working remotely.

**Determining the criticality, uniqueness, or specialty of a worker's role to reduce the need to be at the workplace or working together in close proximity.** There are some functions that are either so essential to supporting the national critical functions and other lifeline support, such as first responders or utility workers, or that are unique or require a special skill set, that these workers must often be at the same workplace or together out in the field. We recommend that organizations re-examine whether these job functions can be conducted from home and if not, if shift work or remaining with a cohort can be conducted to allow for more social distancing.

**Determining the allocation of scarce resources for workers, such as personal protective equipment (PPE), other protection, access to medical evaluation, testing, and vaccines.** We recommend that jurisdictions and organizations use the essential critical infrastructure worker list as a tool to begin engaging with the essential worker community in the planning for the allocation of potential scarce resources should COVID-19 cases continue to increase or enter a second wave. Planning is critical to ensuring that workers are able to continue performing essential tasks supporting critical infrastructure. Furthermore, it will be critical that workers who perform essential tasks and/or have consistent interactions with at-risk populations (e.g., the elderly or those with pre-existing conditions) obtain the necessary resources to reduce the transmission of the virus.

In addition to the aforementioned characteristics of the worker and workplace, there may be local factors that influence COVID-19 risk mitigation plans including, infection rate and trends, the availability and timeliness of testing, the criticality of the business and worker to the local or state economy, and the need to prepare and respond to other localized events such as hurricanes, wildfires, or tornadoes.

The following links can provide additional guidance on health, workplace, and worker safety issues related to the pandemic:

*CDC Safety Practices for Critical Infrastructure Workers:* Implementing Safety Practices for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19

*OSHA/HHS Workplace Guidance:* Guidance for Preparing Workplaces for COVID-19

*CISA Telework Guidance:* Telework Guidance and Resources

*CISA General Guidance:* CISA Information & Updates on COVID-19

CISA will continually solicit and accept feedback on the list and will evolve the list in response to stakeholder feedback. We will also use our various stakeholder engagement mechanisms to work with partners on how they are using this list and share those lessons learned and best practices broadly. Feedback can be sent to CISA.CAT@CISA.DHS.GOV.

**CISA | DEFEND TODAY,** SECURE TOMORROW  4

 www.cisa.gov    CISA.CAT@cisa.dhs.gov    Linkedin.com/company/cisagov   @CISAgov | @cyber | @uscert_gov    Facebook.com/CISA   @cisagov

## CONSIDERATIONS FOR GOVERNMENT AND BUSINESS

This list was developed in consultation with federal agency partners, industry experts, and State and local officials, and is based on several key principles:

1. Response efforts to the COVID-19 pandemic are locally executed, state managed, and federally supported.

2. Critical infrastructure workers and employers should follow Businesses and Workplace guidance from the Centers for Disease Control and Prevention (CDC), as well as state and local government officials, regarding strategies to limit disease spread.

3. Employers must comply with applicable Occupational Safety and Health Administration (OSHA) requirements and guidance for protecting critical infrastructure workers who remain on or return to the job during the COVID-19 pandemic. As the nation relies on these workers to protect public health, safety, and community well-being, they must be protected from exposure to and infection from the virus so that they can continue to carry out their responsibilities. OSHA has guidance and enforcement information for workplaces at www.osha.gov/coronavirus.

4. Businesses and government agencies may continue to implement organization-specific measures as appropriate and consistent with applicable Federal, state, local, or other requirements, which protect the workforce while meeting mission needs.

5. Workers should be encouraged to work remotely when possible and, organizations are encouraged to identify alternative methods for safely engaging in activities that typically required in-person, non-mandatory interactions.

6. When continuous remote work is not possible, businesses should enlist strategies to reduce the likelihood of spreading the disease. This includes, but is not limited to, physically separating staff, staggering work shift hours or days, and other social distancing measures. While the CDC recommends that everyone wear a mask to contain respiratory droplets when around others, critical infrastructure employers must consider how best to implement this public health recommendation for source control in the workplace. For example, employers may provide disposable facemasks (e.g., surgical masks) instead of cloth face coverings when workers would need to wear masks for extended periods of time (e.g., the duration of a work shift) or while performing tasks in which the face covering could become contaminated.

7. Consider the impact of workplace sick leave policies that may contribute to an employee decision to delay reporting medical symptoms. Sick employees should not return to the workplace until they meet the criteria to stop home isolation. CDC has the following guidance on when it is safe to stop home isolation at https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/end-home-isolation.html.

8. Critical infrastructure employers have an obligation to limit to the extent possible the reintegration of in- person workers who have experienced an exposure to COVID-19 but remain asymptomatic in ways that best protect the health of the worker, their co-workers, and the general public. An analysis of core job tasks and workforce availability at worksites can allow the employer to match core activities to other equally skilled and available in-person workers who have not experienced an exposure. CDC guidance on safety practices for critical infrastructure workers is maintained at https://www.cdc.gov/coronavirus/2019-ncov/community/critical- workers/implementing-safety-practices.html.

9. All organizations should implement their business continuity and pandemic plans or put plans in place if they do not exist. Delaying implementation is not advised and puts at risk the viability of the business and the health and safety of workers. The CDC and OSHA have guidance for workplaces and businesses to assist them plan, prepare, and respond to the pandemic at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html and https://www.osha.gov/SLTC/covid-19.

10. Ensure that certain workers have consistent access to specific sites, facilities, and assets to ensure continuity of functions. Most of our economy relies on technology and therefore information technology (IT) and operational technology (OT) workers for critical infrastructure operations are essential. This includes workers in many roles, including workers focusing on management systems, control systems, and Supervisory Control and Data Acquisition (SCADA) systems, and data centers; cybersecurity engineering; and cybersecurity risk management.



 

11. Government workers, such as emergency managers, and the business community need to establish and maintain the practice of openly communicating with one another on such issues as workforce needs and safety as well as the continuity of critical functions.

12. Ensure that essential critical infrastructure workers have continued and unimpeded access to sites, facilities, and equipment within quarantine zones, containment areas, areas under curfew restrictions, or other areas where access or movement is limited, in order to perform functions for community relief and stability; for public safety, security and health; for maintaining essential supply chains for maintaining critical information technology services, and preserving local, regional, and national economic well-being.

13. Whenever possible, local governments should consider adopting specific provisions of state orders or guidance on sustained access and mobility of essential workers to reduce potential complications of workers crossing jurisdictional boundaries to perform critical functions, including during times of quarantine. When this is not possible, local jurisdictions should consider aligning access and movement control policies with neighboring jurisdictions to reduce the burden of cross-jurisdictional movement of essential critical infrastructure workers.

  

# IDENTIFYING ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

The following list of identified essential critical infrastructure workers is intended to be overly inclusive reflecting the diversity of industries across the United States.



## HEALTHCARE / PUBLIC HEALTH

- Workers, including laboratory personnel, that perform critical clinical, biomedical and other research, development, and testing needed for COVID-19 or other diseases.

- Healthcare providers including, but not limited to, physicians (MD/DO/DPM); dentists; psychologists; mid-level practitioners; nurses; emergency medical services personnel, assistants and aids; infection control and quality assurance personnel; phlebotomists; pharmacists; physical, respiratory, speech and occupational therapists and assistants; social workers; optometrists; speech pathologists; chiropractors; diagnostic and therapeutic
technicians; and radiology technologists.

- Workers required for effective clinical, command, infrastructure, support service, administrative, security, and intelligence operations across the direct patient care and full healthcare and public health spectrum. Personnel examples may include, but are not limited to, accounting, administrative, admitting and discharge, engineering, accrediting, certification, licensing, credentialing, epidemiological, source plasma and blood donation, food service, environmental services, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians, etc.

  - o Emergency medical services workers including clinical interns.
  - o Prehospital workers included but not limited to urgent care workers.
  - o Inpatient & hospital workers (e.g. hospitals, critical access hospitals, long-term acute care hospitals, long-term care facilities including skilled nursing facilities, inpatient hospice, ambulatory surgical centers, etc.).
  - o Outpatient care workers (e.g. end-stage-renal disease practitioners and staff, Federally Qualified Health Centers, Rural Health Clinics, community mental health clinics, organ transplant/procurement centers, and other ambulatory care settings/providers, comprehensive outpatient rehabilitation facilities, etc.).
  - o Home care workers (e.g. home health care, at-home hospice, home dialysis, home infusion, etc.).
  - o Workers at Long-term care facilities, residential and community-based providers (e.g. Programs of All-Inclusive Care for the Elderly (PACE), Intermediate Care Facilities for Individuals with Intellectual Disabilities, Psychiatric Residential Treatment Facilities, Religious Nonmedical Health Care Institutions, etc.).
  - o Workplace safety workers (i.e., workers who anticipate, recognize, evaluate, and control workplace conditions that may cause workers' illness or injury).

    

- Workers needed to support transportation to and from healthcare facility and provider appointments.

- Workers needed to provide laundry services, food services, reprocessing of medical equipment, and waste management.

- Workers that manage health plans, billing, and health information and who cannot work remotely.

- Workers performing cybersecurity functions at healthcare and public health facilities and who cannot work remotely.

- Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions, who cannot practically work remotely.

- Vendors and suppliers (e.g. imaging, pharmacy, oxygen services, durable medical equipment, etc.).

- Workers at manufacturers (including biotechnology companies and those companies that have shifted production to medical supplies), materials and parts suppliers, technicians, logistics and warehouse operators, printers, packagers, distributors of medical products and equipment (including third party logistics providers, and those who test and repair), personal protective equipment (PPE), isolation barriers, medical gases, pharmaceuticals (including materials used in radioactive drugs), dietary supplements, commercial health products, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies (including dispensers), sanitary goods, personal care products, pest control products, and tissue and paper towel products.

- Donors of blood, bone marrow, blood stem cell, or plasma, and the workers of the organizations that operate and manage related activities.

- Pharmacy staff, including workers necessary to maintain uninterrupted prescription, and other workers for pharmacy operations.

- Workers and materials (e.g., laboratory supplies) needed to conduct bloodspot and point of care (i.e., hearing and critical congenital heart disease) newborn screening as well as workers and materials need for confirmatory diagnostic testing and initiation of treatment.

- Home health workers (e.g., nursing, respiratory therapists, health aides) who enter the need to go into the homes of individuals with chronic, complex conditions and/or disabilities to deliver nursing and/or daily living care.

- Workers in retail facilities specializing in medical good and supplies.

- Public health and environmental health workers, such as:
  - Workers specializing in environmental health that focus on implementing environmental controls, sanitary and infection control interventions, healthcare facility safety and emergency preparedness planning, engineered work practices, and developing guidance and protocols for appropriate PPE to prevent COVID-19 disease transmission.
  - Public health/community health workers (including call center workers) who conduct community-based public health functions, conducting epidemiologic surveillance and compiling, analyzing, and communicating public health information, who cannot work remotely.

- Human services providers, especially for at risk populations such as:
  - Home delivered meal providers for older adults, people with disabilities, and others with chronic health conditions.
  - Home-maker services for frail, homebound, older adults.
  - Personal assistance services providers to support activities of daily living for older adults, people with disabilities, and others with chronic health conditions who live independently in the community with supports and services.
  - Home health providers who deliver health care services for older adults, people with disabilities, and others with chronic health conditions who live independently in the community with supports and services.
  - Workers who provide human services, including but not limited to social workers, nutritionists, case managers or case workers, crisis counselors, foster care case managers, adult protective services personnel, child protective personnel, domestic violence counselors, human trafficking prevention and recovery personnel, behavior specialists, substance abuse-related counselors, and peer support counselors.

    

- Government entities, and contractors that work in support of local, state, federal, tribal, and territorial public health and medical mission sets, including but not limited to supporting access to healthcare and associated payment functions, conducting public health functions, providing medical care, supporting emergency management, or other services necessary for supporting the COVID-19 response.

- Workers for providers and services supporting effective telehealth.

- Mortuary service providers, such as:

  o Workers performing mortuary funeral, cremation, burial, cemetery, and related services, including funeral homes, crematoriums, cemetery workers, and coffin makers.

  o Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to mental and behavioral health services to the family members, responders, and survivors of an incident.

## LAW ENFORCEMENT, PUBLIC SAFETY, AND OTHER FIRST RESPONDERS

- Public, private, and voluntary personnel (front-line and management, civilian and sworn) in emergency management, law enforcement, fire and rescue services, emergency medical services (EMS), and security, public and private hazardous material responders, air medical service providers (pilots and supporting technicians), corrections, and search and rescue personnel.

- Personnel involved in provisioning of access to emergency services, including the provisioning of real-time text, text-to-911, and dialing 911 via relay.

- Personnel that are involved in the emergency alert system (EAS) (broadcasters, satellite radio and television, cable, and wireline video) and wireless emergency alerts (WEA).

- Workers at Independent System Operators and Regional Transmission Organizations, and Network Operations staff, engineers and technicians to manage the network or operate facilities.

- Workers at emergency communication center, public safety answering points, public safety communications centers, emergency operation centers, and 911 call centers.

- Fusion Center workers.

- Workers, including contracted vendors, who maintain, manufacture, or supply equipment and services supporting law enforcement, fire, EMS, and response operations (to include electronic security and life safety security personnel).

- Workers and contracted vendors who maintain and provide services and supplies to public safety facilities, including emergency communication center, public safety answering points, public safety communications centers, emergency operation centers, fire and emergency medical services stations, police and law enforcement stations and facilities.

- Workers supporting the manufacturing, distribution, and maintenance of necessary safety equipment and uniforms for law enforcement and all public safety personnel.

- Workers supporting the operation of firearm, or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges.

- Public agency workers responding to abuse and neglect of children, spouses, elders, and dependent adults.

- Workers who support weather disaster and natural hazard mitigation and prevention activities.

- Security staff to maintain building access control and physical security measures.

- Workers who support child care and protective service programs such as child protective service.

     

## EDUCATION

- Workers who support the education of pre-school, K-12, college, university, career and technical education, and adult education students, including professors, teachers, teacher aides, special education and special needs teachers, ESOL teachers, para-educators, apprenticeship supervisors, and specialists.
- Workers who provide services necessary to support educators and students, including but not limited to, administrators, administrative staff, IT specialists, media specialists, librarians, guidance counselors, school psychologists and other mental health professions, school nurses and other health professionals, and school safety personnel.
- Workers who support the transportation and operational needs of schools, including bus drivers, crossing guards, cafeteria workers, cleaning and maintenance workers, bus depot and maintenance workers, and those that deliver food and supplies to school facilities.
- Workers who support the administration of school systems including, school superintendents and their management and operational staff.
- Educators and operational staff facilitating and supporting distance learning.

## FOOD AND AGRICULTURE

- Workers enabling the sale of human food, animal food (includes pet food, animal feed, and raw materials and ingredients), pet supply, and beverage products at groceries, pharmacies, convenience stores, and other retail (including unattended and vending), including staff in retail customer support and information technology support necessary for on-line orders, pickup, and delivery.
- Restaurant and quick serve food operations, including dark kitchen and food prep centers, carry-out, and delivery food workers.
- Food manufacturer workers and their supplier workers including those employed at food ingredient production and processing facilities; aquaculture and seafood harvesting facilities; slaughter and processing facilities for livestock, poultry, and seafood; animal food manufacturing and processing facilities; human food facilities producing by-products for animal food; industrial facilities producing co-products for animal food; beverage production facilities; and the production of food packaging.
  - o Farmers, farm and ranch workers, and agribusiness support services, including workers involved in auction and sales; in food operations, including animal food, grain and oilseed storage, handling, processing, and distribution; in ingredient production, packaging, and distribution; in manufacturing, packaging, and distribution of veterinary drugs and biologics (e.g., vaccines); and in distribution and transport.
- Farmers, farm and ranch workers, and support service and supplier workers producing food supplies and other agricultural inputs for domestic consumption and export, to include those engaged in raising, cultivating, phytosanitation, harvesting, packing, storing, or distributing to storage or to market or to a transportation mode to market any agricultural or horticultural commodity for human or animal consumption.
- Workers at fuel ethanol facilities, biodiesel and renewable diesel facilities, and storage facilities.
- Workers and firms supporting the distribution of all human and animal food and beverage and ingredients used in these products, including warehouse workers, vendor-managed inventory controllers, and blockchain managers.
- Workers supporting the sanitation and pest control of all human and animal food manufacturing processes and operations from wholesale to retail.
- Workers supporting greenhouses as well as the growth and distribution of plants and associated products for home gardens.
- Workers in cafeterias used to feed workers, particularly worker populations sheltered against COVID-19

     

and those designated as essential critical infrastructure workers.

- Workers in animal diagnostic and food testing laboratories.
- Government, private, and non-governmental organizations' workers essential for food assistance programs (including school lunch programs) and government payments.
- Workers of companies engaged in the production, storage, transport, and distribution of chemicals, drugs, biologics (e.g. vaccines), and other substances used by the human and agricultural food and agriculture industry, including seeds, pesticides, herbicides, fertilizers, minerals, enrichments, equipment, and other agricultural production aids.
- Animal agriculture workers to include those employed in veterinary health (including those involved in supporting emergency veterinary or livestock services); raising, caring for and management of animals for food, as well as pets; animal production operations; livestock markets; slaughter and packing plants, manufacturers, renderers, and associated regulatory and government workforce.
- Transportation workers supporting animal agricultural industries, including movement of animal medical and reproductive supplies and materials, animal biologics (e.g., vaccines), animal drugs, animal food ingredients, animal food and bedding, live animals, and deceased animals for disposal.
- Workers who support sawmills and the manufacture and distribution of fiber and forestry products, including, but not limited to timber, paper, and other wood and fiber products, as well as manufacture and distribution of products using agricultural commodities.
- Workers engaged in the manufacture and maintenance of equipment and other infrastructure necessary for agricultural production and distribution.



## ENERGY

- Workers supporting the energy sector, regardless of the energy source (including, but not limited to, nuclear, fossil, hydroelectric, or renewable), segment of the system, or infrastructure the worker is involved in, who are needed to construct, manufacture, repair, transport, permit, monitor, operate engineer, and maintain the reliability, safety, security, environmental health, and physical and cyber security of the energy system, including those who support construction, manufacturing, transportation, permitting, and logistics.

- Workers and contractors supporting energy facilities that provide steam, hot water or chilled water from central power plants to connected customers.

- Workers conducting energy/commodity trading/scheduling/marketing functions who can't perform their duties remotely.

- Workers supporting the energy sector through renewable energy infrastructure (including, but not limited to, wind, solar, biomass, hydrogen, ocean, geothermal, and hydroelectric) and microgrids, including those supporting construction, manufacturing, transportation, permitting, operation and maintenance, monitoring, and logistics.

- Workers and security staff involved in nuclear re-fueling operations.

- Workers providing services related to energy sector fuels including, but not limited to, petroleum (crude oil), natural gas, propane, liquefied natural gas (LNG), compressed natural gas (CNG), natural gas liquids (NGL), other liquid fuels, nuclear, and coal) and supporting the mining, processing, manufacturing, construction, logistics, transportation, permitting, operation, maintenance, security, waste disposal, storage, and monitoring of support for resources.

- Workers providing environmental remediation and monitoring, limited to immediate critical needs technicians.

- Workers involved in the manufacturing and distribution of equipment, supplies, and parts necessary to maintain production, maintenance, restoration, and service at energy sector facilities across all energy sector segments.

### Electricity Industry

- Workers who maintain, ensure, restore, or who are involved in the development, transportation, fuel procurement, expansion, or operation of, the generation, transmission, and distribution of electric power, including call centers, utility workers, engineers, retail electricity, construction, maintenance, utility telecommunications, relaying, and fleet maintenance technicians who cannot perform their duties remotely.

- Workers at coal mines, production facilities, and those involved in manufacturing, transportation, permitting, operation, maintenance, and monitoring at coal sites.

- Workers who produce, process, ship, and handle coal used for power generation and manufacturing.

- Workers in the electricity industry including but not limited to those supporting safety, construction, manufacturing, transportation, permitting, operation/maintenance, engineering, physical and cyber security, monitoring, and logistics

- Workers needed for safe and secure operations at nuclear generation including, but not limited to, those critical to the broader nuclear supply chain, the manufacture and delivery of parts needed to maintain nuclear equipment, the operations of fuel manufacturers, and the production and processing of fuel components used in the manufacturing of fuel.



- Workers at fossil fuel (including but not limited to natural gas, refined, distillate, and/or coal), nuclear, and renewable energy infrastructure (including, but not limited to wind, solar, biomass, hydrogen, geothermal, and hydroelectric), and microgrids, including those supporting safety, construction, manufacturing, transportation, permitting, operation, maintenance, monitoring, and logistics.
- Workers at generation, transmission, and electric black start facilities.
- Workers at Reliability Coordinator, Balancing Authority, local distribution control centers, and primary and backup Control Centers, including, but not limited to, independent system operators, regional transmission organizations, and local distribution control centers.
- Workers that are mutual assistance/aid personnel, which may include workers from outside of the state or local jurisdiction.
- Vegetation management and traffic control for supporting those crews.
- Instrumentation, protection, and control technicians.
- Essential support personnel for electricity operations.
- Generator set support workers, such as diesel engineers used in power generation, including those providing fuel.

**Petroleum Industry**

- Workers who support onshore and offshore petroleum drilling operations; platform and drilling construction and maintenance; transportation (including helicopter operations), maritime transportation, supply, and dredging operations; maritime navigation; well stimulation, intervention, monitoring, automation and control, extraction, production; processing; waste disposal, and maintenance, construction, and operations.
- Workers in the petroleum industry including but not limited to those supporting safety, construction, manufacturing, transportation, permitting, operation/maintenance, engineering, physical and cyber security, monitoring, and logistics.
- Workers for crude oil, petroleum, and petroleum product storage and transportation, including pipeline, marine transport, terminals, rail transport, storage facilities, racks, and road transport for use as end- use fuels such as gasoline, diesel fuel, jet fuel, and heating fuels or feedstocks for chemical manufacturing.
- Petroleum and petroleum product security operations center workers and workers who support maintenance and emergency response services.
- Petroleum and petroleum product operations control rooms, centers, and refinery facilities.
- Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them.
- Supporting new and existing construction projects, including, but not limited to, pipeline construction.
- Manufacturing and distribution of equipment, supplies, and parts necessary for production, maintenance, restoration, and service of petroleum and petroleum product operations and use, including end-users.
- Transmission and distribution pipeline workers, including but not limited to pump stations and any other required, operations maintenance, construction, and support for petroleum products.

**Natural Gas, Natural Gas Liquids (NGL), Propane, and Other Liquid Fuels**

- Workers who support onshore and offshore drilling operations, platform and drilling construction and maintenance; transportation (including helicopter operations); maritime transportation, supply, and dredging operations; maritime navigation; natural gas and natural gas liquid production, processing, extraction, storage and transportation; well intervention, monitoring, automation and control; waste disposal, and maintenance, construction, and operations.

- Workers in the natural gas, NGL, propane, and other liquid fuels industries including but not limited to those supporting safety, construction, manufacturing, transportation, permitting, operation/maintenance, engineering, physical and cyber security, monitoring, and logistics.

- Transmission and distribution pipeline workers, including compressor stations and any other required operations maintenance, construction, and support for natural gas, natural gas liquid, propane, and other liquid fuels.

- Workers at Liquefied Natural Gas (LNG) and Compressed Natural Gas (CNG) facilities.

- Workers at natural gas, propane, natural gas liquids, liquified natural gas, liquid fuel storage facilities, underground facilities, and processing plants and other related facilities, including construction, maintenance, and support operations personnel.

- Natural gas processing plants workers and those who deal with natural gas liquids.

- Workers who staff natural gas, propane, natural gas liquids, and other liquid fuel security operations centers, operations dispatch and control rooms and centers, and emergency response and customer emergencies (including leak calls) operations.

- Workers supporting drilling, production, processing, refining, and transporting natural gas, propane, natural gas liquids, and other liquid fuels for use as end-use fuels, feedstocks for chemical manufacturing, or use in electricity generation.

- Workers supporting propane gas service maintenance and restoration, including call centers.

- Workers supporting propane, natural gas liquids, and other liquid fuel distribution centers.

- Workers supporting propane gas storage, transmission, and distribution centers.

- Workers supporting new and existing construction projects, including, but not limited to, pipeline construction.

- Workers supporting ethanol and biofuel production, refining, and distribution.

- Workers in fuel sectors (including, but not limited to nuclear, coal, and gas types and liquid fuels) supporting the mining, manufacturing, logistics, transportation, permitting, operation, maintenance, and monitoring of support for resources.

- Workers ensuring, monitoring, and engaging in the physical security of assets and locations associated with natural gas, propane, natural gas liquids, and other liquid fuels.

- Workers involved in the manufacturing and distribution of equipment, supplies, and parts necessary to maintain production, maintenance, restoration, and service of natural gas, propane, natural gas liquids, and other liquid fuels operations and use, including end-users.

CISA | DEFEND TODAY, SECURE TOMORROW  14

www.cisa.gov    CISA CAT@cisa.dhs.gov    Linkedin.com/company/cisagov    @CISAgov | @cyber | @uscert_gov    Facebook.com/CISA    @cisagov

## WATER AND WASTEWATER

Workers needed to operate and maintain drinking water and wastewater and drainage infrastructure, including:

- Operational staff at water authorities.
- Operational staff at community water systems.
- Operational staff at wastewater treatment facilities.
- Workers repairing water and wastewater conveyances and performing required sampling or monitoring, including field staff.
- Operational staff for water distribution and testing.
- Operational staff at wastewater collection facilities.
- Operational staff and technical support for SCADA Control systems.
- Laboratory staff performing water sampling and analysis.
- Suppliers and manufacturers of chemicals, equipment, personal protection equipment, and goods and services for water and wastewater systems.
- Workers who maintain digital systems infrastructure supporting water and wastewater operations.

## TRANSPORTATION AND LOGISTICS

- Workers supporting or enabling transportation and logistics functions, including truck drivers, bus drivers, dispatchers, maintenance and repair technicians, warehouse workers, third party logisticians, truck stop and rest area workers, driver training and education centers, Department of Motor Vehicle (DMV) workers, enrollment agents for federal transportation worker vetting programs, towing and recovery services, roadside assistance workers, intermodal transportation personnel, and workers that construct, maintain, rehabilitate, and inspect infrastructure, including those that require cross-jurisdiction travel.
- Workers supporting the distribution of food, fuels, pharmaceuticals and medical material (including materials used in radioactive drugs), and chemicals needed for water or water treatment and energy maintenance.
- Workers supporting operation of essential highway infrastructure, including roads, bridges, and tunnels (e.g., traffic operations centers and moveable bridge operators).
- Workers of firms providing services, supplies, and equipment that enable warehouse and operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use, including cold- and frozen-chain logistics for food and critical biologic products.
- Mass transit workers providing critical transit services and performing critical or routine maintenance to mass transit infrastructure or equipment.
- Workers supporting personal and commercial transportation services including taxis, delivery services, vehicle rental services, bicycle maintenance and car-sharing services, and transportation network providers.
- Workers, including police, responsible for operating and dispatching passenger, commuter, and freight trains and maintaining rail infrastructure and equipment.
- Maritime transportation workers, including port authority and commercial facility personnel, dredgers, port workers, security personnel, mariners, ship crewmembers, ship pilots, tugboat operators, equipment operators (to include maintenance and repair, and maritime-specific medical providers), ship supply workers, chandlers, repair company workers, and maritime and mariner training and education centers. Refer to the United States Coast Guard's Marine Safety Information Bulletin "Maintaining Maritime Commerce and Identification of Essential Maritime Critical Infrastructure Workers" for more information.

     

- Maritime transportation workers, including port authority and commercial facility personnel, dredgers, port workers, security personnel, mariners, ship crewmembers, ship pilots, tugboat operators, equipment operators (to include maintenance and repair, and maritime-specific medical providers), ship supply workers, chandlers, repair company workers, and maritime and mariner training and education centers. Refer to the United States Coast Guard's Marine Safety Information Bulletin "Maintaining Maritime Commerce and Identification of Essential Maritime Critical Infrastructure Workers" for more information.

- Workers, including truck drivers, railroad employees, maintenance crews, and cleaners, supporting transportation of chemicals, hazardous, medical, and waste materials that support critical infrastructure, capabilities, functions, and services, including specialized carriers, crane and rigging industry workers.

- Bus drivers and workers who provide or support intercity, commuter, and charter bus service in support of other essential services or functions, including school bus drivers.

- Vehicle repair, maintenance, and transportation equipment manufacturing and distribution facilities.

- Workers who support the construction and maintenance of electric vehicle charging stations.

- Transportation safety inspectors, including hazardous material inspectors and accident investigator inspectors.

- Manufacturers and distributors (to include service centers and related operations) of lighting and communication systems, specialized signage and structural systems, emergency response equipment and support materials, printers, printed materials, packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations, and other critical infrastructure needs.

- Postal Service, parcel, courier, last-mile delivery, and shipping and related workers, to include private companies, who accept, process, transport, and deliver information and goods.

- Workers who supply equipment and materials for maintenance of transportation equipment.

- Workers who repair and maintain vehicles, aircraft, rail equipment, marine vessels, bicycles, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers.

- Workers who support air transportation for cargo and passengers, including operation distribution, maintenance, and sanitation. This includes air traffic controllers, flight dispatchers, maintenance personnel, ramp workers, fueling agents, flight crews, airport safety inspectors and engineers, airport operations personnel, aviation and aerospace safety workers, security, commercial space personnel, operations personnel, accident investigators, flight instructors, and other on- and off-airport facilities workers.

- Workers supporting transportation via inland waterways, such as barge crew, dredging crew, and river port workers for essential goods.

- Workers critical to the manufacturing, distribution, sales, rental, leasing, repair, and maintenance of vehicles and other equipment (including electric vehicle charging stations) and the supply chains that enable these operations to facilitate continuity of travel-related operations for essential workers.

- Warehouse operators, including vendors and support personnel critical for business continuity (including heating, ventilation, and air conditioning (HVAC) and electrical engineers, security personnel, and janitorial staff), e-commerce or online commerce, and customer service for essential functions.

   

## PUBLIC WORKS AND INFRASTRUCTURE SUPPORT SERVICES

- Workers who support the construction, maintenance, or rehabilitation of critical infrastructure.

- Workers supporting construction materials production, testing laboratories, material delivery services, and construction inspection.

- Workers who support the operation, inspection, and maintenance of essential public works facilities and operations, including bridges, water and sewer main breaks, fleet maintenance personnel, construction of critical or strategic infrastructure, traffic signal maintenance, emergency location services for buried utilities, maintenance of digital systems infrastructure supporting public works operations, and other emergent issues.

- Workers such as plumbers, electricians, exterminators, builders (including building and insulation), contractors, HVAC Technicians, technicians for elevators, escalators and moving walkways, landscapers, and other service providers who provide services, including temporary construction, that are necessary to maintaining the safety, sanitation, and essential operation of residences, businesses and buildings, such as hospitals and senior living facilities.

- Workers personnel, who support operations that ensure, the availability of and access to needed facilities, transportation, energy, and communications through activities such as road and line clearing.

- Workers who support the effective removal, storage, and disposal of residential, industrial, and commercial solid waste and hazardous waste, including at landfill operations.

- Workers who support the operation, inspection, and maintenance of essential dams, locks, and levees.

- Workers who support the inspection and maintenance of aids to navigation and other government-provided services that ensure continued maritime commerce.

- Workers who support the operations and maintenance of parks and outdoor recreational facilities.

## COMMUNICATIONS AND INFORMATION TECHNOLOGY

**Communications**

- Maintenance of communications infrastructure, – including privately owned and maintained communication systems, – supported by technicians, operators, call centers, wireline and wireless providers, cable service providers, satellite operations, Internet Exchange Points, Points of Presence, Network Access Points, back haul and front haul facilities, and manufacturers and distributors of communications equipment.

- Government and private sector workers, including government contractors, with work related to undersea cable infrastructure and support facilities, including cable landing sites, beach manhole vaults and covers, submarine cable depots, and submarine cable ship facilities.

- Government and private sector workers, including government contractors, supporting Department of Defense internet and communications facilities.

- Network Operations staff, engineers, and technicians to include IT managers and staff, HVAC and electrical engineers, security personnel, software and hardware engineers, and database administrators that manage the network or operate facilities.

- Workers responsible for infrastructure construction and restoration, including but not limited to engineers, technicians, and contractors for construction and engineering of fiber optic cables, buried conduit, small cells, other wireless facilities, and other communications sector-related infrastructure. This includes permitting, construction of new facilities, and deployment of new technology as required to address congestion or customer usage due to unprecedented use of remote services.

- Installation, maintenance, and repair technicians that establish, support, or repair service as needed.

 

- Central office personnel to maintain and operate central office, data centers, and other network office facilities, including critical support personnel assisting front line workers.

- Customer service and support staff, including managed and professional services, as well as remote providers of support to transitioning workers to set up and maintain home offices, who interface with customers to manage or support service environments and security issues including payroll, billing, fraud, logistics, and troubleshooting.

- Workers providing electronic security, fire, monitoring, and life safety services, and who ensure physical security, cleanliness, and the safety of facilities and personnel, including those who provide temporary licensing waivers for security personnel to work in other States or Municipalities.

- Dispatchers involved with service repair and restoration.

- Retail customer service personnel at critical service center locations to address customer needs, including new customer processing, distributing and repairing equipment, and addressing customer issues, in order to support individuals' remote emergency communications needs.

- Supply chain and logistics personnel to ensure goods and products are available to provision these front-line workers.

- External Affairs personnel to assist in coordinating with local, state, and federal officials to address communications needs supporting COVID-19 response, public safety, and national security.

- Workers responsible for ensuring that persons with disabilities have access to and the benefits of various communications platforms, including those involved in the provision of telecommunication relay services, closed captioning of broadcast television for the deaf, video relay services for deaf citizens who prefer communication via American Sign Language over text, and audio-description for television programming.

## Information Technology

- Workers who support command centers, including, but not limited to, Network Operations Command Centers, Broadcast Operations Control Centers, and Security Operations Command Centers.

- Data center operators, including system administrators, HVAC and electrical engineers, security personnel, IT managers and purchasers, data transfer solutions engineers, software and hardware engineers, and database administrators for all industries, including financial services.

- Workers who support client service centers, field engineers, and other technicians and workers supporting critical infrastructure, as well as manufacturers and supply chain vendors that provide hardware and software, support services, research and development, information technology equipment (to include microelectronics and semiconductors), HVAC and electrical equipment for critical infrastructure, and test labs and certification agencies that qualify such equipment (to include microelectronics, optoelectronics, and semiconductors) for critical infrastructure, including data centers.

- Workers needed to preempt and respond to cyber incidents involving critical infrastructure, including medical facilities; state, local, tribal, and territorial (SLTT) governments and federal facilities; energy and utilities; banks and financial institutions; securities and other exchanges; other entities that support the functioning of capital markets, public works, critical manufacturing, food, and agricultural production; transportation; and other critical infrastructure categories and personnel, in addition to all cyber defense workers who can't perform their duties remotely.

- Suppliers, designers, transporters, and other workers supporting the manufacture, distribution, provision, and construction of essential global, national, and local infrastructure for computing services (including cloud computing services and telework capabilities), business infrastructure, financial transactions and services, web-based services, and critical manufacturing.

**CISA | DEFEND TODAY,** SECURE TOMORROW   18

 www.cisa.gov    CISA.CAT@cisa.dhs.gov    Linkedin.com/company/cisagov   @CISAgov | @cyber | @uscert_gov    Facebook.com/CISA   @cisagov

- Workers supporting communications systems, information technology, and work from home solutions used by law enforcement, public safety, medical, energy, public works, critical manufacturing, food and agricultural production, financial services, in person and remote education, and other critical industries and businesses.

- Workers required in person to support Software as a Service businesses that enable remote working, and education performance of business operations, distance learning, media services, and digital health offerings, or required for technical support crucial for business continuity and connectivity.

## OTHER COMMUNITY- OR GOVERNMENT-BASED OPERATIONS AND ESSENTIAL FUNCTIONS

- Workers to ensure continuity of building functions, including but not limited to security and environmental controls (e.g., HVAC), building transportation equipment, the manufacturing and distribution of the products required for these functions, and the permits and inspections for construction supporting essential infrastructure.

- Elections personnel to include both public and private sector elections support.

- Workers supporting the operations of the judicial system, including judges, lawyers, and others providing legal assistance.

- Workers who support administration and delivery of unemployment insurance programs, income maintenance, employment services, vocational rehabilitation programs and services, disaster assistance, workers' compensation insurance and benefits programs, and pandemic assistance.

- Federal, State, and Local, Tribal, and Territorial government workers who support Mission Essential Functions and communications networks.

- Trade Officials (FTA negotiators; international data flow administrators).

- Workers who support radio, print, internet and television news and media services, including, but not limited to front line news reporters, studio, and technicians for newsgathering, reporting, and publishing news.

- Workers supporting Census 2020.

- Weather forecasters.

- Clergy and other essential support for houses of worship.

- Workers who maintain digital systems infrastructure supporting other critical government operations.

- Workers who support necessary permitting, credentialing, vetting, certifying, and licensing for essential critical infrastructure workers and their operations.

- Customs and immigration workers who are critical to facilitating trade in support of the national emergency response supply chain.

- Workers at testing and education centers for emergency medical services and other healthcare workers.

- Staff at government offices who perform title search, notary, and recording services in support of mortgage and real estate services and transactions.

- Residential and commercial real estate services, including settlement services.

 www.cisa.gov    CISA.CAT@cisa.dhs.gov    Linkedin.com/company/cisagov   @CISAgov | @cyber | @uscert_gov    Facebook.com/CISA    @cisagov

- Workers supporting essential maintenance, manufacturing, design, operation, inspection, security, and construction for essential products, services, supply chain, and COVID-19 relief efforts.

- Workers performing services to animals in human care, including zoos and aquariums.

- Engineers performing or supporting safety inspections.

- Veterinary nurses, technicians, veterinarians, and other services supporting individuals and organizations with service animals, search and rescue dogs, and support animals.

- Workers providing dependent care services, including childcare, eldercare, and other service providers necessary to maintain a comprehensive, supportive environment for individuals and caregivers needing these services.

## CRITICAL MANUFACTURING

- Workers necessary for the manufacturing of metals (including steel and aluminum), industrial minerals, semiconductors, materials and products needed for medical supply chains and for supply chains associated with transportation, building transportation equipment, aerospace, energy, communications, information technology, food and agriculture, chemical manufacturing, nuclear facilities, wood products, commodities used as fuel for power generation facilities, the operation of dams, water and wastewater treatment, processing and reprocessing of solid waste, emergency services, and the defense industrial base. Additionally, workers needed to maintain the continuity of these manufacturing functions and associated supply chains, and workers necessary to maintain a manufacturing operation in warm standby.

- Workers necessary for the manufacturing of materials and products needed to manufacture medical equipment, PPE, and sanctioned substitutes for PPE.

- Workers necessary for mining and production of critical minerals, materials and associated essential supply chains, and workers engaged in the manufacture and maintenance of equipment and other infrastructure necessary for mining production and distribution.

- Workers who produce or manufacture parts or equipment that supports continued operations for any essential services and increase in remote workforce, including computing and communication devices, semiconductors, and equipment such as security tools for Security Operations Centers (SOCs) or data centers.

- Workers manufacturing or providing parts and equipment that enable the maintenance and continued operation of essential businesses and facilities.

## HAZARDOUS MATERIALS

- Workers who manage hazardous materials associated with any other essential activity, including but not limited to healthcare waste (medical, pharmaceuticals, medical material production, and testing operations from laboratories processing and testing kits) and energy (including nuclear facilities).

- Workers who support hazardous materials response and cleanup.

- Workers who maintain digital systems infrastructure supporting hazardous materials management operations.

**CISA | DEFEND TODAY,** SECURE TOMORROW    20

 www.cisa.gov     CISA.CAT@cisa.dhs.gov     Linkedin.com/company/cisagov    @CISAgov | @cyber | @uscert_gov     Facebook.com/CISA     @cisagov

## FINANCIAL SERVICES

- Workers who are needed to provide, process, and maintain systems for processing, verification, and recording of financial transactions and services, including payment, clearing, and settlement; wholesale funding; insurance services; consumer and commercial lending; public accounting; and capital markets activities.

- Workers who are needed to maintain orderly market operations to ensure the continuity of financial transactions and services.

- Workers who are needed to provide business, commercial, and consumer access to bank and non-bank financial services and lending services, including ATMs, lending and money transmission, lockbox banking, and to move currency, checks, securities, and payments (e.g., armored cash carriers).

- Workers who support financial operations and those staffing call centers, such as those staffing data and security operations centers, managing physical security, or providing accounting services.

- Workers supporting production and distribution of debit and credit cards.

- Workers providing electronic point of sale support personnel for essential businesses and workers.

- Workers who support law enforcement requests and support regulatory compliance efforts critical to national security, such as meeting anti-money laundering and countering terrorist financing and sanctions screening requirements.

## CHEMICAL

- Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, laboratories, distribution facilities, and workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, paintings and coatings, textiles, building materials, plumbing, electrical, and paper products.

- Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items.

- Workers supporting the production of protective cleaning and medical solutions, PPE, chemical consumer and institutional products, disinfectants, fragrances, and packaging that prevents the contamination of food, water, medicine, among others essential products.

- Workers supporting the operation and maintenance of facilities (particularly those with high-risk chemicals and sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections.

- Workers (including those in glass container manufacturing) who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products.

    

## DEFENSE INDUSTRIAL BASE

- Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military, including, but are not limited to, space and aerospace workers, nuclear matters workers, mechanical and software engineers (various disciplines), manufacturing and production workers, transportation logistics and cargo handling workers, IT support, security staff, security personnel, intelligence support, aircraft and weapon system mechanics and maintainers, and sanitary workers who maintain the hygienic viability of necessary facilities.

- Personnel working for companies, and their subcontractors, who perform under contract or sub-contract to the Department of Defense (DoD),the Department of Energy (DoE) (on nuclear matters), and Department of Transportation (DOT) as well as personnel at government owned/government operated and government-owned/contractor operated facilities and vessels, and who provide materials and services to DoE (on nuclear matters) and the DoD, including support for weapon systems, software systems and cybersecurity, defense and intelligence communications, surveillance, sale of U.S. defense articles and services for export to foreign allies and partners (as authorized by the U.S. government), transportation and logistics, and space systems and other activities in support of our military, intelligence, and space forces.

## COMMERCIAL FACILITIES

- Workers who support the supply chain of building materials from production through application and installation, including cabinetry, fixtures, doors, cement, hardware, plumbing (including parts and services), electrical, heating and cooling, refrigeration, appliances, paint and coatings, and workers who provide services that enable repair materials and equipment for essential functions.

- Workers supporting ecommerce of essential goods through distribution, warehouse, call center facilities, and other essential operational support functions, that accept, store, and process goods, and that facilitate their transportation and delivery.

- Workers in retail and non-retail businesses – and necessary merchant wholesalers and distributors - necessary to provide access to hardware and building materials, consumer electronics, technology products, appliances, emergency preparedness supplies, home exercise and fitness supplies, and home school instructional supplies.

- Workers distributing, servicing, repairing, installing residential and commercial HVAC systems, building transportation equipment, boilers, furnaces and other heating, cooling, refrigeration, and ventilation equipment.

- Workers supporting the operations of commercial buildings that are critical to safety, security, and the continuance of essential activities, such as on-site property managers, building engineers, security staff, fire safety directors, janitorial personnel, and service technicians (e.g., mechanical, HVAC, plumbers, electricians, and elevator).

- Management and staff at hotels and other temporary lodging facilities that provide for COVID-19 mitigation, containment, and treatment measures or provide accommodations for essential workers.

    

## RESIDENTIAL/SHELTER FACILITIES, HOUSING AND REAL ESTATE, AND RELATED SERVICES

- Workers who support food, shelter, and social services, and other necessities of life for needy groups and individuals, including in-need populations and COVID-19 responders, including traveling medical staff.

- Workers in animal shelters.

- Workers responsible for the leasing of residential properties to provide individuals and families with ready access to available housing.

- Workers responsible for handling property management, maintenance, and related service calls who can coordinate the response to emergency "at-home" situations requiring immediate attention, as well as facilitate the reception of deliveries, mail, and other necessary services.

- Workers performing housing and commercial construction related activities, including those supporting the sale, transportation, and installation of manufactured homes.

- Workers supporting government functions related to the building and development process, such as inspections, permitting, and plan review services that can be modified to protect the public health, but fundamentally should continue and enable the continuity of the construction industry (e.g., allow qualified private third-party inspections in case of federal government shutdown).

- Workers performing services in support of the elderly and disabled populations who coordinate a variety of services, including health care appointments and activities of daily living.

- Workers responsible for the movement and provisioning of household goods.

## HYGIENE PRODUCTS AND SERVICES

- Workers who produce hygiene products.

- Workers in laundromats, laundry services, and dry cleaners.

- Workers providing personal and household goods, repair, and maintenance.

- Workers providing disinfection services for all essential facilities and modes of transportation and who support the sanitation of all food manufacturing processes and operations from wholesale to retail.

- Workers necessary for the installation, maintenance, distribution, and manufacturing of water and space heating equipment and its components.

- Support required for continuity of services, including commercial disinfectant services, janitorial and cleaning personnel, and support personnel functions that need freedom of movement to access facilities in support of front-line workers.

- Workers supporting the production of home cleaning, pest control, and other essential products necessary to clean, disinfect, sanitize, and ensure the cleanliness of residential homes, shelters, and commercial facilities.

- Workers supporting agriculture irrigation infrastructure.

- Workers supporting the production of home cleaning and pest control products.

    



**EXECUTIVE ORDERS**

# Executive Order on Delegating Authority Under the DPA with Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19

**LAND & AGRICULTURE**

Issued on: **April 28, 2020**

★ ★ ★

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Defense Production Act of 1950, as amended (50 U.S.C. 4501 *et seq.*) (the "Act"), and section 301 of title 3, United States Code, it is hereby ordered as follows:

Section 1.  Policy.  The 2019 novel (new) coronavirus known as SARS-CoV-2, the virus causing outbreaks of the disease COVID-19, has significantly disrupted the lives of Americans.  In Proclamation 9994 of March 13, 2020 (Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak), I declared that the COVID-19 outbreak in the United States constituted a national emergency, beginning March 1, 2020.  Since then, the American people have united behind a policy of mitigation strategies, including social distancing, to flatten the curve of infections and reduce the spread of COVID-19.  The COVID-19 outbreak and these necessary mitigation measures have taken a dramatic toll on the United States economy and critical infrastructure.

**EXHIBIT**
**2**

It is important that processors of beef, pork, and poultry ("meat and poultry") in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans. However, outbreaks of COVID-19 among workers at some processing facilities have led to the reduction in some of those facilities' production capacity. In addition, recent actions in some States have led to the complete closure of some large processing facilities. Such actions may differ from or be inconsistent with interim guidance recently issued by the Centers for Disease Control and Prevention (CDC) of the Department of Health and Human Services and the Occupational Safety and Health Administration (OSHA) of the Department of Labor entitled "Meat and Poultry Processing Workers and Employers" providing for the safe operation of such facilities.

Such closures threaten the continued functioning of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency. Given the high volume of meat and poultry processed by many facilities, any unnecessary closures can quickly have a large effect on the food supply chain. For example, closure of a single large beef processing facility can result in the loss of over 10 million individual servings of beef in a single day. Similarly, under established supply chains, closure of a single meat or poultry processing facility can severely disrupt the supply of protein to an entire grocery store chain.

Accordingly, I find that meat and poultry in the food supply chain meet the criteria specified in section 101(b) of the Act (50 U.S.C. 4511(b)). Under the delegation of authority provided in this order, the Secretary of Agriculture shall take all appropriate action under that section to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA. Under the delegation of authority provided in this order, the Secretary of Agriculture may identify additional specific food supply chain resources that meet the criteria of section 101(b).

Sec. 2. Ensuring the Continued Supply of Meat and Poultry. (a) Notwithstanding Executive Order 13603 of March 16, 2012 (National Defense Resources Preparedness), the authority of the President to require performance of contracts or orders (other than

contracts of employment) to promote the national defense over performance of any other contracts or orders, to allocate materials, services, and facilities as deemed necessary or appropriate to promote the national defense, and to implement the Act in subchapter III of chapter 55 of title 50, United States Code (50 U.S.C. 4554, 4555, 4556, 4559, 4560), is delegated to the Secretary of Agriculture with respect to food supply chain resources, including meat and poultry, during the national emergency caused by the outbreak of COVID-19 within the United States.

(b) Secretary of Agriculture shall use the authority under section 101 of the Act, in consultation with the heads of such other executive departments and agencies as he deems appropriate, to determine the proper nationwide priorities and allocation of all the materials, services, and facilities necessary to ensure the continued supply of meat and poultry, consistent with the guidance for the operations of meat and poultry processing facilities jointly issued by the CDC and OSHA.

(c) The Secretary of Agriculture shall issue such orders and adopt and revise appropriate rules and regulations as may be necessary to implement this order.

   Sec. 3. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its

departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,
April 28, 2020.



MICHELLE LUJAN GRISHAM
GOVERNOR

**NEW MEXICO
DEPARTMENT OF
HEALTH**

BILLY J. JIMENEZ
ACTING CABINET SECRETARY

---

### PUBLIC HEALTH ORDER
### NEW MEXICO DEPARTMENT OF HEALTH
### ACTING SECRETARY BILLY J. JIMENEZ

### OCTOBER 22, 2020

**Public Health Emergency Order Clarifying that Current Guidance
Documents, Advisories, and Emergency Public Health Orders Remain
in Effect; and Amending Prior Public Health Emergency Orders
Limiting Businesses and Non-Profit Entities' Operations and
Providing Additional Restrictions on Mass Gatherings Due to COVID-19**

#### PREFACE

The purpose of this amended Public Health Emergency Order is to amend restrictions on mass gatherings and business operations, which were implemented in response to the spread of the Novel Coronavirus Disease 2019 ("COVID-19"). Continued social distancing and self-isolation measures are necessary to protect public health given the potentially devastating effects that could result from a rapid increase in COVID-19 cases in New Mexico. While this Order continues some loosened restrictions on mass gatherings and business operations, the core directive underlying all prior public health initiatives remains intact; **all New Mexicans should be staying in their homes for all but the most essential activities and services.** When New Mexicans are not in their homes, they must strictly adhere to social distancing protocols and wear face coverings to minimize risks. These sacrifices are the best contribution that each of us can individually make to protect the health and wellbeing of our fellow citizens and the State as a whole. In accordance with these purposes, this Order and its exceptions should be narrowly construed to encourage New Mexicans to stay in their homes for all but the most essential activities.

It is hereby **ORDERED** that:

1.     All current guidance documents and advisories issued by the Department of Health remain in effect.

2.     The following Public Health Emergency Orders remain in effect through the current Public Health Emergency and any subsequent renewals of that Public Health Emergency or until they are amended or rescinded:

      A.     March 13, 2020 Public Health Emergency Order to Temporarily Limit Nursing Home Visitation Due to COVID-19;

      B.     April 30, 2020 Public Health Emergency Order Modifying Temporary Restrictions on Non-Essential Health Care Services, Procedures, and Surgeries;

---

**OFFICE OF THE SECRETARY**
1190 St. Francis Dr., Suite N4100 • P.O. Box 26110 • Santa Fe, New Mexico • 87502
(505) 827-2613 • FAX: (505) 827-2530 • www.nmhealth.org



EXHIBIT
3

C. March 24, 2020 Public Health Emergency Order Temporarily Regulating the Sale and Distribution of Personal Protective Equipment Due to Shortages Caused by COVID-19; and

D. September 3, 2020 Public Health Emergency Order Clarifying that Polling Places Shall be Open as Required in the Election Code and Imposing Certain Social Distancing Restrictions on Polling Places.

3. The October 16, 2020 Public Health Emergency Order Clarifying that Current Guidance Documents, Advisories, and Emergency Public Health Orders Remain in Effect; and Amending Prior Public Health Emergency Orders Limiting Businesses and Non-Profit Entities' Operations and Providing Additional Restrictions on Mass Gatherings Due to COVID-19 is hereby amended as follows:

## ORDER

**WHEREAS,** on March 11, 2020, because of the spread of the novel Coronavirus Disease 2019 ("COVID-19"), Michelle Lujan Grisham, the Governor of the State of New Mexico, declared that a Public Health Emergency exists in New Mexico under the Public Health Emergency Response Act, and invoked her authority under the All Hazards Emergency Management Act;

**WHEREAS,** Governor Michelle Lujan Grisham has renewed the declaration of a Public Health Emergency through November 13, 2020;

**WHEREAS,** COVID-19 continues to spread in New Mexico and nationally. Since, Executive Order 2020-004 was issued, confirmed COVID-19 infections in New Mexico have risen to over 34,000 and confirmed cases in the United States have risen to more than 7.8 million, with significant recent spikes in cases in some of our neighboring states;

**WHEREAS,** the further spread of COVID-19 in the State of New Mexico poses a threat to the health, safety, wellbeing and property of the residents in the State due to, among other things, illness from COVID-19, illness-related absenteeism from employment (particularly among public safety and law enforcement personnel and persons engaged in activities and businesses critical to the economy and infrastructure of the State), potential displacement of persons, and closures of schools or other places of public gathering;

**WHEREAS,** social distancing and the consistent and proper use of face coverings in public spaces are the most effective ways New Mexicans can minimize the spread of COVID-19 and mitigate the potentially devastating impact of this pandemic in New Mexico; and

**WHEREAS,** the New Mexico Department of Health possesses legal authority pursuant to the Public Health Act, NMSA 1978, Sections 24-1-1 to -40, the Public Health Emergency Response Act, NMSA 1978, Sections 12-10A-1 to -19, the Department of Health Act, NMSA 1978, Sections 9-7-1 to -18, and inherent constitutional police powers of the New Mexico state government, to preserve and promote public health and safety, to adopt isolation and quarantine,

2

and to close public places and forbid gatherings of people when deemed necessary by the Department for the protection of public health.

**NOW, THEREFORE, I,** Billy J. Jimenez, Acting Cabinet Secretary of the New Mexico Department of Health, in accordance with the authority vested in me by the Constitution and the Laws of the State of New Mexico, and as directed by the Governor pursuant to the full scope of her emergency powers under the All Hazard Emergency Management Act, do hereby declare the current outbreak of COVID-19 a condition of public health importance as defined in the New Mexico Public Health Act, NMSA 1978, Section 24-1-2(A) as an infection, a disease, a syndrome, a symptom, an injury or other threat that is identifiable on an individual or community level and can reasonably be expected to lead to adverse health effects in the community, and that poses an imminent threat of substantial harm to the population of New Mexico.

The following definitions are adopted for the purposes of this Order:

Definitions: As used in this Public Health Order, the following terms shall have the meaning given to them, except where the context clearly requires otherwise:

(1) "Essential business" means any business or non-profit entity falling within one or more of the following categories:

a. Health care operations including hospitals, walk-in-care health facilities, pharmacies, medical wholesale and distribution, home health care workers or aides for the elderly, emergency dental facilities, nursing homes, residential health care facilities, research facilities, congregate care facilities, intermediate care facilities for those with intellectual or developmental disabilities, supportive living homes, home health care providers, drug and alcohol recovery support services, and medical supplies and equipment manufacturers and providers;

b. Homeless shelters, food banks, and other services providing care to indigent or needy populations;

c. Childcare facilities;

d. Grocery stores, supermarkets, food banks, farmers' markets and vendors who sell food, convenience stores, and other businesses that generate the majority of their revenue from the sale of canned food, dry goods, fresh fruits and vegetables, pet food, feed, and other animal supply stores, fresh meats, fish, and poultry, and any other household consumer products;

e. Farms, ranches, and other food cultivation, processing, or packaging operations;

f. Infrastructure operations including, but not limited to, public works construction, commercial and residential construction and maintenance, airport operations, public transportation, airlines, taxis, private transportation providers, transportation network companies, water, gas, electrical, oil drilling, oil refining, natural resources extraction or mining operations, nuclear material research and enrichment, those attendant to the repair and construction of roads and highways, gas stations, solid waste collection and removal, trash and recycling collection,

processing and disposal, sewer, data and internet providers, data centers, technology support operations, and telecommunications systems;

g.   Manufacturing operations involved in food processing, manufacturing agents, chemicals, fertilizer, pharmaceuticals, sanitary products, household paper products, microelectronics/semi-conductor, primary metals manufacturers, electrical equipment, appliance, and component manufacturers, and transportation equipment manufacturers;

h.   Services necessary to maintain the safety and sanitation of residences or essential businesses including security services, towing services, custodial services, plumbers, electricians, and other skilled trades;

i.   Veterinary and livestock services, animal shelters and facilities providing pet adoption, grooming, daycare, or boarding services;

j.   Media services;

k.   Automobile repair facilities, bike repair facilities, and retailers who generate the majority of their revenue from the sale of automobile or bike repair products;

l.   Utilities, including their contractors, suppliers, and supportive operations, engaged in power generation, fuel supply and transmission, water and wastewater supply;

m.   Hardware stores;

n.   Laundromats and dry cleaner services;

o.   Funeral homes, crematoriums and cemeteries;

p.   Banks, credit unions, insurance providers, payroll services, brokerage services, and investment management firms;

q.   Businesses providing mailing and shipping services;

r.   Laboratories and defense and national security-related operations supporting the United States government, a contractor to the United States government, or any federal entity;

s.   Professional services, such as legal or accounting services, but only where necessary to assist in compliance with legally mandated activities; and

t.   Logistics, and also businesses that store, transport, or deliver groceries, food, materials, goods or services directly to residences, retailers, government institutions, or essential businesses.

(2)    "Close-contact businesses" include barbershops, hair salons, gyms, group fitness classes, tattoo parlors, nail salons, spas, massage parlors, esthetician clinics, tanning salons, guided raft tours, guided balloon tours, bowling alleys, ice skating rinks, and personal training services.

(3)    "Food and drink establishments" include restaurants, breweries, wineries, distillers, cafes, coffee shops, or other similar establishments that offer food or drink.  For purposes of this section, "breweries" are those businesses licensed pursuant to NMSA 1978, Section 60-6A-26.1; "distillers" are those businesses licensed pursuant to NMSA 1978, Section 60-6A-1; and "wineries" are those businesses licensed pursuant to NMSA 1978, Section 60-A-11.

(4)    "Houses of worship" means any church, synagogue, mosque, or other gathering space where persons congregate to exercise their religious beliefs.

(5)    "Close-contact recreational facilities" include indoor movie theaters, indoor museums with interactive displays or exhibits and other similar venues, miniature golf, arcades, amusement parks, aquariums, casinos, concert venues, professional sports venues, event venues, bars, dance clubs, performance venues, go-kart courses, automobile racetracks, adult entertainment venues, and other places of recreation or entertainment.  For purposes of this section, a "bar" is defined as any business that generated more than half of its revenue from the sale of alcohol during the preceding fiscal year.

(6)    "Outdoor recreational facilities" include outdoor golf courses, public swimming pools, outdoor tennis courts, youth programs, youth livestock shows, u-pick produce operations and corn mazes, horseracing tracks, botanical gardens, outdoor zoos, and New Mexico state parks.

(7)    "Places of lodging" means all hotels, motels, RV parks, and short-term vacation rentals.

(8)    "Retail space" means any business that sells goods or services directly to consumers or end-users and includes the following "essential businesses" identified in the categories above: 1(d), (1)k, (1)m, and (1)n.

(9)    "Mass gathering" means any public gathering, private gathering, organized event, ceremony, parade, organized amateur contact sport, or other grouping that brings together more than five (5) individuals in a single room or connected space, confined outdoor space or an open outdoor space.  "Mass gathering" does not include the presence more than five (5) individuals where those individuals regularly reside.  "Mass gathering" does not include individuals who are public officials or public employees in the course and scope of their employment.

(10)   "COVID-Safe Practices" ("CSPs") are those directives, guidelines, and recommendations for businesses and other public operations that are set out and memorialized in the document titled "All Together New Mexico: COVID-Safe Practices for Individuals and Employers."  This document may be obtained at the following link https://cv.nmhealth.org/covid-safe-practices/.

**I HEREBY DIRECT AS FOLLOWS:**

(1)     Except as provided elsewhere in this Order, all "mass gatherings" are hereby prohibited under the powers and authority set forth in the Public Health Act. An indoor or outdoor parade of any sort is a mass gathering; parades are therefore prohibited under this Order.

(2)     "Essential businesses" may open but must comply with the pertinent "COVID-Safe Practices (CSPs)" section(s) of the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers" and any identified occupancy restrictions. "Essential businesses" identified as a "retail space" must close by 10:00 p.m. and must remain closed until at least 4:00 a.m. A "retail space" may not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department. Further, an "essential business" identified as a "retail space" may not allow a person who is without a mask or multilayer cloth face covering to enter the premises except where that person is in possession of a written exemption from a healthcare provider.

(3)     "Close-contact businesses" may operate at up to 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department. Bowling alleys may open for league play only and must adhere to occupancy restrictions and all applicable CSP's including wearing masks. Ice skating rinks may operate for athletic training and practice by reservation only.

(4)     "Close-contact recreational facilities" must remain closed.

(5)     "Food and drink establishments" may provide dine-in service, but they may not exceed more than 25% occupancy of the maximum occupancy in any enclosed space on the premises, as determined by the relevant fire marshal or fire department. "Food and drink establishments" choosing to provide indoor dining must ensure that there is at least six feet of distance between tables. No more than six patrons may be seated at any single table. No bar our counter seating is permitted. Dine-in services shall be provided only to patrons who are seated at table, and patrons may not consume food or beverage while standing. In order to provide any indoor dining after October 30, 2020, "food and drink establishments" must complete the NM Safe Certified training offered at https://nmsafecertified.org, as well as comply with all NM Safe Certified requirements, including, but not limited to: screening customers and staff for symptoms of COVID-19 prior to entry, consenting to Department of Health spot-testing of symptomatic employees, requiring dine-in customers to provide limited contact information for contact tracing purposes, and retaining contact tracing information for no less than three weeks. All "food and drink establishments," regardless of noncompliance with the NM Safe Certified requirements, may provide service in outdoor seating areas up to 75% occupancy, where applicable. In all instances, tables in outdoor seating areas must be spaced at least six feet apart. No more than six patrons may be seated at any single table. Patrons must be seated in order to be served food or drink unless ordering food for carryout. No bar or counter seating is permitted. "Food and drink establishments" may provide carryout service, or delivery service if otherwise permitted by law. Any "food and drink establishment" that is permitted to serve alcohol must close for in-person service by 10:00 p.m. and must remain closed until at least 4:00 a.m. "Food and drink

6

establishments" may provide delivery service after 10:00 p.m. but no customers are permitted on the premises.

(6)　"Houses of worship" may hold religious services, indoors or outdoors, or provide services through audiovisual means, but may not be used as a venue for non-religious events. "Houses of worship" may not exceed 40% of the maximum occupancy of any enclosed building, as determined by the relevant fire marshal or fire department.

(7)　"Outdoor recreational facilities" may operate provided they comply with the pertinent "All Together New Mexico: COVID-Safe Practices for Individuals and Businesses." Further, state parks shall only be open to New Mexico residents.　Visitor centers and any other large enclosed indoor spaces at state parks shall remain closed. As a condition of entering a state park, all visitors must demonstrate proof of residency through one of the following means: a New Mexico license plate on their vehicle; a New Mexico driver's license or ID card; a valid New Mexico vehicle registration; a federal document attesting to residency; or a military identification. The State Parks Division is directed to extend the use of annual camping passes that were purchased after March 2019 for a period determined by the State Parks Division related to the original expiration date due to the closure of State Parks to camping. In addition, public swimming pools are limited to the concurrent use of not more than ten (10) persons.　Play and splash areas shall be closed.　Horseracing tracks may not allow spectators.

(8)　"Places of lodging" which have completed the NM Safe Certified training offered at https://nmsafecertified.org may operate up to 60% of maximum occupancy.　All other "places of lodging" shall not operate at more than 25% of maximum occupancy.　Healthcare providers who are engaged in the provision of care to New Mexico residents or individuals utilizing "places of lodging" for extended stays, as temporary housing, or for purposes of quarantining shall not be counted for purposes of determining maximum occupancy. ·

(9)　Any business that is not identified as an "essential business," "close-contact business," "food and drink establishment," "house of worship," "close-contact recreational facility," "outdoor recreational facility," or "place of lodging" may open provided that the total number of persons situated within the business does not exceed 25% of the maximum occupancy of any enclosed space on the business's premises, as determined by the relevant fire marshal or fire department.

(10)　Any entity, including businesses and houses of worship, operating pursuant to this public health order must comply with the pertinent "COVID-Safe Practices (CSPs)" section(s) of the "All Together New Mexico: COVID-Safe Practices for Individuals and Employers" and also any identified occupancy restrictions.

(11)　Private educational institutions serving children and young adults from pre-Kindergarten through 12th Grade, including homeschools serving children who are not household members, shall adhere to the face covering and other COVID-Safe Practices requirements for in-person instruction described in the document "Reentry Guidance" published by New Mexico's Public Education Department on June 20, 2020 and as updated from time to time thereafter, and shall operate with a maximum occupancy of 25% of any individual enclosed indoor space, such as

any classroom, as determined by the relevant fire marshal or fire department, with the occupancy restriction herein to govern in the event of any discrepancy with the "Reentry Guidance."

(12)     Unless a healthcare provider instructs otherwise, all individuals shall wear a mask or multilayer cloth face covering in public settings except when eating or drinking. Masks with vents shall not satisfy this requirement.

(13)     The New Mexico Department of Health, the New Mexico Department of Public Safety, the New Mexico Department of Homeland Security and Emergency Management, the Department of the Environment, and all other State departments and agencies are authorized to take all appropriate steps to ensure compliance with this Order.

(14)     In order to minimize the shortage of health care supplies and other necessary goods, grocery stores and other retailers are hereby directed to limit the sale of medications, durable medical equipment, baby formula, diapers, sanitary care products, and hygiene products to three items per individual. NMSA 1978, § 12-10A-6.

(15)     Any "food and drink establishment," "close-contact business," "place of lodging," "retail space," or other business that poses a significant public health risk, as determined by the Department of Health, must close for a period of two weeks following the occurrence of four (4) or more rapid responses within a fourteen (14) day period. For purposes of this directive, rapid responses will be counted on a rolling basis. Notwithstanding this provision, a "retail space" may be permitted to continue operating if the Department of Health, after consultation with the Environment Department, determines that the business is a necessary provider of goods or services within the community in light of geographic considerations.

(16)     All state-run museums must close.

**I FURTHER DIRECT** as follows:

(1)     This Public Health Order shall be broadly disseminated in English, Spanish and other appropriate languages to the citizens of the State of New Mexico.

(2)     This Public Health Order declaring restrictions based upon the existence of a condition of public health importance shall not abrogate any disease-reporting requirements set forth in the New Mexico Public Health Act.

(3)     Nothing in this Public Health Order is intended to restrain or preempt local authorities from enacting more stringent restrictions than those required by the Order.

(4)     This Public Health Order shall take effect on October 23, 2020 and remain in effect through November 13, 2020.

**I FURTHER ADVISE the public to take the following preventive precautions:**

- <u>New Mexico citizens should stay at home and undertake only those outings absolutely necessary for their health, safety, or welfare.</u>
- Retailers should take appropriate action consistent with this order to reduce hoarding and ensure that all New Mexicans can purchase necessary goods.
- Avoid crowds.
- Avoid all non-essential travel including plane trips and cruise ships.

ATTEST:

DONE AT THE EXECUTIVE OFFICE
THIS 22ND DAY OF OCTOBER 2020

*Maggie Toulouse Oli...*

_____
MAGGIE TOULOUSE OLIVER
SECRETARY OF STATE

WITNESS MY HAND AND THE GREAT
SEAL OF THE STATE OF NEW MEXICO

_____
BILLY J. JIMÉNEZ
ACTING CABINET SECRETARY OF THE
STATE OF NEW MEXICO DEPARTMENT OF
HEALTH

9

 **U.S. DEPARTMENT OF AGRICULTURE**

# USDA To Implement President Trump's Executive Order On Meat and Poultry Processors

**Statement**
Release No. 0234.20

**Contact:** USDA Press
**Email:** press@oc.usda.gov

**(Washington, D.C., April 28, 2020)** - U.S. Secretary of Agriculture Sonny Perdue released the following statement after President Donald J. Trump signed an Executive Order to keep meat and poultry processing facilities open during the COVID-19 national emergency.

"I thank President Trump for signing this executive order and recognizing the importance of keeping our food supply chain safe, secure, and plentiful. Our nation's meat and poultry processing facilities play an integral role in the continuity of our food supply chain," **said Secretary Perdue.** "Maintaining the health and safety of these heroic employees in order to ensure that these critical facilities can continue operating is paramount. I also want to thank the companies who are doing their best to keep their workforce safe as well as keeping our food supply sustained. USDA will continue to work with its partners across the federal government to ensure employee safety to maintain this essential industry."

The Centers for Disease Control and Prevention (CDC) of the Department of Health and Human Services and the Occupational Safety and Health Administration (OSHA) of the Department of Labor have put out guidance for plants to implement to help ensure employee safety to reopen plants or to continue to operate those still open. Under the Executive Order and the authority of the Defense Production Act, USDA will work with



EXHIBIT
4

meat processing to affirm they will operate in accordance with the CDC and OSHA guidance, and then work with state and local officials to ensure that these plants are allowed to operate to produce the meat protein that Americans need. USDA will continue to work with the CDC, OSHA, FDA, and state and local officials to ensure that facilities implementing this guidance to keep employees safe can continue operating.

Additional information and details will be released soon.

#

USDA is an equal opportunity provider, employer, and lender.



CONFIDENTIAL

**RE: Stampede Prevention of COVID-19 Policy and Procedures**

**Date:** October 30, 2020
**Supersedes:** September 30, 2020

The following are measures Stampede has implemented during the COVID-19 pandemic to protect its team members:

**Monitoring & Communication**
1. The HR & Safety Department monitors OSHA, CDC, IDPH, CCDPH, and WHO updates daily and sends notifications to employees via a variety of methods of communication: email; facility postings in common areas, including cafeteria monitors; posters displayed on walls and doors throughout facility; memos on paychecks; and verbal communication by HR and Safety personnel.
2. Stampede issued and updates their COVID-19 policy and implements changes as needed to respond to the coronavirus pandemic.
3. Stampede leadership members meet weekly to discuss new COVID-19 preventative measures and improvements.
4. Employees are instructed not to report to work if they have symptoms of the virus, and to contact Human Resources.
5. All employees, visitors and sanitation personnel are required to complete a COVID-19 screening questionnaire administered on-site daily by HR, security and designated production personnel in order to proceed into the facility. Anyone who affirms that they have suspected or confirmed COVID- 19, symptoms of the virus, close contact with someone who has or is suspected to have the virus, or who has been quarantined by a medical professional is instructed to immediately leave the facility and call the HR department, unless first aid or other assistance is required by the individual due to current state of health.
6. Communication has been posted via cafeteria monitors explaining the importance of answering the questionnaire honestly, and to stay home if employees experience any COVID symptoms to avoid putting co-workers at risk of contracting the virus.
7. Effective May 6, Stampede will use touchless thermometers to take the temperature of every employee prior to entering the building pre-shift as part of the daily employee screening process for COVID-19. The temperature screener will be positioned behind a physical barrier booth to protect the temperature screener from potential exposure to COVID-19 through respiratory droplets of employees as they have their temperature taken. After shift start, temperature screening will be conducted at HR entrance for first floor employees, Shipping & Receiving entrance for employees in that area, and by receptionist for corporate employees and visitors. Temperature Screeners have been trained to conduct temperature taking.
8. Stampede received assistance from NM DOH to periodically test all employees and PSSI employees for COVID-19. First round of testing was completed for both shifts of Stampede employees and third shift PSSI sanitation employees on May 4-5, 2020. Any individuals who tested positive were self-quarantined as per standard policy and social tracing was conducted to notify and self-quarantine close contacts of those who tested positive. Re-testing was completed for all employees weekly, then bi-weekly thereafter.

CONFIDENTIAL – The information contained in this document is privileged, confidential, proprietary and protected from disclosure. If you are not the intended recipient any dissemination, distribution or copying is strictly prohibited.



EXHIBIT
5



CONFIDENTIAL

9.  Additional preventative measure reminders were posted at all facilities to remind employees to practice steps that reduce the spread of COVID-19. Laminated reminders were posted on: all plexi-glass partitions in cafeterias, on the inside of bathroom stall doors, bulletin boards, hallways, locker rooms, frock rooms, and QA Break Rooms.
10. Decals were designed and applied as a new mode of communication to remind employees and visitors of preventative measures throughout all Stampede facilities.
    a.  Removable decals were ordered and distributed to all vehicles as reminders for carpoolers to wear masks when sharing rides.
    b.  Printed adhesive decals were applied to sidewalks and floors to remind of social distancing and wearing masks.
    c.  Decals were placed at entryways reminding of social distancing, wearing masks at all times, and announcing that Stampede is a no handshake facility.
11. Video from President & CEO, was emailed and posted on monitors to encourage safe practices to reduce spread of COVID-19 while outside of work.
    a.  One video was distributed June 25-26.
    b.  Second video was distributed week of June 29, focused on maintaining precautionary measures while employees attend Independence Day celebrations/gatherings.
12. Face covering and meeting policy was emailed and posted to all employees at all Stampede locations to clarify Stampede policy and procedures regarding such. See August 6, 2020 document.
13. HR Director and HR Safety & Facilities Manager attended Illinois Manufacturers' Association and Illinois Manufacturing Excellence Center's Infectious Disease Prevention Training for Healthy Manufacturing Certificate Program, are developing a full Infectious Disease Prevention Control Plan for Stampede for review and approval by IMA to obtain certification for Stampede.
14. Hard hat decal was designed and applied to employee's production helmet to indicate communicate exemption from standard face cover policy, as per physician order.
15. Food Safety and HR teams developed COVID-19 training overview with acknowledgement signature pages for completion by employees to document and acknowledge training.

**Facilities & Housekeeping**

1.  All Stampede facilities are NO handshaking. Signs are posted at each location.
2.  Additional hand sanitizer stations were installed throughout each facility.
3.  High touch-point areas are sanitized every 30 mins.
    a.  This includes surfaces such as doorknobs, sinks, tables, elevator buttons, etc.
    b.  This is being documented as it is being completed.
4.  Employees are instructed to wash hands frequently with soap and water for 20 seconds. Additional handwash posters were posted near sinks throughout each facility, as well as postings on cafeteria monitors.
5.  Foggers are used on delivery trucks prior to loading product.
6.  Welfare areas and cafeterias are wiped down daily and fogged every other weekend.
7.  Plexi-glass barriers have been installed at high-traffic windows, such as frock room, receptionist desks and shipping & receiving windows.
8.  Plexiglass physical barriers installed on cafeteria tables.
9.  In addition to frequent handwashing, production team members are required to sanitize

CONFIDENTIAL – The information contained in this document is privileged, confidential, proprietary and protected from disclosure. If you are not the intended recipient any dissemination, distribution or copying is strictly prohibited.



CONFIDENTIAL

gloved hands hourly using EPA-registered disinfectant products that have qualified for use against SARS-COV-2, the novel coronavirus that causes COVID-19.

10. Supervisors have been instructed to sanitize their keyboards, desks, phones, and immediate work area daily after use in the supervisors' office.

11. Equipment such as forklifts, may not be shared between facilities. All employees at BP were informed that they may only use Stampede equipment to perform work and product inventory duties. Team members were consulted and Stampede equipment needs were reviewed to ensure that equipment on hand is sufficient for Stampede's needs.

12. Deep cleaning of offices, requiring clearing of desks and workspaces, is conducted by cleaning/sanitation teams every other weekend after offices are clear of employees.

13. PureZone anti-microbial silver ion film has been installed at all locations on high touch areas such as turnstiles, door handles and elevator buttons.

14. Stampede reviewed misters that would mist sanitizing solution in employee areas at times throughout the day or evening as an additional sanitation measure. However, were not able to find an acceptable option.

15. Touchless facial mask wearing recognition and temperature-checking kiosks are being tested at Bridgeview, IL entrances. Kiosks will be purchased for use in New Mexico after testing is concluded.

16. HVAC air filters have been changed from 7 MERV rating to 13 and 14 MERV rating filters. Contractor has been secured to assess reconfiguration of HVAC system to accommodate medical-grade HEPA filters.

17. PURO HELO UV disinfection lighting fixtures have been purchased and installation is in process for all facilities as an additional measure to sanitize surfaces.

### Quarantine & Travel

1. Any employee who answers "Yes" on their Daily COVID questionnaire, displays symptom(s) of COVID-19, or has suspected or confirmed COVID-19 is advised not to report to work and:
    a. Call Human Resources to inform of their situation and absence and Complete via telephone with HR: Daily COVID-19 Questionnaire and COVID-19 Investigation form;
    b. Self-quarantine for at least 14 days;
    c. Self-monitor for symptoms;
    d. Contact their physician if needed for medical assessment; and for return to work:
    e. Be fever-free for at least 72 hours without fever-reducing medication;
    f. Be asymptomatic or show improvement of symptoms with medical clearance;
    g. Receive negative results of a COVID-19 test; then
    h. Contact HR to review the information above and complete the Daily COVID questionnaire again via telephone before receiving approval to return on-site

2. After Stampede is informed that an employee has tested positive for COVID-19, social tracing is conducted, including review of video surveillance footage, to identify potential close contacts that were not identified during completion of the COVID-19 Investigation

CONFIDENTIAL – The information contained in this document is privileged, confidential, proprietary and protected from disclosure. If you are not the intended recipient any dissemination, distribution or copying is strictly prohibited.



form.

    a. The CDC defines close contact as at least 15 cumulative minutes of exposure within 6 feet or less distance within the 48 hours prior to the confirmed/suspected individual's development of symptoms or asymptomatic positive COVID specimen collection.

    b. The New Mexico facility utilizes New Mexico's definition of close contact, which is 3 minutes of exposure, versus the CDC's 15 cumulative minutes.

    c. Employees who are properly wearing 3 layers of face coverings are excluded from the close contact designation. Those improperly wearing 3 layers of face coverings or wearing only 1 layer of face covering are included in the close contact designation.

3. Close contacts of a confirmed-positive COVID individual must:

    a. Self-quarantine for at least 14 days from contact;

    b. Self-monitor for symptoms;

    c. Contact their physician if needed for medical assessment;

    d. Complete via telephone with HR: Daily COVID-19 Questionnaire and COVID-19 Investigation form;

    e. Receive negative results of a COVID-19 test;

    f. Be asymptomatic; and

    g. Contact HR to review the information above and complete the Daily COVID questionnaire again via telephone before receiving approval to return on-site

4. Close contacts of a confirmed-positive COVID individual living in the same household must:

    a. Self-monitor for symptoms;

    b. Contact their physician if needed for medical assessment;

    c. Complete via telephone with HR: Daily COVID-19 Questionnaire and COVID-19 Investigation form;

    d. Self-quarantine for at least 14 days;

    e. Receive negative COVID-19 test results for their household and themselves once household member(s) are cleared from isolation, fever-free for at least 72 hours without fever-reducing medication and symptoms improved;

    f. Be asymptomatic; and

    g. Contact HR to review the information above and complete the Daily COVID questionnaire again via telephone before receiving approval to return on-site

5. Stampede recommends that employees avoid personal travel during the pandemic.

6. International business travel was stopped.

7. Domestic business travel was significantly reduced, to include only essential business travel approved by CEO.

8. International travel, excluding employees commuting via automobile from Mexico to the Sunland Park facility, or domestic travel via airplane requires a 14-day self-quarantine period with no symptoms or known close contact to an individual with confirmed or suspected COVID-19, to return to work.

9. Travel policy was altered for any Salaried office employee with a position allowing employee to work from home, who traveled domestically and flew, to include the following options upon their return home from travel to reduce 14 day self-quarantine period to return to work:

    a. May work from home for 7 days and must be asymptomatic;

CONFIDENTIAL – The information contained in this document is privileged, confidential, proprietary and protected from disclosure. If you are not the intended recipient any dissemination, distribution or copying is strictly prohibited.



b. or work from home for 5 days, remain asymptomatic, then get a negative COVID test;
c. AND complete phone screening by HR using Daily COVID Questionnaire;
d. In order to be approved to return to work.
e. Employees were reminded that they must wear a mask, wash hands frequently and maintain precautionary measures after returning to work.
f. If employee is driving to travel, he/she may return to work, but must be asymptomatic, satisfactorily complete Daily COVID Questionnaire, wear a mask at all times, and wash hands frequently to return to work.

## Work Schedules & Social Distancing

1. Employees whose positions allow have been provided the opportunities and equipment necessary to work from home where/when possible.
2. Conference calls are being utilized in place of in-person meetings.
3. Unnecessary foot-traffic has been minimized in all areas where possible. Upstairs employees should remain upstairs; downstairs employees should remain downstairs.
   a. *SP:* Supervisors, Assistant Supervisors, HR, etc. should use the outside balcony walkway, rather than walking inside through the 3rd floor to get to/from their vehicle.
   b. *BV:* Employees upstairs should use the main reception door to enter/exit, rather than walking through HR.
4. Employees are instructed to maintain a 6-foot distance from others when possible.
5. Tape applied to floors in frock areas to practice 6-feet of social distancing between individuals.
6. Additional frock room opened to allow fewer employees to gather in one area to obtain necessary production attire and create social distancing using floor markings in these areas.
7. Scheduled start and end-times were staggered for different lines, positions and shifts to decrease number of people entering/exiting/gathering/punching at timeclocks/occupying locker rooms/obtaining frocks at the same time to allow for social distancing.
8. Work shifts were shortened and employees are dismissed earlier - staggered dismissal.
9. Extra 30-minute breaks were eliminated to reduce gathering of employees in cafeteria. Employees continue to receive 20-minute paid breaks.
   a. SP has resumed two break periods for production due to longer work days.
10. Added additional break times to increase number of breaks on both shifts and decrease number of employees taking breaks at once to allow for social distancing.
11. Lunch seats were marked with "X" at every table. Employees may not sit on marked seats, requiring social distancing. This includes outside picnic tables.
12. Seating maximums in place for social distancing at each table for lunches/breaks.
13. Banned pot-luck lunches to decrease social gathering and sharing of food and food-related items in common areas.
14. A face mask is required to be worn over mouth and nose at all times while in Stampede facilities. Exception is while employee is actively eating or drinking.
15. Two additional neck warmers were distributed to all employees and temporary employees, with instructions that everyone is required to wear a clean neck warmer to cover their mouth and nose prior to entering the facility. Instruction was provided as to the purpose,

CONFIDENTIAL – The information contained in this document is privileged, confidential, proprietary and protected from disclosure. If you are not the intended recipient any dissemination, distribution or copying is strictly prohibited.



function and washing of neck warmers.  Postings were posted on monitors and posters displayed showing how to wear neck warmers properly to cover nose and mouth.

16. Physical barriers in production were evaluated.  Unable to find suitable option that allows for safe and correct installation and placement, with effectiveness for infection control during use while employees move around/to/from work areas during course of work duties.

17. All personnel must wear 3 layers of face coverage while in production:  surgical mask supplied by Stampede or approved mask from home; neck warmer over nose and mouth, or second face mask; and face shield.  Personnel have been provided the option to wear two face mask layers in place of a face mask and neck warmer, due to some complaints of neck warmer pulling the face mask down from nose for some individuals, with face shield as the required third layer.

18. Disposable surgical masks are distributed to employees daily, with replacements as needed, for use underneath their neck warmer and face shield onsite at Stampede.

19. Employees are allowed to wear outside face masks underneath their neck warmer inside the facility, provided the face mask is clean. N-95 masks and respirators are not allowed, as Stampede does not have, nor does it require, a respirator program.

20. Custom-made face shields were designed, tested, and are being distributed to all employees. The new face shields are a solution to the ongoing difficulty experienced due to fogging of face shields in shipping/freezer areas, which caused an accident safety hazard.  Sanitation process is in place for face shields used.  Face shield use and sanitation is being explained to employees in social distanced groups of 5 employees at a time in cafeteria during non-break time.

21. Adherence to items above is monitored by supervisors, human resources, quality assurance and on-site security teams.

22. An additional time clock was secured and installed for Bridgeview, IL facility to provide a 4th location for employees to clock in and out in production.

23. Production areas were assessed for social distancing capabilities.  Some areas of production were reconfigured to allow for social distancing.

24. To ensure social distancing for employees smoking outside facilities, boxes were taped on grounds to designate social distanced smoking areas and additional smoking receptacles were ordered to provide one receptacle per smoking spot.  Compliance is monitored and enforced by HR and Security teams.
    a. Ordered 1 additional receptacle for BV office personnel.
    b. No smoking is allowed at BP facility per building owner.

**GMPs**

1. As per standard requirements, all individuals in production must wear clean frocks, Stampede helmets, hair nets, beard nets when applicable, Stampede-issued boots compliant with the captured boot program, and clean gloves.

2. GMP instructions and reminders posted on employee cafeteria monitors in English, Spanish, and Polish – in Illinois.

3. No Stampede helmets are allowed outside of the facility to reduce risk of outside contamination. Security is monitoring this as well.

CONFIDENTIAL – The information contained in this document is privileged, confidential, proprietary and protected from disclosure. If you are not the intended recipient any dissemination, distribution or copying is strictly prohibited.



CONFIDENTIAL

4. Work gloves, sleeves etc. may only be kept in frock pockets; not in pants, sweatshirts, etc. Photos and postings were displayed on monitors and compliance is monitored by personnel.
5. GMP violations result in an increased 3-day suspension and retraining, versus 1-day suspension.

**Visitors**

1. Any visitors or meetings with outside resources that are Non-Essential/Non-Critical to Stampede production are suspended. This includes routine customer visits, vendor visits, and applicant visits
2. All interviews are conducted over the phone.
3. Job applications are not accepted in person and must be completed and submitted electronically.
4. Truck Drivers are limited to the shipping vestibule and are no longer allowed in Stampede buildings to use restrooms. Porta-potties were secured for use by outside drivers.
5. If essential / business critical visit is necessary, it must be approved in advance by Executive Management and all visitors must enter and check in at the front desk. They must review and sign an updated Visitor GMP policy and questionnaire, which includes screening questions regarding symptoms of COVID-19, exposure and recent travel.
   a. Visitors are not allowed at any of our facilities if they have tested positive or displayed symptoms of COVID-19; or if they have traveled internationally in the last 14 days.
   b. Any visitors who have traveled domestically within last 14 days must wear a mask & gloves in the plant.
   c. All visitors must sign a Visitor Assumption of Liability Relating to COVID-19 before entering our facilities.

**Leniency in company policies**

1. Allowing employees to use PTO or take a voluntary leave of absence from work if they: do not have childcare during the pandemic due to schools closing; have concerns of working during the pandemic; are in a high risk category for complications if they were to contract the virus, such as due to another medical condition or compromised immune system.
2. Suspending disciplinary points system for Hourly employees and temporary workers for COVID- 19 related reasons.

**Benefits**

1. Health insurance benefit plans changed to allow coverage for: all COVID-19 testing without cost- sharing to members.
2. Health insurance benefit plans changed to allow coverage for telehealth or telemedicine services for any diagnosis, both in and out of network, without cost-sharing to members.  This benefit was extended from 2020 into 2021.
3. Stampede approved an addendum to the health insurance plans for employees to expand coverage of flu shots not only at their doctor's office, but at various pharmacies throughout the U.S.
4. Stampede is implementing a voucher program to provide flu shots free of charge to

CONFIDENTIAL -- The information contained in this document is privileged, confidential, proprietary and protected from disclosure. If you are not the intended recipient any dissemination, distribution or copying is strictly prohibited.



CONFIDENTIAL

employees who are not enrolled in Stampede's health insurance coverage.

**Pending/New**

1. The new air purification system, Air PHX, testing at Bedford Park continues for further evaluation after test samples were obtained. QA resources (1-2 from BV – fully masked) conduct testing to test air samples, run the air purification system and obtain post-purification samples. If results show the air purification system is effective, it will be installed at all Stampede locations.
2. Proximity alert device with contract tracing feature starter kit did not function as intended. Seeking alternatives to order and test. Intent is to promote social distancing amongst wearers in office areas. All office employees and production and QA leadership would wear the device. The device vibrates to notify the wearer if he/she is less than 6 ft from another employee. Devices will provide contact tracing capabilities that will also be assessed.
3. Quotes and information are being obtained for consideration of on-site mobile testing of Stampede employees and temporary workers for COVID-19.
4. Currently negotiating procurement of sanitizing misting booths for all employees to pass through upon entry. Booths utilize hydrolyzed water, a safe compound, to sanitize surfaces when mist is applied.

Reviewed By: Christina Hackney

Title:  HR Director

Date:  10/30/2020

**PRIVILEGED & CONFIDENTIAL:** This document is for the exclusive use of the intended recipient(s) and contains privileged & confidential information. Do not replicate or distribute without written approval in advance from an authorized signer of Stampede Meat, Inc.

CONFIDENTIAL – The information contained in this document is privileged, confidential, proprietary and protected from disclosure. If you are not the intended recipient any dissemination, distribution or copying is strictly prohibited.

**CDC** Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

# Coronavirus Disease 2019 (COVID-19)                    MENU >

# Meat and Poultry Processing Workers and Employers

Interim Guidance from CDC and the Occupational Safety and Health Administration (OSHA)

Updated Oct. 29, 2020        Print

Meat and poultry processing facilities are a component of the critical infrastructure within the Food and Agriculture Sector ▣ ☑ . CDC's Critical Infrastructure Guidance advises that critical infrastructure workers may be permitted to continue work following potential exposure to COVID-19, provided they remain asymptomatic, have not had a positive test result for COVID-19, and additional precautions are implemented to protect them and the community. All meat and poultry processing facilities developing plans for continuing operations in the setting of COVID-19 occurring among workers or in the surrounding community should (1) work directly with appropriate state and local public health officials and occupational safety and health professionals; (2) incorporate relevant aspects of CDC guidance, including but not limited to this document and the CDC's Critical Infrastructure Guidance; and (3) incorporate guidance from other authoritative sources or regulatory bodies as needed.

### Facility Assessment Toolkit

Infection prevention and control measures at meat and poultry processing facilities.

### Printable Resources

Key Strategies for Employers ▣ [1 page] (alternate languages)

Tips for Employees ▣ [2 pages] (alternate languages)

 ### Communicating with Your Employees

Communication Plan for Select Non-healthcare Critical Infrastructure Employers

Multiple outbreaks of COVID-19 among meat and poultry processing facility workers have occurred in the United States recently. This document provides guidance for meat and poultry processing workers and employers—including those involved in beef, pork, and poultry operations. This guidance supplements but does not replace general guidance at these web sites:

- osha.gov/coronavirus ☑
- https://www.cdc.gov/coronavirus/2019-ncov/index.html
- https://www.cdc.gov/coronavirus/2019-ncov/community/critical-workers/implementing-safety-practices.html

COVID-19 is a respiratory illness caused by a new virus called SARS-CoV-2. Symptoms often include a fever, cough, and shortness of breath and can range from very mild to severe. Some people become so sick they must be admitted to the hospital, and some people may die from the illness. Our understanding about the new virus and how the virus spreads is evolving as we learn more about COVID-19, so check the CDC website for the latest information. The virus is thought to spread mainly from person to person:

- Between people who are in close contact with one another (within about six feet, which is about two meters).
- Through respiratory droplets produced when an infected person coughs, sneezes, or talks.



Recent studies indicate that people who are not showing symptoms can spread the virus. It may also be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes. This is not thought to be the main way the virus spreads, but we are still learning more about this virus. Some workers may be at higher risk for severe illness, including older adults and people of any age with underlying medical conditions. Policies and procedures addressing issues related to workers at higher risk of severe illness should be made in consultation with occupational medicine and human resource professionals.

# Exposure risk among meat and poultry processing workers

Workers involved in meat and poultry processing are not exposed to SARS-CoV-2 through the meat products they handle. However, their work environments—processing lines and other areas in busy plants where they have close contact with coworkers and supervisors—may contribute substantially to their potential exposures. The risk of occupational transmission of SARS-CoV-2 depends on several factors. Some of these factors are described in the U.S. Department of Labor and U.S. Department of and Health and Human Services' booklet Guidance on Preparing Workplaces for COVID-19 ◼ ☐ . Distinctive factors that affect workers' risk for exposure to SARS-CoV-2 in meat and poultry processing workplaces include:

- **Distance between workers** – meat and poultry processing workers often work close to one another on processing lines. Workers may also be near one another at other times, such as when clocking in or out, during breaks, or in locker/changing rooms.
- **Duration of contact** – meat and poultry processing workers often have prolonged closeness to coworkers (e.g., for 10-12 hours per shift). Continued contact with potentially infectious individuals increases the risk of SARS-CoV-2 transmission.
- **Type of contact** – meat and poultry processing workers may be exposed to the infectious virus through respiratory droplets in the air – for example, when workers in the plant who have the virus cough or sneeze. It is also possible that exposure could occur from contact with contaminated surfaces or objects, such as tools, workstations, or break room tables. Shared spaces such as break rooms, locker rooms, and entrances/exits to the facility may contribute to their risk.
- **Other distinctive factors that may increase risk among these workers include:**
  - A common practice at some workplaces of sharing transportation such as ride-share vans or shuttle vehicles, car-pools, and public transportation.
  - Frequent contact with fellow workers in community settings in areas where there is ongoing community transmission.

# Create a COVID-19 assessment and control plan

A qualified workplace coordinator should be identified who will be responsible for COVID-19 assessment and control planning. All workers in the facility should know how to contact the identified coordinator with any COVID-19 concerns. Infection control and occupational safety and health plans should apply to anyone entering or working in the plant (e.g., all facility workers, contractors, and others). Facility management should reach out to state and/or local public health officials and occupational safety and health professionals and establish ongoing communications to make sure they are getting relevant and up-to-date information concerning COVID-19. The workplace coordinators and management should also be aware of and follow all applicable federal regulations and public health agency guidelines. Worksite assessments to identify COVID-19 risks and prevention strategies should be done periodically as part of sound occupational health and public health practice. As part of these assessments, facilities should consider the appropriate role for testing and workplace contact tracing (identifying person-to-person spread) of COVID-19-positive workers in a worksite risk assessment, following available CDC guidance.

# Controls

Worker infection prevention recommendations are based on an approach known as the hierarchy of controls. This approach groups actions by their effectiveness in reducing or removing hazards. In most cases, the preferred approach is to eliminate a hazard or processes; install engineering controls; and implement appropriate cleaning, sanitation, and disinfection practices to reduce exposure or shield workers. Administrative controls are also an important part of an approach to prevention in these workplaces.

## Engineering Controls

Configure communal work environments so that workers are spaced at least six feet apart, if possible. Current information about the asymptomatic spread of SARS-CoV-2 supports the need for social distancing and other protective measures within a meat and poultry processing work environment. Changes in production practices may be necessary in order to maintain appropriate distances among workers.

# ng Workstations, If Feasible





Partitions may need to be adjusted to integrate with the processing line or other manufacturing equipment.



or tasks performed in tandem with workers cross from one another, partitions can be ositioned to protect workers while allowing e pass-through of materials.



**Partition**



Modify the alignment of workstations, including along processing lines, if feasible, so that workers are at least six feet apart in all directions (e.g., side-to-side and when facing one another), when possible. Ideally, modify the alignment of workstations so that workers do not face one another. Consider using markings and signs to remind workers to maintain their location at their station away from each other and practice social distancing on breaks.

Use physical barriers, such as strip curtains, plexiglass or similar materials, or other impermeable dividers or partitions, to separate meat and poultry processing workers from each other, if feasible.

Facilities should consider consulting with a heating, ventilation, and air conditioning engineer to ensure adequate ventilation in work areas to help minimize workers' potential exposures.

If fans such as pedestal fans or hard mounted fans are used in the facility, take steps to minimize air from fans blowing from one worker directly at another worker. Personal cooling fans should be removed from the workplace to reduce the potential spread of any airborne or aerosolized viruses. If fans are removed, employers should remain aware of, and take steps to prevent, heat hazards ☑ .

Place handwashing stations or hand sanitizers with at least 60% alcohol in multiple locations to encourage hand hygiene. If possible, choose hand sanitizer stations that are touch-free. See OSHA's Sanitation Standard (29 CFR 1910.141 ⧉ ), which requires employers to provide handwashing facilities for workers.

Add additional clock in/out stations, if possible, that are spaced apart, to reduce crowding in these areas. Consider alternatives such as touch-free methods or staggering times for workers to clock in/out.

Remove or rearrange chairs and tables, or add partitions to tables, in break rooms and other areas workers may frequent to increase worker separation. Identify alternative areas to accommodate overflow volume such as training and conference rooms, or using outside tents for break and lunch areas.

## Administrative Controls

Employers should do the following to promote social distancing:

- Encourage single-file movement with a six-foot distance between each worker through the facility, where possible.
- Designate workers to monitor and facilitate distancing on processing floor lines.
- Stagger break times or provide temporary break areas and restrooms to avoid groups of workers during breaks. Workers should maintain at least six feet of distance from others at all times, including on breaks.
- Stagger workers' arrival and departure times to avoid congregations of workers in parking areas, locker rooms, and near time clocks.
- Provide visual cues (e.g., floor markings, signs) as a reminder to workers to maintain social distancing.
- Encourage workers to avoid carpooling to and from work, if possible.
  - If carpooling or using company shuttle vehicles is a necessity for workers, the following control practices should be used:
    - Limit the number of people per vehicle as much as possible. This may mean using more vehicles.
    - Encourage employees to maintain social distancing as much as possible.
    - Encourage employees to use hand hygiene before entering the vehicle and when arriving at the destination.
    - Encourage employees in a shared van or car space to wear cloth masks.
    - Clean and disinfect commonly touched surfaces after each carpool or shuttle trip (e.g., door handles, handrails, seatbelt buckles).
    - Encourage employees to follow coughing and sneezing ■ etiquette when in the vehicle.

Employers may determine that modifying processing or production lines, shifts, and staggering workers across shifts would help to maintain overall meat and poultry processing capacity while measures to minimize exposure to SARS-CoV-2 are in place. For example, a plant that normally operates on one daytime shift may be able to split workers into two or three shifts throughout a 24-hour period. In meat and poultry processing plants, one shift may need to be reserved for cleaning and sanitization.

Monitor and respond to absenteeism at the workplace. Implement plans to continue essential business functions in cases of higher than usual absenteeism.

Review leave and incentivize policies:

- Analyze sick leave policies and consider modifying them to make sure that ill workers are not in the workplace. Make sure that employees are aware of and understand these policies.
- Analyze any incentive programs and consider modifying them, if warranted, so that employees are not penalized for taking sick leave if they have COVID-19.

- Additional flexibilities might include giving advances on future sick leave and allowing employees to donate sick leave to each other.

Consider cohorting (grouping together) workers. This can increase the effectiveness of altering the plant's normal shift schedules by making sure that groups of workers are always assigned to the same shifts with the same coworkers. Cohorting may reduce the spread of workplace SARS-CoV-2 transmission by minimizing the number of different individuals who come into close contact with each other over the course of a week. Cohorting may also reduce the number of workers quarantined because of exposure to the virus.

Establish a system for employees to alert their supervisors if they are experiencing signs or symptoms of COVID-19 or if they have had recent close contact with a suspected or confirmed COVID-19 case.

Give employees enough time to wash and dry their hands, and provide accessible sinks, soap, water, and a way to dry their hands (e.g., paper towels, hand dryer).

- Provide alcohol-based hand sanitizers containing at least 60% alcohol if soap and water are not immediately available.
- Place hand sanitizers in multiple locations to encourage hand hygiene. If possible, choose hand sanitizer stations that are touch-free.
- Consider other workplace programs to promote personal hygiene, such as:
    ◦ building additional short breaks into staff schedules to increase how often staff can wash their hands with soap and water or use hand sanitizers with at least 60% alcohol;
    ◦ providing tissues and no-touch trash receptacles for workers to use; and
    ◦ educating workers that cigarettes and smokeless tobacco use can lead to increased contact between potentially contaminated hands and their mouth, and that avoiding these products may reduce their risk of infection.

Workers should be educated to avoid touching their faces, including their eyes, noses, and mouths, particularly until after they have thoroughly washed their hands upon completing work and/or removing personal protective equipment (PPE).
- Encourage single-file movement with a six-foot distance between each worker through the facility, where possible.
- Designate workers to monitor and facilitate distancing on processing floor lines.
- Stagger break times or provide temporary break areas and restrooms to avoid groups of workers during breaks. Workers should maintain at least six feet of distance from others at all times, including on breaks.
- Stagger workers' arrival and departure times to avoid congregations of workers in parking areas, locker rooms, and near time clocks.
- Provide visual cues (e.g., floor markings, signs) as a reminder to workers to maintain social distancing.
- Encourage workers to avoid carpooling to and from work, if possible.
    ◦ If carpooling or using company shuttle vehicles is a necessity for workers, the following control practices should be used:
        ▪ Limit the number of people per vehicle as much as possible. This may mean using more vehicles.
        ▪ Encourage employees to maintain social distancing as much as possible.
        ▪ Encourage employees to use hand hygiene before entering the vehicle and when arriving at the destination.
        ▪ Encourage employees in a shared van or car space to wear cloth masks.
        ▪ Clean and disinfect commonly touched surfaces after each carpool or shuttle trip (e.g., door handles, handrails, seatbelt buckles).
        ▪ Encourage employees to follow coughing and sneezing ▪ etiquette when in the vehicle.

Employers may determine that modifying processing or production lines, shifts, and staggering workers across shifts would help to maintain overall meat and poultry processing capacity while measures to minimize exposure to SARS-CoV-2 are in place. For example, a plant that normally operates on one daytime shift may be able to split workers into two or three shifts throughout a 24-hour period. In meat and poultry processing plants, one shift may need to be reserved for cleaning and sanitization.

Monitor and respond to absenteeism at the workplace. Implement plans to continue essential business functions in cases of higher than usual absenteeism.

Review leave and incentivize policies:

- Analyze sick leave policies and consider modifying them to make sure that ill workers are not in the workplace. Make sure that employees are aware of and understand these policies.
- Analyze any incentive programs and consider modifying them, if warranted, so that employees are not penalized for taking sick leave if they have COVID-19.
- Additional flexibilities might include giving advances on future sick leave and allowing employees to donate sick leave to each other.

Consider cohorting (grouping together) workers. This can increase the effectiveness of altering the plant's normal shift schedules by making sure that groups of workers are always assigned to the same shifts with the same coworkers. Cohorting may reduce the spread of workplace SARS-CoV-2 transmission by minimizing the number of different individuals who come into close contact with each other over the course of a week. Cohorting may also reduce the number of workers quarantined because of exposure to the virus.

Establish a system for employees to alert their supervisors if they are experiencing signs or symptoms of COVID-19 or if they have had recent close contact with a suspected or confirmed COVID-19 case.

Give employees enough time to wash and dry their hands, and provide accessible sinks, soap, water, and a way to dry their hands (e.g., paper towels, hand dryer).

- Provide alcohol-based hand sanitizers containing at least 60% alcohol if soap and water are not immediately available.
- Place hand sanitizers in multiple locations to encourage hand hygiene. If possible, choose hand sanitizer stations that are touch-free.
- Consider other workplace programs to promote personal hygiene, such as:
    ∘ building additional short breaks into staff schedules to increase how often staff can wash their hands with soap and water or use hand sanitizers with at least 60% alcohol;
    ∘ providing tissues and no-touch trash receptacles for workers to use; and
    ∘ educating workers that cigarettes and smokeless tobacco use can lead to increased contact between potentially contaminated hands and their mouth, and that avoiding these products may reduce their risk of infection.

Workers should be educated to avoid touching their faces, including their eyes, noses, and mouths, particularly until after they have thoroughly washed their hands upon completing work and/or removing personal protective equipment (PPE).

## Cloth face coverings in meat and poultry processing facilities

CDC recommends wearing cloth face coverings as a protective measure in addition to social distancing (i.e., staying at least 6 feet away from others). Cloth face coverings may be especially important when social distancing is not possible or feasible based on working conditions. A cloth face covering may reduce the amount of large

respiratory droplets that a person spreads when talking, sneezing, or coughing. Cloth face coverings may prevent people who do not know they have the virus that causes COVID-19 from spreading it to others. Cloth face coverings are intended to protect other people—not the wearer.

**Cloth face coverings are not PPE. They are not appropriate substitutes for PPE such as respirators (like N95 respirators) or medical facemasks (like surgical masks) in workplaces where respirators or facemasks are recommended or required to protect the wearer.**

While wearing cloth face coverings is a public health measure intended to reduce the spread of COVID-19 in communities, it may not be practical for workers to wear a single cloth face covering for the full duration of a work shift (e.g., eight or more hours) in a meat or poultry processing facility if they become wet, soiled, or otherwise visibly contaminated during the work shift. If cloth face coverings are worn in these facilities, employers should provide readily available clean cloth face coverings (or disposable facemask options) for workers to use when the coverings become wet, soiled, or otherwise visibly contaminated.

Employers who determine that cloth face coverings should be worn in the workplace, including to comply with state or local requirements for their use, should ensure the cloth face coverings:

- fit over the nose and mouth and fit snugly but comfortably against the side of the face;
- are secured with ties or ear loops;
- include multiple layers of fabric;
- allow for breathing without restriction;
- can be laundered using the warmest appropriate water setting and machine dried daily after the shift, without damage or change to shape (a clean cloth face covering should be used each day);
- are not used if they become wet or contaminated;
- are replaced with clean replacements, provided by employer, as needed;
- are handled as little as possible to prevent transferring infectious materials to the cloth; and
- are not worn with or instead of respiratory protection when respirators are needed.

# Educate and train workers and supervisors about how they can reduce the spread of COVID-19.

Supplement workers' normal and required job training (e.g., training required under OSHA standards) with additional training and information about COVID-19, recognizing signs and symptoms of infection, and ways to prevent exposure to the virus. Training should include information about how to implement the various infection prevention and control measures recommended here and included in any infection prevention and control or COVID-19 response plan that an employer develops. OSHA provides additional information ⬀ about training on its COVID-19 webpage.

All communication and training should be easy to understand and should (1) be provided in languages appropriate to the preferred languages spoken or read by the workers, if possible; (2) be at the appropriate literacy level; and (3) include accurate and timely information about:

- signs and symptoms of COVID-19, how it spreads, risks for workplace exposures, and how workers can protect themselves;
- proper handwashing practices and use of hand sanitizer stations;
- cough and sneeze etiquette; and

- other routine infection control precautions (e.g., signs and symptoms of COVID-19, putting on or taking off masks or cloth face coverings and social distancing measures).

Employers should place simple posters in all of the languages that are common in the worker population that encourage staying home when sick, cough and sneeze etiquette, and proper hand hygiene practices. They should place these posters at the entrance to the workplace and in break areas, locker rooms, and other workplace areas where they are likely to be seen.



- CDC has free, simple posters available to download and print, some of which are translated into different languages. The Stop the Spread of Germs poster ■ is available in Amharic ■ , Arabic ■ , Burmese ■ , Dari ■ , Farsi ■ , French ■ , Haitian Creole ■ , Kinyarwanda ■ , Karen ■ , Korean ■ , Nepali ■ , Pashto ■ , Portuguese ■ , Russian ■ , Simplified Chinese ■ , Somali ■ , Spanish ■ , Swahili ■ , Tigrinya ■ , Ukrainian ■ , and Vietnamese ■ .

Employers should post signs that you can read from a far distance (or use portable, electronic reader boards) that inform visitors and workers of social distancing practices.

OSHA understands that some employers may face difficulties complying with certain OSHA standards due to the ongoing health emergency, including those standards that require certain types of worker training. OSHA is providing enforcement discretion ⊡ around completion of training and other provisions in its various standards. OSHA has instructed its Compliance Safety and Health Officers (CSHOs) to evaluate whether an employer has made a good faith effort to comply with applicable OSHA standards and, in situations where compliance was not possible given the ongoing pandemic, to ensure that employees were not exposed to hazards from tasks, processes, or equipment for which they were not prepared or trained.

# Cleaning and disinfection in meat and poultry processing

For tool-intensive operations, employers should ensure tools are regularly cleaned and disinfected, including at least as often as workers change workstations or move to a new set of tools. Refer to List N ⊡ on the EPA website for EPA-registered disinfectants that have qualified under EPA's emerging viral pathogens program for use against SARS-CoV-2.

Establish protocols and provide supplies to increase the frequency of sanitization in work and common spaces. Disinfect frequently touched surfaces in workspaces and break rooms (e.g., microwave or refrigerator handles or vending machine touchpads) at least once per shift, if possible. For example, wipe down tools or other equipment at least as often as workers change workstations. Frequently clean push bars and handles on any doors that do not open automatically and handrails on stairs or along walkways. If physical barriers are being used, then these should be cleaned frequently.

Workers who perform cleaning and disinfection tasks may require additional PPE and other controls to protect them from chemical hazards posed by disinfectants. Note: Employers must ⊡ ensure their written hazard communication program is up to date and training is up to date for all employees. (Also see OSHA's enforcement discretion memorandum ⊡ on this topic.) Employers may need to adapt guidance from this section, the Environmental Services Workers and Employers ⊡ section, and the Interim Guidance for Workers and Employers of Workers at Increased Risk of Occupational Exposure ⊡ , to fully protect workers performing cleaning and disinfection activities in manufacturing workplaces.

# Screening[1] and monitoring workers

Workplaces, particularly in areas where community transmission of COVID-19 is occurring, should consider developing and implementing a comprehensive screening and monitoring strategy aimed at preventing the introduction of COVID-19 into the worksite. Consider a program of screening workers before entry into the workplace, criteria for return to work of

exposed and recovered (those who have had signs or symptoms of COVID-19 but have gotten better), and criteria for exclusion of sick workers. This type of program should be coordinated to the extent possible with local public health authorities and could consist of the following activities:

# Screening of workers for COVID-19

Screening meat and poultry processing workers for COVID-19 symptoms (such as temperature checks) is an optional strategy that employers may use. If implemented for all workers, policies and procedures for screening workers should be developed in consultation with state and local health officials and occupational medicine professionals. Options to screen workers for COVID-19 symptoms include:

- Screen prior to entry into the facility.
- Provide verbal screening in appropriate language(s) to determine whether workers have had a fever, felt feverish, or had chills, coughing, or difficulty breathing in the past 24 hours.
- Check temperatures of workers at the start of each shift to identify anyone with a fever of 100.4°F or greater (or reported feelings of feverishness). Ensure that screeners:
  - are trained to use temperature monitors and monitors are accurate under conditions of use (such as cold temperatures); and
  - wear appropriate PPE.
- Do not let employees enter the workplace if they have a fever of 100.4°F or greater (or reported feelings of feverishness), or if screening results indicate that the worker is suspected of having COVID-19.
  - Encourage workers to self-isolate and contact a healthcare provider;
  - Provide information on the facility's return-to-work policies and procedures; and
  - Inform human resources, employer health unit (if in place), and supervisor (so worker can be moved off schedule during illness and a replacement can be assigned, if needed).

Ensure that personnel performing screening activities, including temperature checks, are appropriately protected from exposure to potentially infectious workers entering the facility:

- Implement engineering controls, such as physical barriers or dividers or rope and stanchion systems, to maintain at least six feet of distance between screeners and workers being screened.
- If screeners need to be within six feet of workers, provide them with appropriate PPE based on the repeated close contact the screeners have with other workers.
  - Such PPE may include gloves, a gown, a face shield, and, at a minimum, a face mask.
  - N95 filtering facepiece respirators (or more protective) may be appropriate for workers performing screening duties and necessary for workers managing a sick employee in the work environment (see below) if that employee has signs or symptoms of COVID-19. If respirators are needed, they must be used in the context of a comprehensive respiratory protection program that includes medical exams, fit testing, and training in accordance with OSHA's Respiratory Protection standard (29 CFR 1910.134 ↗ ).

# Managing sick workers

Workers who appear to have symptoms (e.g., fever, cough, or shortness of breath) upon arrival at work or who become sick during the day should immediately be separated from others at the workplace and sent home.

Ensure that personnel managing sick employees are appropriately protected from exposure. When personnel need to be within six feet of a sick colleague, appropriate PPE may include gloves, a gown, a face shield and, at a minimum, a face mask. N95 filtering facepiece respirators (or more protective) may be appropriate for workers managing a sick employee if

that employee has signs or symptoms of COVID-19. If respirators are needed, they must be used in the context of a comprehensive respiratory protection program that includes medical exams, fit testing, and training in accordance with OSHA's Respiratory Protection standard (29 CFR 1910.134 ☑ ).

If a worker is confirmed to have COVID-19, employers should inform anyone they have come into contact with (including fellow workers, inspectors, graders, etc.) of their possible exposure to COVID-19 in the workplace, but should maintain confidentiality as required by the Americans with Disabilities Act (ADA). The employer should instruct fellow workers about how to proceed based on the CDC Public Health Recommendations for Community-Related Exposure.

If a worker becomes or reports being sick, disinfect the workstation used and any tools handled by the symptomatic worker.

Employers should work with state, local, tribal, and/or territorial health officials to facilitate the identification of other exposed and potentially exposed individuals, such as coworkers in a plant.

On-site healthcare personnel, such as facility nurses or emergency medical technicians, should follow appropriate CDC and OSHA guidance for healthcare and emergency response personnel.

# Addressing return to work

- Critical infrastructure employers have an obligation to manage the continuation of work and return to work of their workers in ways that best protect the health of workers, their coworkers, and the general public. Employers should consider providing screening and ongoing medical monitoring of these workers, ensuring they wear an appropriate source control device in accordance with CDC and OSHA guidance, and implementing social distancing to minimize the chances of workers exposing one another.
- Critical infrastructure employers should continue to minimize the number of workers present at worksites, balancing the need to protect workers with support for continuing critical operations.
- Reintegration (bringing back) of exposed, asymptomatic workers to onsite operations should follow the CDC Critical Infrastructure Guidance. The guidance advises that employers may permit workers who have been exposed to COVID-19, but remain without symptoms, to continue to work, provided they adhere to additional safety precautions. Consultation with an occupational health provider and state and local health officials will help employers develop the most appropriate plan consistent with CDC guidance.
- Reintegration of workers with COVID-19 (COVID-19 positive), including those workers who have remained asymptomatic, to onsite operations should follow the CDC interim guidance, "Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings."

As employers move forward with continuing essential work, they should implement strategies to prioritize positions without which critical work would stop. This prioritization should include an analysis of work tasks, workforce availability at specific worksites, and assessment of hazards associated with the tasks and worksite. Employers may be able to cross-train workers to perform critical duties at a worksite to minimize the total number of workers needed to continue operations.

## For workers who have had signs/symptoms of COVID-19

Workers with COVID-19 who have symptoms and have stayed home (home isolated) should not return to work until they have met the criteria to discontinue home isolation, and have consulted with their healthcare providers and state and local health departments.

The situation is constantly changing, so employers of critical infrastructure workers will need to continue to reassess the virus's transmission levels in their area.

# Personal protective equipment

Employers must conduct a hazard assessment to determine if hazards are present, or are likely to be present, for which workers need PPE. OSHA's PPE standards (29 CFR 1910 Subpart I ☑ ) require employers to select and provide appropriate PPE to protect workers from hazards identified in the hazard assessment. The results of that assessment will be the basis of workplace controls (including PPE) needed to protect workers.

Employers should:

- Use videos or in-person visual demonstrations of proper PPE donning and doffing procedures. (Maintain social distancing during these demonstrations.)
- Emphasize that care must be taken when putting on and taking off PPE to ensure that the worker or the item does not become contaminated.
- Provide PPE that is either disposable (preferred) or, if reusable, ensure it is properly disinfected and stored in a clean location when not in use.
- PPE worn at the facility should not be taken home or shared.

Face shields may serve as both PPE and source control:

- If helmets are being used, use face shields designed to attach to helmets.
- Face shields can provide additional protection from both potential process-related splashes and potential person-to-person droplet spread.
  - Safety glasses may fog up when used in combination with masks or cloth face coverings.
  - Only some face shields are acceptable substitutions for eye protection (such as safety glasses) that are used for impact protection; facilities should consult with an occupational safety and health professional concerning the use of face shields.
- Face shields can help minimize contamination of masks and cloth face coverings.
- If used, face shields should be cleaned and decontaminated after each shift, and when not in use they should be kept in a clean location at the work facility.
- If used, face shields should also wrap around the sides of the wearer's face and extend to below the chin.

Employers should stress hand hygiene before and after handling all PPE. Employers in meat and poultry processing industries should continue to stay up to date on the most current guidance concerning PPE.

As part of their hazard assessments, employers must always consider whether PPE is necessary to protect workers. Specifically, when engineering and administrative controls are difficult to maintain and there may be exposure to other workplace hazards, such as splashes or sprays of liquids on processing lines or disinfectants used for facility cleaning, PPE should be considered.

During the COVID-19 pandemic, meat and poultry processing employers should consider allowing voluntary use of filtering facepiece respirators (such as an N95, if available) for their workers, even if respirators are not normally required.

In addition to face shields as noted above, workers in meat and poultry processing facilities may need PPE such as gloves, face and eye protection, and other types of PPE when cleaning and disinfecting meat and poultry processing plants (including frequently touched surfaces), tools, and equipment.

When PPE is needed, employers should consider additional hazards created by poorly fitting PPE (e.g., mask ties that dangle or catch, PPE that is loose and requires frequent adjustment or tends to fall off) with respect to the work environment (e.g., machinery in which PPE could get caught).

# Workers' rights

Section 11(c) ☑ of the Occupational Safety and Health Act of 1970 ☑ , 29 USC 660(c), prohibits employers from retaliating against workers for raising concerns about safety and health conditions. Additionally, OSHA's Whistleblower Protection Program ☑ enforces the provisions of more than 20 industry-specific federal laws protecting employees from retaliation for raising or reporting concerns about hazards or violations of various airline, commercial motor carrier, consumer product, environmental, financial reform, food safety, health insurance reform, motor vehicle safety, nuclear, pipeline, public transportation agency, railroad, maritime, securities, and tax laws. OSHA encourages workers who suffer such retaliation to submit a complaint to OSHA ☑ as soon as possible in order to file their complaint within the legal time limits, some of which may be as short as 30 days from the date they learned of or experienced retaliation. An employee can file a complaint with OSHA by visiting or calling his or her local OSHA office; sending a written complaint via fax, mail, or email to the closest OSHA office; or filing a complaint online. No particular form is required, and complaints may be submitted in any language.

OSHA provides recommendations intended to assist employers in creating workplaces that are free of retaliation and guidance to employers on how to properly respond to workers who may complain about workplace hazards or potential violations of federal laws. OSHA urges employers to review its publication Recommended Practices for Anti-Retaliation Programs ■ ☑ .

[1] Employers should evaluate the burdens and benefits of recording workers' temperatures or asking them to complete written questionnaires. These types of written products become records that must be retained for the duration of the workers' employment plus 30 years. See OSHA's Access to Employee Exposure and Medical Records standard (29 CFR 1910.1020 ☑ ).

# Quick reference guides for meat and poultry processing facility employees and employers

CDC has also developed three one-page flyers with recommendations and strategies for preventing the spread of COVID-19 in meat and poultry processing facilities and when carpooling to and from work. These include:

- Key strategies for employers ■ to prevent COVID-19 infection among employees
- Tips for employees ■ to protect themselves and other from COVID-19 at work and at home
- Carpooling ■ tips to help prevent the spread of COVID-19 when carpooling to and from work

The fliers are available in multiple languages.



Alternate Language Links

**Key Strategies for Employers:** Amharic ■ | Arabic ■ | Burmese ■ | Chinese ■ | French ■ | Haitian-Creole ■ | Karen ■ | Korean ■ |Nepali ■ | Portuguese ■ | Spanish ■ | Somali ■ | Tigrinya ■ | Vietnamese ■

**Tips for Employees:** Amharic ■ | Arabic ■ | Burmese ■ | Chinese ■ | French ■ | Haitian-Creole ■ | Karen ■ | Korean ■ |Nepali ■ | Portuguese ■ | Spanish ■ | Somali ■ | Tigrinya ■ | Vietnamese ■

**Carpooling:** Marshallese ■ | Russian ■ | Spanish ■ | Tamil ■ | Telugu ■ | Vietnamese ■

Last Updated Oct. 29, 2020

Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases

Case 1:20-cv-01160   Document 5   Filed 11/09/20   Page 98 of 99



















## Palmer, Michael

| | |
|---|---|
| **From:** | Knight, Andrew, NMENV <Andrew.Knight@state.nm.us> |
| **Sent:** | Tuesday, May 5, 2020 8:28 PM |
| **To:** | Palmer, Michael; Jimenez, Billy, DOH |
| **Cc:** | Kittaka, Mark |
| **Subject:** | [EXTERNAL]RE: Stampede Meat, Inc., UPA # 1581358 |

Mike,
I have confirmed with DOH that the measures in your plan are adequate to resume operations tomorrow, provided however, that you confirm that Stampede has adequate supplies of masks and face shields for all employees that will be within 6 feet of each other tomorrow. Although this resolves the distancing issue, the test results are still pending, as you know.

**Andrew P. Knight**
**Assistant General Counsel**
New Mexico Environment Department
Office of General Counsel
121 Tijeras Ave NE
(Office) 505-222-9540 (Cell) 505-907-8836
Andrew.Knight@state.nm.us
www.env.nm.gov
Twitter: @NMEnvDep | #IamNMED

**From:** Palmer, Michael <Michael.Palmer@btlaw.com>
**Sent:** Tuesday, May 5, 2020 6:04 PM
**To:** Knight, Andrew, NMENV <Andrew.Knight@state.nm.us>; Jimenez, Billy, DOH <Billy.Jimenez@state.nm.us>
**Cc:** Kittaka, Mark <Mark.Kittaka@btlaw.com>
**Subject:** [EXT] RE: Stampede Meat, Inc., UPA # 1581358
**Importance:** High

Andrew, thank you for checking in. I've added Billy to this email in an effort to move this along.

Stampede believes its plan fully complies with the applicable joint CDC and OSHA guidelines for meat processing plants, which means it should be allowed to operate at full capacity even if that means physical distancing of six feet is not always possible. In fact, we believe President Trump's executive order clearly requires Stampede to continue operations, as long as the company complies with the CDC and OSHA guidance. In fact, I know of other meat processing clients throughout the country who have shut down voluntarily or been shut down by state agencies, and then received letters from the federal USDA to reopen.

We really need to know what New Mexico OSHA's and DOH's position in on this issue. Continued delay will jeopardize Stampede's production tomorrow, which may result in the loss of thousands of pounds of meat, thousands of dollars of wages for Stampede employees, and more importantly exacerbate a looming food crisis – which impacts all Americans. If you think my last point is hyperbole, it isn't. As you know, Costco along with many other national restaurants, grocery stores and food distributors are Stampede customers. In fact, Stampede is the nation's leading pre-portioned protein supplier. As a direct result of NM DOH forcing Stampede's reduced production yesterday and today, Stampede shorted Costco and other customer orders. And, just yesterday, Costco announced its plans to limit their customers protein purchases. See https://www.cnn.com/2020/05/04/business/costco-meat-purchases/index.html. This afternoon I was on a call with my region's chamber of commerce, and this type of rationing was one of the top issues of discussion.

1


**EXHIBIT**
8

I don't make this point to minimize worker safety. Far from it. While Stampede is proud to be a part of the nation's critical food supply chain and provide meat and poultry products to Americans throughout the country, it views its obligations to ensure a safe workplace as its paramount concern during these unprecedented times. It has had a COVID-19 response plan for months and revised it as guidance has evolved.

Please recognize that the federal government has balanced these competing interests of maintaining a food supply and providing for workers' safety, and decided that rigid adherence to physical distancing is not the solution. As long as meat processing companies like Stampede follow other mitigation steps as outlined by the CDC and OSHA, they should be allowed to continue to operate.

Sincerely,
Mike Palmer

**Michael Palmer** | Partner
Barnes & Thornburg LLP
700 1st Source Bank Center, 100 North Michigan, South Bend, IN 46601-1632
Direct: (574) 237-1135 | Mobile: (574) 386-4153 | Fax: (574) 237-1125


**BARNES &**
**THORNBURG**LLP

Atlanta | California | Chicago | Delaware | Indiana | Michigan | Minneapolis
Ohio | Raleigh | Salt Lake City | Texas | Washington, D.C.

**From:** Knight, Andrew, NMENV <Andrew.Knight@state.nm.us>
**Sent:** Tuesday, May 5, 2020 7:28 PM
**To:** Palmer, Michael <Michael.Palmer@btlaw.com>
**Cc:** Kittaka, Mark <Mark.Kittaka@btlaw.com>
**Subject:** [EXTERNAL]RE: Stampede Meat, Inc., UPA # 1581358

Still waiting . . .

**From:** Knight, Andrew, NMENV
**Sent:** Tuesday, May 5, 2020 4:35 PM
**To:** 'Palmer, Michael' <Michael.Palmer@btlaw.com>
**Cc:** Kittaka, Mark <Mark.Kittaka@btlaw.com>
**Subject:** RE: Stampede Meat, Inc., UPA # 1581358

Yes, a textbook example of the limitations of having everyone work from home.

**From:** Palmer, Michael <Michael.Palmer@btlaw.com>
**Sent:** Tuesday, May 5, 2020 4:32 PM
**To:** Knight, Andrew, NMENV <Andrew.Knight@state.nm.us>
**Cc:** Kittaka, Mark <Mark.Kittaka@btlaw.com>
**Subject:** [EXT] RE: Stampede Meat, Inc., UPA # 1581358

Thank you, Andrew. I didn't know Billy or DOH wanted the plan. It seems there have been some significant communication issues since late last week, which I believe may have unnecessarily complicated this matter.

**Michael Palmer** | Partner
Barnes & Thornburg LLP
700 1st Source Bank Center, 100 North Michigan, South Bend, IN 46601-1632
Direct: (574) 237-1135 | Mobile: (574) 386-4153 | Fax: (574) 237-1125



**BARNES &
THORNBURG** LLP

Atlanta | California | Chicago | Delaware | Indiana | Michigan | Minneapolis
Ohio | Raleigh | Salt Lake City | Texas | Washington, D.C.

**From:** Knight, Andrew, NMENV <Andrew.Knight@state.nm.us>
**Sent:** Tuesday, May 5, 2020 6:21 PM
**To:** Palmer, Michael <Michael.Palmer@btlaw.com>
**Cc:** Kittaka, Mark <Mark.Kittaka@btlaw.com>
**Subject:** [EXTERNAL]RE: Stampede Meat, Inc., UPA # 1581358

Mike,

We are just waiting for DOH to sign off on the plan you submitted. Apparently it had not been shared with them until now. They are taking a look at it, and as soon as we hear from them, I will be able to provide you with a formal response. Billy Jimenez also noted that we are all still waiting for the test results.

**Andrew P. Knight**
**Assistant General Counsel**
**New Mexico Environment Department**
**Office of General Counsel**
**121 Tijeras Ave NE**
**(Office) 505-222-9540 (Cell) 505-907-8836**
Andrew.Knight@state.nm.us
www.env.nm.gov
**Twitter: @NMEnvDep | #IamNMED**

**From:** Palmer, Michael <Michael.Palmer@btlaw.com>
**Sent:** Tuesday, May 5, 2020 4:02 PM
**To:** Knight, Andrew, NMENV <Andrew.Knight@state.nm.us>
**Cc:** Kittaka, Mark <Mark.Kittaka@btlaw.com>; Genoway, Robert, NMENV <robert.genoway@state.nm.us>
**Subject:** [EXT] RE: Stampede Meat, Inc., UPA # 1581358

Thank you, Andrew. I was drafting the response, so I appreciate your email. If there is any additional information or documents you need after you coordinate internally, please let us know.

**Michael Palmer** | Partner
Barnes & Thornburg LLP
700 1st Source Bank Center, 100 North Michigan, South Bend, IN 46601-1632
Direct: (574) 237-1135 | Mobile: (574) 386-4153 | Fax: (574) 237-1125



**BARNES &
THORNBURG** LLP

Atlanta | California | Chicago | Delaware | Indiana | Michigan | Minneapolis
Ohio | Raleigh | Salt Lake City | Texas | Washington, D.C.

**From:** Knight, Andrew, NMENV <Andrew.Knight@state.nm.us>
**Sent:** Tuesday, May 5, 2020 5:59 PM
**To:** Palmer, Michael <Michael.Palmer@btlaw.com>
**Cc:** Kittaka, Mark <Mark.Kittaka@btlaw.com>; Genoway, Robert, NMENV <robert.genoway@state.nm.us>
**Subject:** [EXTERNAL]FW: Stampede Meat, Inc., UPA # 1581358

Mike and Mark,
Please note we are having issues with multiple lines of communication and hold Mr. Montoya's response below in abeyance until I provide a response on behalf of the department.
Thanks.

**Andrew P. Knight**
**Assistant General Counsel**
New Mexico Environment Department
Office of General Counsel
121 Tijeras Ave NE
(Office) 505-222-9540 (Cell) 505-907-8836
Andrew.Knight@state.nm.us
www.env.nm.gov
Twitter: @NMEnvDep | #IamNMED

**From:** Genoway, Robert, NMENV <robert.genoway@state.nm.us>
**Sent:** Tuesday, May 5, 2020 3:51 PM
**To:** Montoya, Lorenzo, NMENV <Lorenzo.Montoya@state.nm.us>; Marquez, Gregory, NMENV <Gregory.Marquez@state.nm.us>; Knight, Andrew, NMENV <Andrew.Knight@state.nm.us>
**Cc:** Ely, Sandra, NMENV <Sandra.Ely@state.nm.us>
**Subject:** RE: Stampede Meat, Inc., UPA # 1581358

We seem to have multiple lines of correspondence going on here. Let's make sure all correspondence to company counsel is sent via Andrew.

**From:** Montoya, Lorenzo, NMENV <Lorenzo.Montoya@state.nm.us>
**Sent:** Tuesday, May 5, 2020 3:49 PM
**To:** Palmer, Michael <Michael.Palmer@btlaw.com>
**Cc:** Marquez, Gregory, NMENV <Gregory.Marquez@state.nm.us>; Mark.Kittaka@btlaw.com; Genoway, Robert, NMENV <robert.genoway@state.nm.us>
**Subject:** RE: Stampede Meat, Inc., UPA # 1581358

Hello Michael,

I noticed in the formal response letter, which I have attached above for your convenience, it states in the first paragraph:

"Pursuant to our conversation this morning, you requested information regarding the Company's responses to the first three allegations of the complaint. You indicated that based on the photos Mike Palmer sent you today

and the letter outlining details of the operations over the next two days, you did not need additional information regarding the "social distancing" allegation."

I have not had a single conversation with anyone this morning nor yesterday morning, and I never indicated that we did not need proof of social distancing. In my email which was sent on Friday, May 5th, at 6:15pm Mountain Time, I clearly stated that it was absolutely necessary that Stampede Meat demonstrate compliance with the social distancing protocols as dictated by the NM DOH Public Health Order which came into effect on April 30th. I have attached the email for your convenience, and attached to it is the PHO. This email was my last interaction with the company until our conference call Monday morning, and I did not indicate otherwise during that conference call. As it stands, my supervision still requires photo evidence of the 6ft. social distancing protocols being adhered to in the Sunland Park Facility. As for whether NM DOH is adopting the Federal OSHA or CDC guidelines for meat production facilities, that remains to be seen. At this moment in time, this decision has not been made.

Respectfully,

**Lorenzo J. Montoya**
**Safety Compliance Officer**
New Mexico Environment Department
Occupational Health and Safety Bureau- NM OSHA
525 Camino de los Marquez, Suite 3
Santa Fe, New Mexico 87505
(Office) 505-476-8710
lorenzo.montoya@state.nm.us
www.env.nm.gov/occupational_health_safety
Twitter: @NMEnvDep | #IamNMED



**From:** Palmer, Michael <Michael.Palmer@btlaw.com>
**Sent:** Tuesday, May 5, 2020 3:39 PM
**To:** Marquez, Gregory, NMENV <Gregory.Marquez@state.nm.us>; Kittaka, Mark <Mark.Kittaka@btlaw.com>
**Cc:** Montoya, Lorenzo, NMENV <Lorenzo.Montoya@state.nm.us>; Knight, Andrew, NMENV
<Andrew.Knight@state.nm.us>; Genoway, Robert, NMENV <robert.genoway@state.nm.us>
**Subject:** [EXT] RE: Stampede Meat, Inc., UPA # 1581358

Greg, sorry to jump in, but I've been handling this today. I just spoke with Andrew Knight about this and other matters. I talked with Billy Jimenez an hour or so ago. We still do not have the test results.

Sincerely,
Mike Palmer

**Michael Palmer** | Partner
Barnes & Thornburg LLP
700 1st Source Bank Center, 100 North Michigan, South Bend, IN 46601-1632
Direct: (574) 237-1135 | Mobile: (574) 386-4153 | Fax: (574) 237-1125



Atlanta | California | Chicago | Delaware | Indiana | Michigan | Minneapolis
Ohio | Raleigh | Salt Lake City | Texas | Washington, D.C.

**From:** Marquez, Gregory, NMENV <Gregory.Marquez@state.nm.us>
**Sent:** Tuesday, May 5, 2020 5:35 PM
**To:** Kittaka, Mark <Mark.Kittaka@btlaw.com>
**Cc:** Palmer, Michael <Michael.Palmer@btlaw.com>; Montoya, Lorenzo, NMENV <Lorenzo.Montoya@state.nm.us>; Knight, Andrew, NMENV <Andrew.Knight@state.nm.us>; Genoway, Robert, NMENV <robert.genoway@state.nm.us>
**Subject:** [EXTERNAL]RE: Stampede Meat, Inc., UPA # 1581358

Mark,

Thank you for the detailed response.  Have you received testing results from NM DOH and if so, were any of the tested employee's positive for COVID19?  New employees being quarantined?

Best regards,

Gregory Marquez
Compliance Program Manager
New Mexico Environment Department
**Occupational Health & Safety Bureau (NM OSHA)**
525 Camino de los Marquez, Ste. 3
*505.476.8724 Office; 505.490.5872 Mobile*
www.env.nm.gov/occupational_health_safety



**From:** Kittaka, Mark <Mark.Kittaka@btlaw.com>
**Sent:** Monday, May 4, 2020 7:33 PM
**To:** Montoya, Lorenzo, NMENV <Lorenzo.Montoya@state.nm.us>
**Cc:** Marquez, Gregory, NMENV <Gregory.Marquez@state.nm.us>; Palmer, Michael <Michael.Palmer@btlaw.com>
**Subject:** [EXT] Stampede Meat, Inc., UPA # 1581358

Dear Mr. Montoya,

As requested, I have attached the Company's response to the allegations in the 3rd OSHA complaint.  I have also attached an updated version of the Company's COVID-19 Prevention Plan and related Exhibits.

Please let me know if you have any questions.

Mark Kittaka

**Mark Kittaka** | Partner
Barnes & Thornburg LLP

888 S. Harrison Street, Suite 600, Fort Wayne, IN 46802-2206
Direct: (260) 425-4616 | Mobile: (260) 615-3901 | Fax: (260) 424-8316



**BARNES &
THORNBURG** LLP

Atlanta | California | Chicago | Delaware | Indiana | Michigan | Minneapolis
Ohio | Raleigh | Salt Lake City | Texas | Washington, D.C.

CONFIDENTIALITY NOTICE: This email and any attachments are
for the exclusive and confidential use of the intended recipient. If
you are not the intended recipient, please do not read, distribute
or take action in reliance upon this message. If you have received
this in error, please notify us immediately by return email and
promptly delete this message and its attachments from your
computer system. We do not waive attorney-client or work product
privilege by the transmission of this message.

CONFIDENTIALITY NOTICE: This email and any attachments are
for the exclusive and confidential use of the intended recipient. If
you are not the intended recipient, please do not read, distribute
or take action in reliance upon this message. If you have received
this in error, please notify us immediately by return email and
promptly delete this message and its attachments from your
computer system. We do not waive attorney-client or work product
privilege by the transmission of this message.

CONFIDENTIALITY NOTICE: This email and any attachments are
for the exclusive and confidential use of the intended recipient. If
you are not the intended recipient, please do not read, distribute
or take action in reliance upon this message. If you have received
this in error, please notify us immediately by return email and
promptly delete this message and its attachments from your
computer system. We do not waive attorney-client or work product
privilege by the transmission of this message.

CONFIDENTIALITY NOTICE: This email and any attachments are
for the exclusive and confidential use of the intended recipient. If
you are not the intended recipient, please do not read, distribute
or take action in reliance upon this message. If you have received
this in error, please notify us immediately by return email and
promptly delete this message and its attachments from your
computer system. We do not waive attorney-client or work product
privilege by the transmission of this message.

CONFIDENTIALITY NOTICE: This email and any attachments are
for the exclusive and confidential use of the intended recipient. If
you are not the intended recipient, please do not read, distribute
or take action in reliance upon this message. If you have received
this in error, please notify us immediately by return email and
promptly delete this message and its attachments from your
computer system. We do not waive attorney-client or work product
privilege by the transmission of this message.

## Palmer, Michael

| | |
|---|---|
| **From:** | Sanzone, Aja, DOH <Aja.Sanzone@state.nm.us> |
| **Sent:** | Thursday, June 11, 2020 9:14 PM |
| **To:** | Palmer, Michael; Kunkel, Kathy, DOH |
| **Cc:** | Jimenez, Billy, DOH; Vito Giustino; Silvia Paola Miranda |
| **Subject:** | [EXTERNAL]RE: [EXT] RE: Help Obtaining Missing Results from the 5.28.2020 Test - URGENT |

Dear Mr. Palmer,

I hope all is going well.

We are very pleased with the results and the collaborative efforts between Stampede Meats and NMDOH. The rapid response from both parties was instrumental in the prevention of further spread within the facility and the community and I believe your success will serve as a model to other businesses not only locally but even nationally.

Although our initial protocol was to continue to test until no further cases were identified, I believe given only 1 new positive test at the last screening, the next mass testing should be scheduled in 3-4 weeks as a follow up and to make sure no further spread has occurred amongst your employees.

We look forward to continuing our work with you. Do not hesitate to reach out if you have questions or desire further information.

Very truly,
Aja Sanzone, MD

**Aja Sanzone, MD**
**Infectious Disease Bureau Medical Director**



**Infectious Disease Bureau (IDB)**
**Public Health Division (PHD)**
1190 S. St Francis Drive, Room S-11574
Santa Fe, NM 87502
Office: (505) 476-3668
Cell: (917) 582-6241



*Accredited since 2015*

Searchable HIV, STD, Hepatitis and
Harm Reduction resources: www.nmhivguide.org
www.nmhealth.org

  

*Investing for tomorrow, delivering today.*

The information contained in this electronic message is privileged, confidential, proprietary, and intended only for the use of the owner of the e-mail address listed as the recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, copying of this communication, or unauthorized use is strictly prohibited and to the fullest extent of the law! If you are not the intended recipient, please delete this electronic message and DO NOT ACT UPON, FORWARD, OTHERWISE DISSEMINATE IT OR ITS CONTENTS.

**EXHIBIT**

*9*

1

**From:** Palmer, Michael <Michael.Palmer@btlaw.com>
**Sent:** Thursday, June 11, 2020 2:45 PM
**To:** Kunkel, Kathy, DOH <Kathy.Kunkel@state.nm.us>
**Cc:** Sanzone, Aja, DOH <Aja.Sanzone@state.nm.us>; Jimenez, Billy, DOH <Billy.Jimenez@state.nm.us>; Vito Giustino <vito.g@gostampede.com>; Silvia Paola Miranda <silvia.m@gostampede.com>
**Subject:** RE: [EXT] RE: Help Obtaining Missing Results from the 5.28.2020 Test - URGENT

Secretary Kunkel,

As promised, we write to provide you with a copy of Stampede's draft press release relating to the success of its COVID-19 plan and partnership with the New Mexico Department of Health. See attached. Please let us know if you have any questions or concerns about the statement.

Sincerely,
Mike

### Michael Palmer | Partner
Barnes & Thornburg LLP
700 1st Source Bank Center, 100 North Michigan, South Bend, IN 46601-1632
Direct: (574) 237-1135 | Mobile: (574) 386-4153 | Fax: (574) 237-1125



Atlanta | California | Chicago | Delaware | Indiana | Michigan | Minneapolis
Ohio | Raleigh | Salt Lake City | Texas | Washington, D.C.

**From:** Kunkel, Kathy, DOH <Kathy.Kunkel@state.nm.us>
**Sent:** Tuesday, June 9, 2020 4:29 PM
**To:** Palmer, Michael <Michael.Palmer@btlaw.com>
**Cc:** Sanzone, Aja, DOH <Aja.Sanzone@state.nm.us>; Jimenez, Billy, DOH <Billy.Jimenez@state.nm.us>; Vito Giustino <vito.g@gostampede.com>; Silvia Paola Miranda <silvia.m@gostampede.com>
**Subject:** [EXTERNAL]Re: [EXT] RE: Help Obtaining Missing Results from the 5.28.2020 Test - URGENT

Good news Mike. Thank you for your partnership. I will talk to the medical experts and get back to you.

Sent from my iPhone

> On Jun 9, 2020, at 1:33 PM, Palmer, Michael <Michael.Palmer@btlaw.com> wrote:
>
> Secretary Kunkel,
>
> Thank you for your efforts yesterday. We received all of the results. I'm not sure if you have had an opportunity to analyze the results, but they're good news and show that Stampede's program – with the help of the New Mexico Department of Health – works.

There were five positive tests out of 394 tests. But the important point is that there was only **one** new positive test. The other four positive tests related to individuals who previously tested positive and were released by the DoH testing facility as they were asymptomatic and were being retested to return to work. I don't know the science behind why those four individuals tested positive again, but the point remains: Stampede only had one new positive, which is a 0.25% infection rate – well below the public infection rate and significantly below the New Mexico State average of 3%. In other words, Stampede employees are less likely to be infected than the public at large. No doubt this is because of Stampede's commitment to protecting its team at work and to teaching them how to protect themselves outside of work.

Given these results, we respectfully request the Department of Health end its testing program at Stampede. Stampede will, of course, quarantine each of the five individuals who tested positive and anyone who they came in close contact with at work in accordance with its plan and CDC guidance. Stampede will also remain committed to following its COVID-19 plan, which includes biweekly team meetings to discuss current state, CDC and OSHA guidance and to modify the safety procedures consistent with the latest guidance, as long as necessary to address this pandemic. Part of this plan involves taking temperatures and screening for COVID-19 symptoms before individuals enter Stampede's facilities and to require those who show symptoms to quarantine until released by a health care professional to return to work. Stampede is also open to scheduling additional testing in a 30-45 days or as the need arises, and Stampede will continue to send new hires to the DoH facility to get tested prior to entering the facility. But given the success of Stampede's COVID-19 plan, the operational impact on Stampede, and related business consequences, we believe it makes sense to cease the current testing program.

Please let us know your position on this request. If you want to discuss this issue, please let us know times when you're available.

Finally, as discussed last week, we believe this Stampede success story is an important one to tell. Unfortunately, we're facing a long battle with COVID-19, and the citizens of New Mexico (like folks across the globe) need to find a way to fight that battle and remain safe while also returning to some level of normalcy. Stampede, with the help of your department, has shown that's possible. This program shows that people can safely return to work – even when physical distancing of six feet or more isn't always possible. Stampede's media-relations team is working on a press release, and we will send it to you before issuing it to the media. Please let me know if you have any concerns about this approach.

Sincerely,
Mike Palmer


**Michael Palmer** | Partner
Barnes & Thornburg LLP
700 1st Source Bank Center, 100 North Michigan, South Bend, IN 46601-1632
Direct: (574) 237-1135 | Mobile: (574) 386-4153 | Fax: (574) 237-1125

<image002.gif>
Atlanta | California | Chicago | Delaware | Indiana | Michigan | Minneapolis
Ohio | Raleigh | Salt Lake City | Texas | Washington, D.C.

**From:** Kunkel, Kathy, DOH <Kathy.Kunkel@state.nm.us>
**Sent:** Monday, June 8, 2020 2:34 PM
**To:** Palmer, Michael <Michael.Palmer@btlaw.com>; Sanzone, Aja, DOH <Aja.Sanzone@state.nm.us>; Jimenez, Billy, DOH <Billy.Jimenez@state.nm.us>
**Cc:** Vito Giustino <vito.g@gostampede.com>; Silvia Paola Miranda <silvia.m@gostampede.com>
**Subject:** [EXTERNAL]RE: Help Obtaining Missing Results from the 5.28.2020 Test – URGENT

Michael,

I am personally following up.

Kathy

Kathyleen M. Kunkel
Secretary

<image003.jpg>

New Mexico Department of Health
1190 St. Francis Drive
Santa Fe, NM 87505
ph: ( 505) 827-2613
fax:(505) 827-2530
www.nmhealth.org

<image008.jpg>

<image004.png>
<image005.png>

*Accredited since 2015*

<image006.png>

<image007.png>

The information contained in this electronic message is privileged, confidential, proprietary, and intended only for the use of the owner of the e-mail address listed as the recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, copying of this communication, or unauthorized use is strictly prohibited and subject to prosecution to the fullest extent of the law! If you are not the intended recipient, please delete this electronic message and DO NOT ACT UPON, FORWARD, COPY OR OTHERWISE DISSEMINATE IT OR ITS CONTENTS.

**From:** Palmer, Michael <Michael.Palmer@btlaw.com>
**Sent:** Thursday, June 4, 2020 3:46 PM
**To:** Sanzone, Aja, DOH <Aja.Sanzone@state.nm.us>; Kunkel, Kathy, DOH <Kathy.Kunkel@state.nm.us>; Jimenez, Billy, DOH <Billy.Jimenez@state.nm.us>
**Cc:** Vito Giustino <vito.g@gostampede.com>; Silvia Paola Miranda <silvia.m@gostampede.com>
**Subject:** [EXT] Help Obtaining Missing Results from the 5.28.2020 Test – URGENT
**Importance:** High

Secretary Kunkel, Dr. Sanzone, and Billy,

We could use your help obtaining the remaining results from the tests taken on May 28 and June 2.

As I understand it, Stampede received notice last night that it had zero positive results for 136 of the tests taken on May 28. However, Stampede does not yet have results for 51 tests taken on May 28. I

4

believe Stampede has been told that the Department of Health cannot obtain the results of those 51 tests, and Stampede should contact the lab directly. However, it does not seem realistic that Stampede will fare better than the DoH in obtaining those tests results. Attached is a spreadsheet with two tabs. The tab for the May 28 tests contains the list of the 51 employees for whom we do not have test results. Could someone at DoH obtain those results and send them to us?

With regard to the June 2 tests, we have obtained the results for 160 of the 206 tests that were taken. Three employees tested positive, but those three employees had previously tested positive and were released to return to work. In other words, there are no new positive tests thus far. As we understand it, DoH will provide us with the results for the remaining 46 tests tomorrow.

We really need these results today, if possible, so we can quarantine any employees who tested positive.

Sincerely,
Mike Palmer

**Michael Palmer** | Partner
Barnes & Thornburg LLP
700 1st Source Bank Center, 100 North Michigan, South Bend, IN 46601-1632
Direct: (574) 237-1135 | Mobile: (574) 386-4153 | Fax: (574) 237-1125

<image002.gif>
Atlanta | California | Chicago | Delaware | Indiana | Michigan | Minneapolis
Ohio | Raleigh | Salt Lake City | Texas | Washington, D.C.

CONFIDENTIALITY NOTICE: This email and any attachments are
for the exclusive and confidential use of the intended recipient. If
you are not the intended recipient, please do not read, distribute
or take action in reliance upon this message. If you have received
this in error, please notify us immediately by return email and
promptly delete this message and its attachments from your
computer system. We do not waive attorney-client or work product
privilege by the transmission of this message.
CONFIDENTIALITY NOTICE: This email and any attachments are
for the exclusive and confidential use of the intended recipient. If
you are not the intended recipient, please do not read, distribute
or take action in reliance upon this message. If you have received
this in error, please notify us immediately by return email and
promptly delete this message and its attachments from your
computer system. We do not waive attorney-client or work product
privilege by the transmission of this message.

CONFIDENTIALITY NOTICE: This email and any attachments are
for the exclusive and confidential use of the intended recipient. If
you are not the intended recipient, please do not read, distribute
or take action in reliance upon this message. If you have received
this in error, please notify us immediately by return email and
promptly delete this message and its attachments from your

computer system. We do not waive attorney-client or work product
privilege by the transmission of this message.



**MICHELLE LUJAN GRISHAM
GOVERNOR**

**NEW MEXICO
DEPARTMENT OF
HEALTH**

**BILLY J. JIMENEZ
ACTING CABINET SECRETARY**

### Via Certified U.S. Postal Mail and Hand Delivery

11/3/2020

Stampede Meat, Inc.
5700 McNutt Rd.
Sunland Park, NM 88008
*Certified mail no. 7019 2280 0002 0185 7712*

**Re: Notice of Immediate Closure Pursuant to Public Health Order – Stampede Meat, Inc.**

Dear Sir or Madam:

Pursuant to the COVID-Safe Practices for Individuals and Employers Guide, which is incorporated by reference in the current Public Health Order, a "rapid response" is conducted whenever a COVID-19 case is identified in a place of business or a high-risk facility or population. As part of the rapid response process, the New Mexico Department of Health requires that the identified entity follow appropriate isolation, quarantine, and infection control protocols to mitigate potential COVID-19 transmission and limit risk to employees and the public.

Section 15 of the operative Public Health Order mandates closure of certain business entities that receive four (4) or more rapid responses within a rolling fourteen (14) day period. Specifically:

> Any "food and drink establishment," "close-contact business," "place of lodging," "retail space," or other business that poses a significant public health risk, as determined by the Department of Health, must close for a period of two weeks following the occurrence of four (4) or more rapid responses within a fourteen (14) day period. For purposes of this directive, rapid responses will be counted on a rolling basis.

Stampede Meat, Inc., located at 5700 McNutt Road in Sunland Park, NM, 88088, had the following rapid responses related to COVID-19 infections within a 14-calendar-day period:

Response #1: 10/23/20, 1 COVID-19 infection cited.
Response #2: 10/23/20, 1 COVID-19 infection cited.
Response #3: 10/26/20, 1 COVID-19 infection cited.
Response #4: 10/26/20, 1 COVID-19 infection cited.
Response #5: 10/27/20, 1 COVID-19 infection cited.
Response #6: 10/27/20, 1 COVID-19 infection cited.

**Upon receipt of this Notice, Stampede Meat, Inc. must immediately close all business operations at the location of the rapid responses cited above for fourteen consecutive calendar days, in accordance with the Public Health Order issued October 22, 2020.**

**OFFICE OF THE SECRETARY**
1190 St. Francis Dr., Suite N4100 • P.O. Box 26110 • Santa Fe, New Mexico • 87502
(505) 827-2613 • FAX: (505) 827-2530 • www.nmhealth.org



**EXHIBIT
10**

Stampede Meat, Inc. must immediately cease operations at this location through November 16, 2020. Stampede Meat, Inc. may resume normal operations at this location on November 17, 2020.

In addition, Stampede Meat, Inc. will appear on the Rapid Response COVID-19 Watchlist under the "Rapid Response Closure" tab on the New Mexico Environment Department's (NMED) website for the duration of the fourteen-day closure. The NMED will also include your business/organization and location in a daily press release and social media updates during the fourteen-day closure.

**Failure to comply with this directive may result in substantial monetary penalties in accordance with the Public Health Emergency Response Act, NMSA 1978, §§ 12-10a-1 to -19, and may further subject you to criminal penalties or civil judicial enforcement, or both. The failure to comply with this and other directives of the Public Health Order may also subject you to other penalties under applicable state laws.**

While your operations are suspended at this location, you are encouraged to have all your employees tested for COVID-19. To find a COVID-19 testing center near you, please visit: https://cvprovider.nmhealth.org/directory.html. Additional resources can also be found at https://cv.nmhealth.org and https://www.env.nm.gov/nmed-resources-for-covid-19/.

A representative from the New Mexico Department of Health, the New Mexico Environment Department, or other applicable state agencies will contact you to discuss COVID-safe practices and provide guidance to prevent workplace exposure. Please be prepared to provide information on additional measures you have taken or plan to take to prevent additional positive cases.

Sincerely,

Billy J. Jimenez
Acting Cabinet Secretary

 **U.S. DEPARTMENT OF LABOR**

Search

**News Release**

## STATEMENT OF ENFORCEMENT POLICY BY SOLICITOR OF LABOR KATE O'SCANNLAIN AND PRINCIPAL DEPUTY ASSISTANT SECRETARY FOR OSHA LOREN SWEATT REGARDING MEAT AND POULTRY PROCESSING FACILITIES

**WASHINGTON, DC** – The U.S. Department of Labor issued the following statement from Solicitor of Labor Kate O'Scannlain and Principal Deputy Assistant Secretary for OSHA Loren Sweatt regarding Meat and Poultry Processing Facilities:

"The Occupational Safety and Health Administration (OSHA) and the Centers for Disease Control and Prevention (CDC) recently issued joint interim guidance for meat and poultry processing workers and employers (Joint Meat Processing Guidance) in light of multiple outbreaks of COVID-19 among meat, pork, and poultry processing facility workers. It is vitally important that employers in this critical industry adhere to the Joint Meat Processing Guidance to protect their workers from the risk of COVID-19 infection. Moreover, the security of America's food supply relies on meat, pork, and poultry processing facilities continuing to operate, which they cannot do without a healthy workforce. In light of President Trump's invocation of the Defense Production Act (DPA) with respect to meat and poultry processing, OSHA and the Solicitor of Labor issue this statement to clarify the effect of the Joint Meat Processing Guidance in this circumstance.

"OSHA has issued enforcement guidance indicating the agency will use enforcement discretion for employers adhering to appropriate guidance, including the Joint Meat Processing Guidance. As stated in the Joint Meat Processing Guidance, employers should conduct worksite assessments to identify COVID-19 risks and prevention strategies and then implement them. It is important that employers seek to adhere to this Guidance. To the extent employers determine that certain measures are not feasible in the context of specific plants and circumstances, they are encouraged to document why that is the case. In the event of an investigation, OSHA will take into account good faith attempts to follow the Joint Meat Processing Guidance. OSHA does not anticipate citing employers that adhere to the Joint Meat Processing Guidance. Additionally, because of the President's invocation of the DPA, no part of the Joint Meat Processing Guidance should be construed to indicate that state and local authorities may direct a meat and poultry processing facility to close, to remain closed, or to operate in accordance with procedures other than those provided for in this Guidance.

"In addition, courts often consider compliance with OSHA standards and guidance as evidence in an employer's favor in litigation. Where a meat, pork, or poultry processing employer operating pursuant to the President's invocation of the DPA has demonstrated good faith attempts to comply with the Joint Meat Processing Guidance and is sued for alleged workplace exposures, the Department of Labor will consider a request to participate in that litigation in support of the employer's compliance program. Likewise, the Department of Labor will consider similar requests by workers if their employer has not taken steps in good faith to follow the Joint Meat Processing Guidance.

"OSHA encourages employers to contact OSHA for compliance assistance or the OSHA On-Site Consultation Program for assistance in applying the joint guidance to their worksites. Employers also may contact CDC for assistance."

**Agency:** Occupational Safety & Health Administration
**Date:** April 28, 2020
**Release Number:** 20-791-NAT

**Contact:** Department of Labor National Contact Center
**Email:** DOL-Info@dol.gov
Share This

  



**More News Releases**

| **Previous** | **Next Up** |
|---|---|
| U.S. Department of Labor Issues Statement Commemorating Workers' Memorial Day | U.S. Department of Labor Issues COVID-19 Relief and Guidance for Employee Benefit Plans |

---

**Agencies**    **Forms**    **Guidance Search**    **FAQ**    **About Us**    **News**    **Contact Us**

**U.S. DEPARTMENT OF LABOR**

200 Constitution Ave NW
Washington, DC 20210
1-866-4-USA-DOL
1-866-487-2365
www.dol.gov

**FEDERAL GOVERNMENT**⊞

White House

Coronavirus Resources

Severe Storm and Flood Recovery Assistance

Disaster Recovery Assistance

DisasterAssistance.gov

USA.gov

No Fear Act Data

U.S. Office of Special Counsel

**ABOUT THE SITE**⊞

Freedom of Information Act

Disclaimers

Plug-Ins Used on DOL.gov

Accessibility Statement

**LABOR DEPARTMENT**⊞

About DOL

Guidance Search

Español

Office of Inspector General

Subscribe to the DOL Newsletter

Read the DOL Newsletter

Emergency Accountability Status Link

A to Z Index

**Connect With DOL**

    

Site Map    |    Important Website Notices    |    Privacy & Security Statement

## Palmer, Michael

| | |
|---|---|
| **From:** | Woodward, Chris, DOH <Chris.Woodward@state.nm.us> |
| **Sent:** | Thursday, November 5, 2020 5:02 PM |
| **To:** | Palmer, Michael; Jimenez, Billy, DOH |
| **Cc:** | Moses Winston; Christopher Tebo; Haskins, Thomas; Vital, Victor |
| **Subject:** | [EXTERNAL]RE: Stampede Meat - Proposal - URGENT |

Mr. Palmer:

Following up on this: I have been in contact with our Acting Secretary, Mr. Jimenez, about this. It remains the position of the New Mexico Department of Health that Stampede Meat must close for 14 days in accordance with the 10/22/20 Public Health Order.

Chris D. Woodward
Acting General Counsel
New Mexico Department of Health
(505) 827-2703
(505) 827-2930 (fax)

*This email contains information that may be confidential or privileged. This information is intended only for the use of the individual or entity named. Any disclosure, copying, distribution or use of this information by any person other than the intended recipient is prohibited. If you have received this email in error, please contact the sender so that the message may be resent to the correct person, and please delete the copy that you received.*

**From:** Palmer, Michael [mailto:Michael.Palmer@btlaw.com]
**Sent:** Thursday, November 5, 2020 11:43 AM
**To:** Woodward, Chris, DOH <Chris.Woodward@state.nm.us>; Jimenez, Billy, DOH <Billy.Jimenez@state.nm.us>
**Cc:** Moses Winston <mwinston@raylaw.com>; Christopher Tebo <ctebo@raylaw.com>; Haskins, Thomas <THaskins@btlaw.com>; Vital, Victor <Victor.Vital@btlaw.com>
**Subject:** [EXT] RE: Stampede Meat - Proposal - URGENT

Chris and Billy,

I just spoke with Shawna Newsome, the Chief of Staff, Office of Food Safety at USDA. She said the federal government may be able to assist with testing resources, which would allow Stampede to test its entire workforce, identifying any asymptomatic, but infected workers, so they can quarantine, and continue operating. This is the type of approach utilized by DoH in the past with Stampede, but I understood DoH does not have the resources to facilitate such an approach now. Shawna would like to schedule a call to discuss this issue with you and perhaps other issues, e.g., she mentioned food safety concerns. Are you willing to participate in such a call, and if so, when are you available?

Sincerely,
Mike

Michael Palmer | Partner
Barnes & Thornburg LLP
700 1st Source Bank Center 100 N. Michigan Street, South Bend, IN 46601
Direct: (574) 237-1135 | Mobile: (574) 386-4153

    

1



Atlanta | California | Chicago | Delaware | Indiana | Michigan | Minneapolis
New York | Ohio | Raleigh | Salt Lake City | Texas | Washington, D.C.

AT THE HEART OF SOUTH BEND
We're moving soon to our new location in the
Barnes & Thornburg Building:
201 S. Main St., Suite 400, South Bend, IN 46601



Learn more about our COVID-19 Resources

**From:** Woodward, Chris, DOH <Chris.Woodward@state.nm.us>
**Sent:** Thursday, November 5, 2020 10:14 AM
**To:** Palmer, Michael <Michael.Palmer@btlaw.com>; Jimenez, Billy, DOH <Billy.Jimenez@state.nm.us>
**Cc:** Moses Winston <mwinston@raylaw.com>; Christopher Tebo <ctebo@raylaw.com>; Haskins, Thomas
<THaskins@btlaw.com>; Vital, Victor <Victor.Vital@btlaw.com>
**Subject:** [EXTERNAL]RE: Stampede Meat - Proposal - URGENT

Mr. Palmer:

I spoke with the NMDOH Acting Secretary, Billy Jimenez, about this matter a short while ago. It remains the position of
the New Mexico Department of Health that any business that has had four or more rapid responses in a 14-day period
must close its operations at that location for 14 days. If Stampede Meat remains in operation in violation of this provision
of the October 22, 2020 Public Health Order, it will be subject to a $5,000 civil penalty for every day that it continues in
operation, and the Department will also pursue injunctive relief in the courts. Employees of Stampede may also be
subject to other penalties as provided by law.

—————————————————————
Chris D. Woodward
Acting General Counsel
New Mexico Department of Health
(505) 827-2703
(505) 827-2930 (fax)

*This email contains information that may be confidential or privileged. This information is intended only for the use of the individual or entity named. Any
disclosure, copying, distribution or use of this information by any person other than the intended recipient is prohibited. If you have received this email in
error, please contact the sender so that the message may be resent to the correct person, and please delete the copy that you received.*

**From:** Palmer, Michael [mailto:Michael.Palmer@btlaw.com]
**Sent:** Wednesday, November 4, 2020 7:03 PM
**To:** Jimenez, Billy, DOH <Billy.Jimenez@state.nm.us>; Woodward, Chris, DOH <Chris.Woodward@state.nm.us>
**Cc:** Moses Winston <mwinston@raylaw.com>; Christopher Tebo <ctebo@raylaw.com>; Haskins, Thomas
<THaskins@btlaw.com>; Vital, Victor <Victor.Vital@btlaw.com>
**Subject:** [EXT] Stampede Meat – Proposal - URGENT
**Importance:** High

Chris and Billy,

While we continue to analyze the situation, Stampede Meat believes the New Mexico Department of Health's
immediate closure order is unlawful for many reasons. To begin, DoH's approach is not supported by your October 22,
2020 order and is arbitrary and capricious. DoH seems to contend Stampede is a "business that poses a significant
health risk, as determined by the [DoH]" pursuant to Paragraph 15 of the October 22 order, and therefore, DoH may
issue the closure notice because four Stampede employees tested positive for COVID-19 within the past 14
days. However, I'm unaware of an DoH determination that Stampede poses a significant health risk. To the contrary, as
Billy is aware, former Secretary Kinkel publically lauded Stampede's efforts to keep its employees safe from COVID-19,
and the DoH *and* New Mexico's OSHA reviewed Stampede's COVID-19 plan and approved it. Stampede goes well

2

beyond CDC, OSHA, NM DoH and NM OSHA guidance for keeping its workers safe. Stampede's plan, as Billy knows, includes:

- Every Stampede worker wears triple-protection face protection, including a face mask, neck warmer, which gets pulled over the face mask, *and* a face shield;
- Hourly hand sanitation of hourly employees;
- Social distancing on lines where space allows AND still requiring three layers of face coverings;
- Plastic dividers in cafeteria area;
- Pre-shift temperature taking and other COVID screening;
- Aggressive contact tracing and quarantining protocols;
- Nightly CDC-compliant sanitizing of the entire facility (Note: Stampede has always done daily deep cleaning and sanitization as a USDA-inspected food production facility); and
- More than 80 other safety precautions.

Indeed, Stampede's contact tracing efforts reveal that its positive cases have been driven by exposure outside of work, e.g., close contact with a spouse or significant other who has been infected, not risk at Stampede.

Moreover, your closure notice is preempted. President Trump invoked the Defense Production Act, and issued an executive order on April 28 requiring meat and poultry processing plants to remain open to prevent food shortages. The CDC and federal OSHA issued specific guidance for meat processors to follow, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html, and they've made clear that state and local governments could not require employers to satisfy health requirements that go beyond the guidance's recommendations. In fact, CDC and OSHA made a joint statement, explaining that "because of the President's invocation of the DPA, no part of the Joint Meat Processing Guidance should be construed to indicate that state and local authorities may direct a meat and poultry processing facility to close, to remain closed, or to operate in accordance with procedures other than those provided for in this

Guidance." https://www.dol.gov/newsroom/releases/osha/osha20200428-1 The CDC and OSHA went on to state: "Where a meat, pork, or poultry processing employer operating pursuant to the President's invocation of the DPA has demonstrated good faith attempts to comply with the Joint Meat Processing Guidance and is sued for alleged workplace exposures, the Department of Labor will consider a request to participate in that litigation in support of the employer's compliance program." Again NM DoH and NMOSHA reviewed Stampede's COVID-19 policy *after* this joint CDC and OSHA meat processing guidance, and both agencies approved the plan.

While we understand DoH's and the governor's desire to address COVID-19, targeting Stampede is clearly unlawful. I know one of the other companies that was issued a closure notice today shares these concerns.

Having said all of this, Stampede – as in the past – remains willing to work with DoH to address any concerns you may have about its COVID plan. Stampede invites DoH to its facility to observe its safety protocols, meet with its team and review its plan. In the meantime, Stampede will agree to a 30% reduction in its labor force for a week to allow for increased social distancing while DoH revisits Stampede's COVID-19 plan. During the past two weeks, Stampede has had attendance of 550-575 during its two shifts. Stampede is willing to reduce its workforce to 400 over two shifts as follows:

|  | | Current | Proposed | |
|---|---|---|---|---|
| | 1st Shift | 308 | 235 | (73) |
| | 2nd Shift | 241 | 160 | (81) |
| Cleaning/Maintanence | 3rd Shift | 3 | 3 | |
| | | 552 | -398 | |

In addition, if the DoH can resource the tests, Stampede will allow for its entire workforce to be tested every two weeks.

This plan will allow us to minimize the number employees in the facility while the DoH can confirm Stampede's COVID-19 plan goes well beyond CDC, OSHA and DoH requirements, while also reducing the impact to the food supply that Stampede provides as an essential business. This plan will also help minimize the economic harm to Stampede and its workforce. Indeed, closing Stampede will result in nearly a million pounds of lost product, and force Stampede to short its customers – which will likely result in the permanent loss of business.

Please let me know if you accept this proposal.

Sincerely,
Mike Palmer

**Michael Palmer** | Partner
Barnes & Thornburg LLP
700 1st Source Bank Center 100 N. Michigan Street, South Bend, IN 46601
Direct: (574) 237-1135 | Mobile: (574) 386-4153

    

Atlanta | California | Chicago | Delaware | Indiana | Michigan | Minneapolis
New York | Ohio | Raleigh | Salt Lake City | Texas | Washington, D.C.



AT THE HEART OF SOUTH BEND
We're moving soon to our new location in the
Barnes & Thornburg Building:
201 S. Main St., Suite 400, South Bend, IN 46601

Learn more about our COVID-19 Resources

```
CONFIDENTIALITY NOTICE: This email and any attachments are
for the exclusive and confidential use of the intended recipient. If
you are not the intended recipient, please do not read, distribute
or take action in reliance upon this message. If you have received
this in error, please notify us immediately by return email and
promptly delete this message and its attachments from your
computer system. We do not waive attorney-client or work product
privilege by the transmission of this message.

CONFIDENTIALITY NOTICE: This email and any attachments are
for the exclusive and confidential use of the intended recipient. If
you are not the intended recipient, please do not read, distribute
or take action in reliance upon this message. If you have received
this in error, please notify us immediately by return email and
promptly delete this message and its attachments from your
computer system. We do not waive attorney-client or work product
privilege by the transmission of this message.
```



**U.S. Department of Homeland Security**
Cybersecurity & Infrastructure Security Agency
*Office of the Director*
Washington, DC 20528

August 18, 2020

## ADVISORY MEMORANDUM ON ENSURING ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS ABILITY TO WORK DURING THE COVID-19 RESPONSE

FROM:        Christopher C. Krebs
             Director
             Cybersecurity and Infrastructure Security Agency (CISA)

---

As the Nation continues to come together to respond to COVID-19, the March 16th updated Coronavirus Guidance for America that highlighted the significance of the critical infrastructure workforce remains important.

The Cybersecurity and Infrastructure Security Agency (CISA) executes the Secretary of Homeland Security's authorities to secure critical infrastructure. Consistent with these authorities, CISA has developed, in collaboration with other federal agencies, State and local governments, and the private sector, an "Essential Critical Infrastructure Workforce" advisory list.

This list is intended to help State, local, tribal, territorial officials and organizations endeavor to protect their workers and communities as they continue to reopen in a phased approach, coupled with the need to ensure continuity of functions critical to public health and safety, as well as economic and national security. Decisions informed by this list should also take into consideration worker safety, workplace settings, as well as additional public health considerations based on the specific COVID-19-related concerns of particular jurisdictions.

**This list is advisory in nature. It is not, nor should it be considered, a federal directive or standard. Additionally, this advisory list is not intended to be the exclusive list of critical infrastructure sectors, workers, and functions that should continue to work safely during the COVID-19 response across all jurisdictions.**

The advisory list identifies workers who conduct a range of operations and services that are typically essential to continued critical infrastructure viability, including staffing operations centers, maintaining and repairing critical infrastructure, operating call centers, working construction, and performing operational functions, among others. It also includes workers who support crucial supply chains and enable functions for critical infrastructure. The industries they support represent, but are not limited to, medical and healthcare, telecommunications, information technology systems, defense, food and agriculture, transportation and logistics, energy, water and wastewater, and law enforcement.



EXHIBIT

2-1

The earlier versions of the list were meant to assist officials and organizations identify essential work functions and to allow essential workers access to their workplaces during times of community restrictions.  Now, several months into the pandemic, it is commonly acknowledged that essential workers have access to their workplaces.  The list can now be most useful in identifying the universe of essential workers that may require specialized risk management strategies to ensure that they can work safely.  Furthermore, the list can be used to begin planning and preparing for the allocation of scarce resources used to protect essential workers against COVID-19.

State, local, tribal, and territorial governments are responsible for implementing and executing response activities in their communities, while the Federal Government is in a supporting role. Officials should use their own judgment in issuing implementation re-opening directives and guidance. Similarly, while adhering to relevant public health guidance, critical infrastructure owners and operators are expected to use their own judgement on issues of the prioritization of business processes and workforce allocation to best ensure worker safety and the continuity of the essential goods and services they support. All decisions should appropriately balance public safety, the health and safety of the workforce, and the continued delivery of essential critical infrastructure services and functions.

CISA will continue to work with our partners in the critical infrastructure community to update this advisory list, if necessary, as the Nation's response to COVID-19 evolves.

Should you have questions about this list, please contact CISA at CISA.CAT@CISA.DHS.GOV.

**Attachment:** "Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response Version 4.0"



**Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response**

## Version 4.0 (August 18, 2020)

## ENSURING ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS HAVE THE ABILITY TO WORK SAFELY

Functioning critical infrastructure is imperative during the response to the COVID-19 emergency for both public health and security as well as community well-being. While stopping the spread of the virus and protecting the most vulnerable among us rightfully remain national priorities, a degradation of infrastructure operations and resilience only makes achieving those missions more difficult. Recognizing this, CISA published guidance identifying Essential Critical Infrastructure Workers at the outset of the COVID-19 pandemic. This guidance was adopted broadly across the country and was subsequently updated as the response evolved. This update, Version 4.0, continues to advance the guidance considering developments in pandemic response to support a risk-based approach towards worker safety to ensure the continuity of critical functions.

CISA appreciates the partnership with the critical infrastructure community in developing the guidance. The Nation's infrastructure resilience was undoubtedly enhanced by a common approach to, and prioritization of, essential critical infrastructure workers being able to work during periods of community restrictions. As with previous guidance, this list is advisory in nature. It is not, nor should it be considered, a federal directive or standard. Additionally, this advisory list is not intended to be the exclusive list of critical infrastructure sectors, workers, and functions that should continue during the COVID-19 response across all jurisdictions. Individual jurisdictions and critical infrastructure owners and operators should add or subtract essential workforce categories based on their own requirements and discretion.

Central to the value of the guidance in the early months of the pandemic was the discrete problem it was intended to support solutions for – enabling essential workers to work during community restrictions. While CISA continues to engage with stakeholders to identify workforce limitations that may impact infrastructure resilience, it is our assessment that, for the most part, essential workers are able to work – what is now most important is that essential workers are able to work in a safe environment.

Recognizing this, the Essential Critical Infrastructure Workers guidance can add the most value going forward by illuminating the universe of workers that require particularly thoughtful and deliberate risk management strategies so that they can continue to *work safely*.

CISA recognizes that states and localities across the country have undergone a phased re-opening of businesses, public lands, and other places of community and civic importance. Previous versions of the list did not include essential workers in critical infrastructure work settings, such as schools, that were presumed to be closed at the time of publication. Reflecting ongoing national discussions around reopening, this version includes these workers, in addition to other adjustments. As we enter the next stage in the pandemic response and schools and additional businesses reopen, CISA encourages jurisdictions and critical infrastructure owners to use the list to assist in prioritizing the ability of essential workers to work safely to ensure ongoing infrastructure operations and resilience.

Doing so will require looking at the universe of workers on the Essential Critical Infrastructure Workforce list and identifying tailored risk mitigation strategies for specific workplace settings. These could include:

**Creating a Risk Categorization Methodology for Worker Safety.** We recommend that organizations continue to categorize their employees against a risk factor matrix so that mitigation strategies can be implemented to enhance safety. The risk categorization factors that should be considered include:

> **Setting:** Are workers indoors or outdoors?
> **Proximity:** How physically close are workers (and customers) to each other?
> **Type of contact:** Do workers touch shared surfaces, common items, and other workers or customers?
> **Duration:** How long does an average interaction last?

    

**Number of different contacts:** How many interactions occur daily?
**Employee risk factors:** Which workers face heightened risk due to their age or underlying medical conditions?
**Capability to assess possible infection:** Are there screening protocols that protect workers (and customers) from interactions with contagious people?
**Cleaning:** How frequently can the facility be sanitized and cleaned?

Based on the responses to these risks, organizations can categorize the conditions that their workers face and continue to implement measures to increase worker well-being. In other words, increased protective measures should be based on those with high risk factors. Risk categorization guidance assistance can be found at OSHA.

**Identifying those workers that can potentially transition to working from home based on the lessons learned over the past few months from the unprecedented number of teleworkers.** We encourage employers to take a fresh look at the job functions of their workforce to determine if it is necessary for workers to be in the office given the technology breakthroughs that have eased some of the roadblocks to working remotely.

**Determining the criticality, uniqueness, or specialty of a worker's role to reduce the need to be at the workplace or working together in close proximity.** There are some functions that are either so essential to supporting the national critical functions and other lifeline support, such as first responders or utility workers, or that are unique or require a special skill set, that these workers must often be at the same workplace or together out in the field. We recommend that organizations re-examine whether these job functions can be conducted from home and if not, if shift work or remaining with a cohort can be conducted to allow for more social distancing.

**Determining the allocation of scarce resources for workers, such as personal protective equipment (PPE), other protection, access to medical evaluation, testing, and vaccines.** We recommend that jurisdictions and organizations use the essential critical infrastructure worker list as a tool to begin engaging with the essential worker community in the planning for the allocation of potential scarce resources should COVID-19 cases continue to increase or enter a second wave. Planning is critical to ensuring that workers are able to continue performing essential tasks supporting critical infrastructure. Furthermore, it will be critical that workers who perform essential tasks and/or have consistent interactions with at-risk populations (e.g., the elderly or those with pre-existing conditions) obtain the necessary resources to reduce the transmission of the virus.

In addition to the aforementioned characteristics of the worker and workplace, there may be local factors that influence COVID-19 risk mitigation plans including, infection rate and trends, the availability and timeliness of testing, the criticality of the business and worker to the local or state economy, and the need to prepare and respond to other localized events such as hurricanes, wildfires, or tornadoes.

The following links can provide additional guidance on health, workplace, and worker safety issues related to the pandemic:

*CDC Safety Practices for Critical Infrastructure Workers:* Implementing Safety Practices for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19

*OSHA/HHS Workplace Guidance:* Guidance for Preparing Workplaces for COVID-19

*CISA Telework Guidance:* Telework Guidance and Resources

*CISA General Guidance:* CISA Information & Updates on COVID-19

CISA will continually solicit and accept feedback on the list and will evolve the list in response to stakeholder feedback. We will also use our various stakeholder engagement mechanisms to work with partners on how they are using this list and share those lessons learned and best practices broadly. Feedback can be sent to CISA.CAT@CISA.DHS.GOV.

   

## CONSIDERATIONS FOR GOVERNMENT AND BUSINESS

This list was developed in consultation with federal agency partners, industry experts, and State and local officials, and is based on several key principles:

1. Response efforts to the COVID-19 pandemic are locally executed, state managed, and federally supported.

2. Critical infrastructure workers and employers should follow Businesses and Workplace guidance from the Centers for Disease Control and Prevention (CDC), as well as state and local government officials, regarding strategies to limit disease spread.

3. Employers must comply with applicable Occupational Safety and Health Administration (OSHA) requirements and guidance for protecting critical infrastructure workers who remain on or return to the job during the COVID-19 pandemic. As the nation relies on these workers to protect public health, safety, and community well-being, they must be protected from exposure to and infection from the virus so that they can continue to carry out their responsibilities. OSHA has guidance and enforcement information for workplaces at www.osha.gov/coronavirus.

4. Businesses and government agencies may continue to implement organization-specific measures as appropriate and consistent with applicable Federal, state, local, or other requirements, which protect the workforce while meeting mission needs.

5. Workers should be encouraged to work remotely when possible and, organizations are encouraged to identify alternative methods for safely engaging in activities that typically required in-person, non-mandatory interactions.

6. When continuous remote work is not possible, businesses should enlist strategies to reduce the likelihood of spreading the disease. This includes, but is not limited to, physically separating staff, staggering work shift hours or days, and other social distancing measures. While the CDC recommends that everyone wear a mask to contain respiratory droplets when around others, critical infrastructure employers must consider how best to implement this public health recommendation for source control in the workplace. For example, employers may provide disposable facemasks (e.g., surgical masks) instead of cloth face coverings when workers would need to wear masks for extended periods of time (e.g., the duration of a work shift) or while performing tasks in which the face covering could become contaminated.

7. Consider the impact of workplace sick leave policies that may contribute to an employee decision to delay reporting medical symptoms. Sick employees should not return to the workplace until they meet the criteria to stop home isolation. CDC has the following guidance on when it is safe to stop home isolation at https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/end-home-isolation.html.

8. Critical infrastructure employers have an obligation to limit to the extent possible the reintegration of in- person workers who have experienced an exposure to COVID-19 but remain asymptomatic in ways that best protect the health of the worker, their co-workers, and the general public. An analysis of core job tasks and workforce availability at worksites can allow the employer to match core activities to other equally skilled and available in-person workers who have not experienced an exposure. CDC guidance on safety practices for critical infrastructure workers is maintained at https://www.cdc.gov/coronavirus/2019-ncov/community/critical- workers/implementing-safety-practices.html.

9. All organizations should implement their business continuity and pandemic plans or put plans in place if they do not exist. Delaying implementation is not advised and puts at risk the viability of the business and the health and safety of workers. The CDC and OSHA have guidance for workplaces and businesses to assist them plan, prepare, and respond to the pandemic at https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html and https://www.osha.gov/SLTC/covid-19.

10. Ensure that certain workers have consistent access to specific  sites, facilities, and assets to ensure continuity of functions. Most of our economy relies on technology and therefore information technology (IT) and operational technology (OT) workers for critical infrastructure operations are essential. This includes workers in many roles, including workers focusing on management systems, control systems, and Supervisory Control and Data Acquisition (SCADA) systems, and data centers; cybersecurity engineering; and cybersecurity risk management.

  

11. Government workers, such as emergency managers, and the business community need to establish and maintain the practice of openly communicating with one another on such issues as workforce needs and safety as well as the continuity of critical functions.

12. Ensure that essential critical infrastructure workers have continued and unimpeded access to sites, facilities, and equipment within quarantine zones, containment areas, areas under curfew restrictions, or other areas where access or movement is limited, in order to perform functions for community relief and stability; for public safety, security and health; for maintaining essential supply chains for maintaining critical information technology services, and preserving local, regional, and national economic well-being.

13. Whenever possible, local governments should consider adopting specific provisions of state orders or guidance on sustained access and mobility of essential workers to reduce potential complications of workers crossing jurisdictional boundaries to perform critical functions, including during times of quarantine. When this is not possible, local jurisdictions should consider aligning access and movement control policies with neighboring jurisdictions to reduce the burden of cross-jurisdictional movement of essential critical infrastructure workers.

   

# IDENTIFYING ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

The following list of identified essential critical infrastructure workers is intended to be overly inclusive reflecting the diversity of industries across the United States.



## HEALTHCARE / PUBLIC HEALTH

- Workers, including laboratory personnel, that perform critical clinical, biomedical and other research, development, and testing needed for COVID-19 or other diseases.

- Healthcare providers including, but not limited to, physicians (MD/DO/DPM); dentists; psychologists; mid-level practitioners; nurses; emergency medical services personnel, assistants and aids; infection control and quality assurance personnel; phlebotomists; pharmacists; physical, respiratory, speech and occupational therapists and assistants; social workers; optometrists; speech pathologists; chiropractors; diagnostic and therapeutic technicians; and radiology technologists.

- Workers required for effective clinical, command, infrastructure, support service, administrative, security, and intelligence operations across the direct patient care and full healthcare and public health spectrum. Personnel examples may include, but are not limited to, accounting, administrative, admitting and discharge, engineering, accrediting, certification, licensing, credentialing, epidemiological, source plasma and blood donation, food service, environmental services, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians, etc.

  - Emergency medical services workers including clinical interns.
  - Prehospital workers included but not limited to urgent care workers.
  - Inpatient & hospital workers (e.g. hospitals, critical access hospitals, long-term acute care hospitals, long-term care facilities including skilled nursing facilities, inpatient hospice, ambulatory surgical centers, etc.).
  - Outpatient care workers (e.g. end-stage-renal disease practitioners and staff, Federally Qualified Health Centers, Rural Health Clinics, community mental health clinics, organ transplant/procurement centers, and other ambulatory care settings/providers, comprehensive outpatient rehabilitation facilities, etc.).
  - Home care workers (e.g. home health care, at-home hospice, home dialysis, home infusion, etc.).
  - Workers at Long-term care facilities, residential and community-based providers (e.g. Programs of All-Inclusive Care for the Elderly (PACE), Intermediate Care Facilities for Individuals with Intellectual Disabilities, Psychiatric Residential Treatment Facilities, Religious Nonmedical Health Care Institutions, etc.).
  - Workplace safety workers (i.e., workers who anticipate, recognize, evaluate, and control workplace conditions that may cause workers' illness or injury).

    

- Workers needed to support transportation to and from healthcare facility and provider appointments.
- Workers needed to provide laundry services, food services, reprocessing of medical equipment, and waste management.
- Workers that manage health plans, billing, and health information and who cannot work remotely.
- Workers performing cybersecurity functions at healthcare and public health facilities and who cannot work remotely.
- Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions, who cannot practically work remotely.
- Vendors and suppliers (e.g. imaging, pharmacy, oxygen services, durable medical equipment, etc.).
- Workers at manufacturers (including biotechnology companies and those companies that have shifted production to medical supplies), materials and parts suppliers, technicians, logistics and warehouse operators, printers, packagers, distributors of medical products and equipment (including third party logistics providers, and those who test and repair), personal protective equipment (PPE), isolation barriers, medical gases, pharmaceuticals (including materials used in radioactive drugs), dietary supplements, commercial health products, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies (including dispensers), sanitary goods, personal care products, pest control products, and tissue and paper towel products.
- Donors of blood, bone marrow, blood stem cell, or plasma, and the workers of the organizations that operate and manage related activities.
- Pharmacy staff, including workers necessary to maintain uninterrupted prescription, and other workers for pharmacy operations.
- Workers and materials (e.g., laboratory supplies) needed to conduct bloodspot and point of care (i.e., hearing and critical congenital heart disease) newborn screening as well as workers and materials need for confirmatory diagnostic testing and initiation of treatment.
- Home health workers (e.g., nursing, respiratory therapists, health aides) who enter the need to go into the homes of individuals with chronic, complex conditions and/or disabilities to deliver nursing and/or daily living care.
- Workers in retail facilities specializing in medical good and supplies.
- Public health and environmental health workers, such as:
    - Workers specializing in environmental health that focus on implementing environmental controls, sanitary and infection control interventions, healthcare facility safety and emergency preparedness planning, engineered work practices, and developing guidance and protocols for appropriate PPE to prevent COVID-19 disease transmission.
    - Public health/community health workers (including call center workers) who conduct community-based public health functions, conducting epidemiologic surveillance and compiling, analyzing, and communicating public health information, who cannot work remotely.
- Human services providers, especially for at risk populations such as:
    - Home delivered meal providers for older adults, people with disabilities, and others with chronic health conditions.
    - Home-maker services for frail, homebound, older adults.
    - Personal assistance services providers to support activities of daily living for older adults, people with disabilities, and others with chronic health conditions who live independently in the community with supports and services.
    - Home health providers who deliver health care services for older adults, people with disabilities, and others with chronic health conditions who live independently in the community with supports and services.
    - Workers who provide human services, including but not limited to social workers, nutritionists, case managers or case workers, crisis counselors, foster care case managers, adult protective services personnel, child protective personnel, domestic violence counselors, human trafficking prevention and recovery personnel, behavior specialists, substance abuse-related counselors, and peer support counselors.

  

- Government entities, and contractors that work in support of local, state, federal, tribal, and territorial public health and medical mission sets, including but not limited to supporting access to healthcare and associated payment functions, conducting public health functions, providing medical care, supporting emergency management, or other services necessary for supporting the COVID-19 response.

- Workers for providers and services supporting effective telehealth.

- Mortuary service providers, such as:

  - Workers performing mortuary funeral, cremation, burial, cemetery, and related services, including funeral homes, crematoriums, cemetery workers, and coffin makers.

  - Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to mental and behavioral health services to the family members, responders, and survivors of an incident.

## LAW ENFORCEMENT, PUBLIC SAFETY, AND OTHER FIRST RESPONDERS

- Public, private, and voluntary personnel (front-line and management, civilian and sworn) in emergency management, law enforcement, fire and rescue services, emergency medical services (EMS), and security, public and private hazardous material responders, air medical service providers (pilots and supporting technicians), corrections, and search and rescue personnel.

- Personnel involved in provisioning of access to emergency services, including the provisioning of real-time text, text-to-911, and dialing 911 via relay.

- Personnel that are involved in the emergency alert system (EAS) (broadcasters, satellite radio and television, cable, and wireline video) and wireless emergency alerts (WEA).

- Workers at Independent System Operators and Regional Transmission Organizations, and Network Operations staff, engineers and technicians to manage the network or operate facilities.

- Workers at emergency communication center, public safety answering points, public safety communications centers, emergency operation centers, and 911 call centers.

- Fusion Center workers.

- Workers, including contracted vendors, who maintain, manufacture, or supply equipment and services supporting law enforcement, fire, EMS, and response operations (to include electronic security and life safety security personnel).

- Workers and contracted vendors who maintain and provide services and supplies to public safety facilities, including emergency communication center, public safety answering points, public safety communications centers, emergency operation centers, fire and emergency medical services stations, police and law enforcement stations and facilities.

- Workers supporting the manufacturing, distribution, and maintenance of necessary safety equipment and uniforms for law enforcement and all public safety personnel.

- Workers supporting the operation of firearm, or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges.

- Public agency workers responding to abuse and neglect of children, spouses, elders, and dependent adults.

- Workers who support weather disaster and natural hazard mitigation and prevention activities.

- Security staff to maintain building access control and physical security measures.

- Workers who support child care and protective service programs such as child protective service.

   

## EDUCATION

- Workers who support the education of pre-school, K-12, college, university, career and technical education, and adult education students, including professors, teachers, teacher aides, special education and special needs teachers, ESOL teachers, para-educators, apprenticeship supervisors, and specialists.
- Workers who provide services necessary to support educators and students, including but not limited to, administrators, administrative staff, IT specialists, media specialists, librarians, guidance counselors, school psychologists and other mental health professions, school nurses and other health professionals, and school safety personnel.
- Workers who support the transportation and operational needs of schools, including bus drivers, crossing guards, cafeteria workers, cleaning and maintenance workers, bus depot and maintenance workers, and those that deliver food and supplies to school facilities.
- Workers who support the administration of school systems including, school superintendents and their management and operational staff.
- Educators and operational staff facilitating and supporting distance learning.

## FOOD AND AGRICULTURE

- Workers enabling the sale of human food, animal food (includes pet food, animal feed, and raw materials and ingredients), pet supply, and beverage products at groceries, pharmacies, convenience stores, and other retail (including unattended and vending), including staff in retail customer support and information technology support necessary for on-line orders, pickup, and delivery.
- Restaurant and quick serve food operations, including dark kitchen and food prep centers, carry-out, and delivery food workers.
- Food manufacturer workers and their supplier workers including those employed at food ingredient production and processing facilities; aquaculture and seafood harvesting facilities; slaughter and processing facilities for livestock, poultry, and seafood; animal food manufacturing and processing facilities; human food facilities producing by-products for animal food; industrial facilities producing co-products for animal food; beverage production facilities; and the production of food packaging.
    - Farmers, farm and ranch workers, and agribusiness support services, including workers involved in auction and sales; in food operations, including animal food, grain and oilseed storage, handling, processing, and distribution; in ingredient production, packaging, and distribution; in manufacturing, packaging, and distribution of veterinary drugs and biologics (e.g., vaccines); and in distribution and transport.
- Farmers, farm and ranch workers, and support service and supplier workers producing food supplies and other agricultural inputs for domestic consumption and export, to include those engaged in raising, cultivating, phytosanitation, harvesting, packing, storing, or distributing to storage or to market or to a transportation mode to market any agricultural or horticultural commodity for human or animal consumption.
- Workers at fuel ethanol facilities, biodiesel and renewable diesel facilities, and storage facilities.
- Workers and firms supporting the distribution of all human and animal food and beverage and ingredients used in these products, including warehouse workers, vendor-managed inventory controllers, and blockchain managers.
- Workers supporting the sanitation and pest control of all human and animal food manufacturing processes and operations from wholesale to retail.
- Workers supporting greenhouses as well as the growth and distribution of plants and associated products for home gardens.
- Workers in cafeterias used to feed workers, particularly worker populations sheltered against COVID-19

    

and those designated as essential critical infrastructure workers.

- Workers in animal diagnostic and food testing laboratories.

- Government, private, and non-governmental organizations' workers essential for food assistance programs (including school lunch programs) and government payments.

- Workers of companies engaged in the production, storage, transport, and distribution of chemicals, drugs, biologics (e.g. vaccines), and other substances used by the human and agricultural food and agriculture industry, including seeds, pesticides, herbicides, fertilizers, minerals, enrichments, equipment, and other agricultural production aids.

- Animal agriculture workers to include those employed in veterinary health (including those involved in supporting emergency veterinary or livestock services); raising, caring for and management of animals for food, as well as pets; animal production operations; livestock markets; slaughter and packing plants, manufacturers, renderers, and associated regulatory and government workforce.

- Transportation workers supporting animal agricultural industries, including movement of animal medical and reproductive supplies and materials, animal biologics (e.g., vaccines), animal drugs, animal food ingredients, animal food and bedding, live animals, and deceased animals for disposal.

- Workers who support sawmills and the manufacture and distribution of fiber and forestry products, including, but not limited to timber, paper, and other wood and fiber products, as well as manufacture and distribution of products using agricultural commodities.

- Workers engaged in the manufacture and maintenance of equipment and other infrastructure necessary for agricultural production and distribution.

     

# ENERGY

- Workers supporting the energy sector, regardless of the energy source (including, but not limited to, nuclear, fossil, hydroelectric, or renewable), segment of the system, or infrastructure the worker is involved in, who are needed to construct, manufacture, repair, transport, permit, monitor, operate engineer, and maintain the reliability, safety, security, environmental health, and physical and cyber security of the energy system, including those who support construction, manufacturing, transportation, permitting, and logistics.

- Workers and contractors supporting energy facilities that provide steam, hot water or chilled water from central power plants to connected customers.

- Workers conducting energy/commodity trading/scheduling/marketing functions who can't perform their duties remotely.

- Workers supporting the energy sector through renewable energy infrastructure (including, but not limited to, wind, solar, biomass, hydrogen, ocean, geothermal, and hydroelectric) and microgrids, including those supporting construction, manufacturing, transportation, permitting, operation and maintenance, monitoring, and logistics.

- Workers and security staff involved in nuclear re-fueling operations.

- Workers providing services related to energy sector fuels including, but not limited to, petroleum (crude oil), natural gas, propane, liquefied natural gas (LNG), compressed natural gas (CNG), natural gas liquids (NGL), other liquid fuels, nuclear, and coal) and supporting the mining, processing, manufacturing, construction, logistics, transportation, permitting, operation, maintenance, security, waste disposal, storage, and monitoring of support for resources.

- Workers providing environmental remediation and monitoring, limited to immediate critical needs technicians.

- Workers involved in the manufacturing and distribution of equipment, supplies, and parts necessary to maintain production, maintenance, restoration, and service at energy sector facilities across all energy sector segments.

## Electricity Industry

- Workers who maintain, ensure, restore, or who are involved in the development, transportation, fuel procurement, expansion, or operation of, the generation, transmission, and distribution of electric power, including call centers, utility workers, engineers, retail electricity, construction, maintenance, utility telecommunications, relaying, and fleet maintenance technicians who cannot perform their duties remotely.

- Workers at coal mines, production facilities, and those involved in manufacturing, transportation, permitting, operation, maintenance, and monitoring at coal sites.

- Workers who produce, process, ship, and handle coal used for power generation and manufacturing.

- Workers in the electricity industry including but not limited to those supporting safety, construction, manufacturing, transportation, permitting, operation/maintenance, engineering, physical and cyber security, monitoring, and logistics

- Workers needed for safe and secure operations at nuclear generation including, but not limited to, those critical to the broader nuclear supply chain, the manufacture and delivery of parts needed to maintain nuclear equipment, the operations of fuel manufacturers, and the production and processing of fuel components used in the manufacturing of fuel.

    

- Workers at fossil fuel (including but not limited to natural gas, refined, distillate, and/or coal), nuclear, and renewable energy infrastructure (including, but not limited to wind, solar, biomass, hydrogen, geothermal, and hydroelectric), and microgrids, including those supporting safety, construction, manufacturing, transportation, permitting, operation, maintenance, monitoring, and logistics.

- Workers at generation, transmission, and electric black start facilities.

- Workers at Reliability Coordinator, Balancing Authority, local distribution control centers, and primary and backup Control Centers, including, but not limited to, independent system operators, regional transmission organizations, and local distribution control centers.

- Workers that are mutual assistance/aid personnel, which may include workers from outside of the state or local jurisdiction.

- Vegetation management and traffic control for supporting those crews.

- Instrumentation, protection, and control technicians.

- Essential support personnel for electricity operations.

- Generator set support workers, such as diesel engineers used in power generation, including those providing fuel.

### Petroleum Industry

- Workers who support onshore and offshore petroleum drilling operations; platform and drilling construction and maintenance; transportation (including helicopter operations), maritime transportation, supply, and dredging operations; maritime navigation; well stimulation, intervention, monitoring, automation and control, extraction, production; processing; waste disposal, and maintenance, construction, and operations.

- Workers in the petroleum industry including but not limited to those supporting safety, construction, manufacturing, transportation, permitting, operation/maintenance, engineering, physical and cyber security, monitoring, and logistics.

- Workers for crude oil, petroleum, and petroleum product storage and transportation, including pipeline, marine transport, terminals, rail transport, storage facilities, racks, and road transport for use as end- use fuels such as gasoline, diesel fuel, jet fuel, and heating fuels or feedstocks for chemical manufacturing.

- Petroleum and petroleum product security operations center workers and workers who support maintenance and emergency response services.

- Petroleum and petroleum product operations control rooms, centers, and refinery facilities.

- Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them.

- Supporting new and existing construction projects, including, but not limited to, pipeline construction.

- Manufacturing and distribution of equipment, supplies, and parts necessary for production, maintenance, restoration, and service of petroleum and petroleum product operations and use, including end-users.

- Transmission and distribution pipeline workers, including but not limited to pump stations and any other required, operations maintenance, construction, and support for petroleum products.




### Natural Gas, Natural Gas Liquids (NGL), Propane, and Other Liquid Fuels

- Workers who support onshore and offshore drilling operations, platform and drilling construction and maintenance; transportation (including helicopter operations); maritime transportation, supply, and dredging operations; maritime navigation; natural gas and natural gas liquid production, processing, extraction, storage and transportation; well intervention, monitoring, automation and control; waste disposal, and maintenance, construction, and operations.

- Workers in the natural gas, NGL, propane, and other liquid fuels industries including but not limited to those supporting safety, construction, manufacturing, transportation, permitting, operation/maintenance, engineering, physical and cyber security, monitoring, and logistics.

- Transmission and distribution pipeline workers, including compressor stations and any other required operations maintenance, construction, and support for natural gas, natural gas liquid, propane, and other liquid fuels.

- Workers at Liquefied Natural Gas (LNG) and Compressed Natural Gas (CNG) facilities.

- Workers at natural gas, propane, natural gas liquids, liquified natural gas, liquid fuel storage facilities, underground facilities, and processing plants and other related facilities, including construction, maintenance, and support operations personnel.

- Natural gas processing plants workers and those who deal with natural gas liquids.

- Workers who staff natural gas, propane, natural gas liquids, and other liquid fuel security operations centers, operations dispatch and control rooms and centers, and emergency response and customer emergencies (including leak calls) operations.

- Workers supporting drilling, production, processing, refining, and transporting natural gas, propane, natural gas liquids, and other liquid fuels for use as end-use fuels, feedstocks for chemical manufacturing, or use in electricity generation.

- Workers supporting propane gas service maintenance and restoration, including call centers.

- Workers supporting propane, natural gas liquids, and other liquid fuel distribution centers.

- Workers supporting propane gas storage, transmission, and distribution centers.

- Workers supporting new and existing construction projects, including, but not limited to, pipeline construction.

- Workers supporting ethanol and biofuel production, refining, and distribution.

- Workers in fuel sectors (including, but not limited to nuclear, coal, and gas types and liquid fuels) supporting the mining, manufacturing, logistics, transportation, permitting, operation, maintenance, and monitoring of support for resources.

- Workers ensuring, monitoring, and engaging in the physical security of assets and locations associated with natural gas, propane, natural gas liquids, and other liquid fuels.

- Workers involved in the manufacturing and distribution of equipment, supplies, and parts necessary to maintain production, maintenance, restoration, and service of natural gas, propane, natural gas liquids, and other liquid fuels operations and use, including end-users.

## WATER AND WASTEWATER

Workers needed to operate and maintain drinking water and wastewater and drainage infrastructure, including:

- Operational staff at water authorities.
- Operational staff at community water systems.
- Operational staff at wastewater treatment facilities.
- Workers repairing water and wastewater conveyances and performing required sampling or monitoring, including field staff.
- Operational staff for water distribution and testing.
- Operational staff at wastewater collection facilities.
- Operational staff and technical support for SCADA Control systems.
- Laboratory staff performing water sampling and analysis.
- Suppliers and manufacturers of chemicals, equipment, personal protection equipment, and goods and services for water and wastewater systems.
- Workers who maintain digital systems infrastructure supporting water and wastewater operations.

## TRANSPORTATION AND LOGISTICS

- Workers supporting or enabling transportation and logistics functions, including truck drivers, bus drivers, dispatchers, maintenance and repair technicians, warehouse workers, third party logisticians, truck stop and rest area workers, driver training and education centers, Department of Motor Vehicle (DMV) workers, enrollment agents for federal transportation worker vetting programs, towing and recovery services, roadside assistance workers, intermodal transportation personnel, and workers that construct, maintain, rehabilitate, and inspect infrastructure, including those that require cross-jurisdiction travel.
- Workers supporting the distribution of food, fuels, pharmaceuticals and medical material (including materials used in radioactive drugs), and chemicals needed for water or water treatment and energy maintenance.
- Workers supporting operation of essential highway infrastructure, including roads, bridges, and tunnels (e.g., traffic operations centers and moveable bridge operators).
- Workers of firms providing services, supplies, and equipment that enable warehouse and operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use, including cold- and frozen-chain logistics for food and critical biologic products.
- Mass transit workers providing critical transit services and performing critical or routine maintenance to mass transit infrastructure or equipment.
- Workers supporting personal and commercial transportation services including taxis, delivery services, vehicle rental services, bicycle maintenance and car-sharing services, and transportation network providers.
- Workers, including police, responsible for operating and dispatching passenger, commuter, and freight trains and maintaining rail infrastructure and equipment.
- Maritime transportation workers, including port authority and commercial facility personnel, dredgers, port workers, security personnel, mariners, ship crewmembers, ship pilots, tugboat operators, equipment operators (to include maintenance and repair, and maritime-specific medical providers), ship supply workers, chandlers, repair company workers, and maritime and mariner training and education centers. Refer to the United States Coast Guard's Marine Safety Information Bulletin "Maintaining Maritime Commerce and Identification of Essential Maritime Critical Infrastructure Workers" for more information.

   

- Maritime transportation workers, including port authority and commercial facility personnel, dredgers, port workers, security personnel, mariners, ship crewmembers, ship pilots, tugboat operators, equipment operators (to include maintenance and repair, and maritime-specific medical providers), ship supply workers, chandlers, repair company workers, and maritime and mariner training and education centers. Refer to the United States Coast Guard's Marine Safety Information Bulletin "Maintaining Maritime Commerce and Identification of Essential Maritime Critical Infrastructure Workers" for more information.

- Workers, including truck drivers, railroad employees, maintenance crews, and cleaners, supporting transportation of chemicals, hazardous, medical, and waste materials that support critical infrastructure, capabilities, functions, and services, including specialized carriers, crane and rigging industry workers.

- Bus drivers and workers who provide or support intercity, commuter, and charter bus service in support of other essential services or functions, including school bus drivers.

- Vehicle repair, maintenance, and transportation equipment manufacturing and distribution facilities.

- Workers who support the construction and maintenance of electric vehicle charging stations.

- Transportation safety inspectors, including hazardous material inspectors and accident investigator inspectors.

- Manufacturers and distributors (to include service centers and related operations) of lighting and communication systems, specialized signage and structural systems, emergency response equipment and support materials, printers, printed materials, packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations, and other critical infrastructure needs.

- Postal Service, parcel, courier, last-mile delivery, and shipping and related workers, to include private companies, who accept, process, transport, and deliver information and goods.

- Workers who supply equipment and materials for maintenance of transportation equipment.

- Workers who repair and maintain vehicles, aircraft, rail equipment, marine vessels, bicycles, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers.

- Workers who support air transportation for cargo and passengers, including operation distribution, maintenance, and sanitation. This includes air traffic controllers, flight dispatchers, maintenance personnel, ramp workers, fueling agents, flight crews, airport safety inspectors and engineers, airport operations personnel, aviation and aerospace safety workers, security, commercial space personnel, operations personnel, accident investigators, flight instructors, and other on- and off-airport facilities workers.

- Workers supporting transportation via inland waterways, such as barge crew, dredging crew, and river port workers for essential goods.

- Workers critical to the manufacturing, distribution, sales, rental, leasing, repair, and maintenance of vehicles and other equipment (including electric vehicle charging stations) and the supply chains that enable these operations to facilitate continuity of travel-related operations for essential workers.

- Warehouse operators, including vendors and support personnel critical for business continuity (including heating, ventilation, and air conditioning (HVAC) and electrical engineers, security personnel, and janitorial staff), e-commerce or online commerce, and customer service for essential functions.

**CISA | DEFEND TODAY,** SECURE TOMORROW  16

 www.cisa.gov    CISA.CAT@cisa.dhs.gov    Linkedin.com/company/cisagov    @CISAgov | @cyber | @uscert_gov    Facebook.com/CISA   @cisagov

# PUBLIC WORKS AND INFRASTRUCTURE SUPPORT SERVICES

- Workers who support the construction, maintenance, or rehabilitation of critical infrastructure.

- Workers supporting construction materials production, testing laboratories, material delivery services, and construction inspection.

- Workers who support the operation, inspection, and maintenance of essential public works facilities and operations, including bridges, water and sewer main breaks, fleet maintenance personnel, construction of critical or strategic infrastructure, traffic signal maintenance, emergency location services for buried utilities, maintenance of digital systems infrastructure supporting public works operations, and other emergent issues.

- Workers such as plumbers, electricians, exterminators, builders (including building and insulation), contractors, HVAC Technicians, technicians for elevators, escalators and moving walkways, landscapers, and other service providers who provide services, including temporary construction, that are necessary to maintaining the safety, sanitation, and essential operation of residences, businesses and buildings, such as hospitals and senior living facilities.

- Workers personnel, who support operations that ensure, the availability of and access to needed facilities, transportation, energy, and communications through activities such as road and line clearing.

- Workers who support the effective removal, storage, and disposal of residential, industrial, and commercial solid waste and hazardous waste, including at landfill operations.

- Workers who support the operation, inspection, and maintenance of essential dams, locks, and levees.

- Workers who support the inspection and maintenance of aids to navigation and other government-provided services that ensure continued maritime commerce.

- Workers who support the operations and maintenance of parks and outdoor recreational facilities.

# COMMUNICATIONS AND INFORMATION TECHNOLOGY

## Communications

- Maintenance of communications infrastructure, – including privately owned and maintained communication systems, – supported by technicians, operators, call centers, wireline and wireless providers, cable service providers, satellite operations, Internet Exchange Points, Points of Presence, Network Access Points, back haul and front haul facilities, and manufacturers and distributors of communications equipment.

- Government and private sector workers, including government contractors, with work related to undersea cable infrastructure and support facilities, including cable landing sites, beach manhole vaults and covers, submarine cable depots, and submarine cable ship facilities.

- Government and private sector workers, including government contractors, supporting Department of Defense internet and communications facilities.

- Network Operations staff, engineers, and technicians to include IT managers and staff, HVAC and electrical engineers, security personnel, software and hardware engineers, and database administrators that manage the network or operate facilities.

- Workers responsible for infrastructure construction and restoration, including but not limited to engineers, technicians, and contractors for construction and engineering of fiber optic cables, buried conduit, small cells, other wireless facilities, and other communications sector-related infrastructure. This includes permitting, construction of new facilities, and deployment of new technology as required to address congestion or customer usage due to unprecedented use of remote services.

- Installation, maintenance, and repair technicians that establish, support, or repair service as needed.

    

- Central office personnel to maintain and operate central office, data centers, and other network office facilities, including critical support personnel assisting front line workers.

- Customer service and support staff, including managed and professional services, as well as remote providers of support to transitioning workers to set up and maintain home offices, who interface with customers to manage or support service environments and security issues including payroll, billing, fraud, logistics, and troubleshooting.

- Workers providing electronic security, fire, monitoring, and life safety services, and who ensure physical security, cleanliness, and the safety of facilities and personnel, including those who provide temporary licensing waivers for security personnel to work in other States or Municipalities.

- Dispatchers involved with service repair and restoration.

- Retail customer service personnel at critical service center locations to address customer needs, including new customer processing, distributing and repairing equipment, and addressing customer issues, in order to support individuals' remote emergency communications needs.

- Supply chain and logistics personnel to ensure goods and products are available to provision these front-line workers.

- External Affairs personnel to assist in coordinating with local, state, and federal officials to address communications needs supporting COVID-19 response, public safety, and national security.

- Workers responsible for ensuring that persons with disabilities have access to and the benefits of various communications platforms, including those involved in the provision of telecommunication relay services, closed captioning of broadcast television for the deaf, video relay services for deaf citizens who prefer communication via American Sign Language over text, and audio-description for television programming.

**Information Technology**

- Workers who support command centers, including, but not limited to, Network Operations Command Centers, Broadcast Operations Control Centers, and Security Operations Command Centers.

- Data center operators, including system administrators, HVAC and electrical engineers, security personnel, IT managers and purchasers, data transfer solutions engineers, software and hardware engineers, and database administrators for all industries, including financial services.

- Workers who support client service centers, field engineers, and other technicians and workers supporting critical infrastructure, as well as manufacturers and supply chain vendors that provide hardware and software, support services, research and development, information technology equipment (to include microelectronics and semiconductors), HVAC and electrical equipment for critical infrastructure, and test labs and certification agencies that qualify such equipment (to include microelectronics, optoelectronics, and semiconductors) for critical infrastructure, including data centers.

- Workers needed to preempt and respond to cyber incidents involving critical infrastructure, including medical facilities; state, local, tribal, and territorial (SLTT) governments and federal facilities; energy and utilities; banks and financial institutions; securities and other exchanges; other entities that support the functioning of capital markets, public works, critical manufacturing, food, and agricultural production; transportation; and other critical infrastructure categories and personnel, in addition to all cyber defense workers who can't perform their duties remotely.

- Suppliers, designers, transporters, and other workers supporting the manufacture, distribution, provision, and construction of essential global, national, and local infrastructure for computing services (including cloud computing services and telework capabilities), business infrastructure, financial transactions and services, web-based services, and critical manufacturing.

   

- Workers supporting communications systems, information technology, and work from home solutions used by law enforcement, public safety, medical, energy, public works, critical manufacturing, food and agricultural production, financial services, in person and remote education, and other critical industries and businesses.

- Workers required in person to support Software as a Service businesses that enable remote working, and education performance of business operations, distance learning, media services, and digital health offerings, or required for technical support crucial for business continuity and connectivity.

## OTHER COMMUNITY- OR GOVERNMENT-BASED OPERATIONS AND ESSENTIAL FUNCTIONS

- Workers to ensure continuity of building functions, including but not limited to security and environmental controls (e.g., HVAC), building transportation equipment, the manufacturing and distribution of the products required for these functions, and the permits and inspections for construction supporting essential infrastructure.

- Elections personnel to include both public and private sector elections support.

- Workers supporting the operations of the judicial system, including judges, lawyers, and others providing legal assistance.

- Workers who support administration and delivery of unemployment insurance programs, income maintenance, employment services, vocational rehabilitation programs and services, disaster assistance, workers' compensation insurance and benefits programs, and pandemic assistance.

- Federal, State, and Local, Tribal, and Territorial government workers who support Mission Essential Functions and communications networks.

- Trade Officials (FTA negotiators; international data flow administrators).

- Workers who support radio, print, internet and television news and media services, including, but not limited to front line news reporters, studio, and technicians for newsgathering, reporting, and publishing news.

- Workers supporting Census 2020.

- Weather forecasters.

- Clergy and other essential support for houses of worship.

- Workers who maintain digital systems infrastructure supporting other critical government operations.

- Workers who support necessary permitting, credentialing, vetting, certifying, and licensing for essential critical infrastructure workers and their operations.

- Customs and immigration workers who are critical to facilitating trade in support of the national emergency response supply chain.

- Workers at testing and education centers for emergency medical services and other healthcare workers.

- Staff at government offices who perform title search, notary, and recording services in support of mortgage and real estate services and transactions.

- Residential and commercial real estate services, including settlement services.

CISA | DEFEND TODAY, SECURE TOMORROW    19

 www.cisa.gov     CISA.CAT@cisa.dhs.gov     Linkedin.com/company/cisagov     @CISAgov | @cyber | @uscert_gov     Facebook.com/CISA     @cisagov

- Workers supporting essential maintenance, manufacturing, design, operation, inspection, security, and construction for essential products, services, supply chain, and COVID-19 relief efforts.

- Workers performing services to animals in human care, including zoos and aquariums.

- Engineers performing or supporting safety inspections.

- Veterinary nurses, technicians, veterinarians, and other services supporting individuals and organizations with service animals, search and rescue dogs, and support animals.

- Workers providing dependent care services, including childcare, eldercare, and other service providers necessary to maintain a comprehensive, supportive environment for individuals and caregivers needing these services.

## CRITICAL MANUFACTURING

- Workers necessary for the manufacturing of metals (including steel and aluminum), industrial minerals, semiconductors, materials and products needed for medical supply chains and for supply chains associated with transportation, building transportation equipment, aerospace, energy, communications, information technology, food and agriculture, chemical manufacturing, nuclear facilities, wood products, commodities used as fuel for power generation facilities, the operation of dams, water and wastewater treatment, processing and reprocessing of solid waste, emergency services, and the defense industrial base. Additionally, workers needed to maintain the continuity of these manufacturing functions and associated supply chains, and workers necessary to maintain a manufacturing operation in warm standby.

- Workers necessary for the manufacturing of materials and products needed to manufacture medical equipment, PPE, and sanctioned substitutes for PPE.

- Workers necessary for mining and production of critical minerals, materials and associated essential supply chains, and workers engaged in the manufacture and maintenance of equipment and other infrastructure necessary for mining production and distribution.

- Workers who produce or manufacture parts or equipment that supports continued operations for any essential services and increase in remote workforce, including computing and communication devices, semiconductors, and equipment such as security tools for Security Operations Centers (SOCs) or data centers.

- Workers manufacturing or providing parts and equipment that enable the maintenance and continued operation of essential businesses and facilities.

## HAZARDOUS MATERIALS

- Workers who manage hazardous materials associated with any other essential activity, including but not limited to healthcare waste (medical, pharmaceuticals, medical material production, and testing operations from laboratories processing and testing kits) and energy (including nuclear facilities).

- Workers who support hazardous materials response and cleanup.

- Workers who maintain digital systems infrastructure supporting hazardous materials management operations.

     

## FINANCIAL SERVICES

- Workers who are needed to provide, process, and maintain systems for processing, verification, and recording of financial transactions and services, including payment, clearing, and settlement; wholesale funding; insurance services; consumer and commercial lending; public accounting; and capital markets activities.

- Workers who are needed to maintain orderly market operations to ensure the continuity of financial transactions and services.

- Workers who are needed to provide business, commercial, and consumer access to bank and non-bank financial services and lending services, including ATMs, lending and money transmission, lockbox banking, and to move currency, checks, securities, and payments (e.g., armored cash carriers).

- Workers who support financial operations and those staffing call centers, such as those staffing data and security operations centers, managing physical security, or providing accounting services.

- Workers supporting production and distribution of debit and credit cards.

- Workers providing electronic point of sale support personnel for essential businesses and workers.

- Workers who support law enforcement requests and support regulatory compliance efforts critical to national security, such as meeting anti-money laundering and countering terrorist financing and sanctions screening requirements.

## CHEMICAL

- Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, laboratories, distribution facilities, and workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, paintings and coatings, textiles, building materials, plumbing, electrical, and paper products.

- Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items.

- Workers supporting the production of protective cleaning and medical solutions, PPE, chemical consumer and institutional products, disinfectants, fragrances, and packaging that prevents the contamination of food, water, medicine, among others essential products.

- Workers supporting the operation and maintenance of facilities (particularly those with high-risk chemicals and sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections.

- Workers (including those in glass container manufacturing) who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products.

   

## DEFENSE INDUSTRIAL BASE

- Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military, including, but are not limited to, space and aerospace workers, nuclear matters workers, mechanical and software engineers (various disciplines), manufacturing and production workers, transportation logistics and cargo handling workers, IT support, security staff, security personnel, intelligence support, aircraft and weapon system mechanics and maintainers, and sanitary workers who maintain the hygienic viability of necessary facilities.

- Personnel working for companies, and their subcontractors, who perform under contract or sub-contract to the Department of Defense (DoD), the Department of Energy (DoE) (on nuclear matters), and Department of Transportation (DOT) as well as personnel at government owned/government operated and government-owned/contractor operated facilities and vessels, and who provide materials and services to DoE (on nuclear matters) and the DoD, including support for weapon systems, software systems and cybersecurity, defense and intelligence communications, surveillance, sale of U.S. defense articles and services for export to foreign allies and partners (as authorized by the U.S. government), transportation and logistics, and space systems and other activities in support of our military, intelligence, and space forces.

## COMMERCIAL FACILITIES

- Workers who support the supply chain of building materials from production through application and installation, including cabinetry, fixtures, doors, cement, hardware, plumbing (including parts and services), electrical, heating and cooling, refrigeration, appliances, paint and coatings, and workers who provide services that enable repair materials and equipment for essential functions.

- Workers supporting ecommerce of essential goods through distribution, warehouse, call center facilities, and other essential operational support functions, that accept, store, and process goods, and that facilitate their transportation and delivery.

- Workers in retail and non-retail businesses – and necessary merchant wholesalers and distributors - necessary to provide access to hardware and building materials, consumer electronics, technology products, appliances, emergency preparedness supplies, home exercise and fitness supplies, and home school instructional supplies.

- Workers distributing, servicing, repairing, installing residential and commercial HVAC systems, building transportation equipment, boilers, furnaces and other heating, cooling, refrigeration, and ventilation equipment.

- Workers supporting the operations of commercial buildings that are critical to safety, security, and the continuance of essential activities, such as on-site property managers, building engineers, security staff, fire safety directors, janitorial personnel, and service technicians (e.g., mechanical, HVAC, plumbers, electricians, and elevator).

- Management and staff at hotels and other temporary lodging facilities that provide for COVID-19 mitigation, containment, and treatment measures or provide accommodations for essential workers.

    

## RESIDENTIAL/SHELTER FACILITIES, HOUSING AND REAL ESTATE, AND RELATED SERVICES

- Workers who support food, shelter, and social services, and other necessities of life for needy groups and individuals, including in-need populations and COVID-19 responders, including traveling medical staff.

- Workers in animal shelters.

- Workers responsible for the leasing of residential properties to provide individuals and families with ready access to available housing.

- Workers responsible for handling property management, maintenance, and related service calls who can coordinate the response to emergency "at-home" situations requiring immediate attention, as well as facilitate the reception of deliveries, mail, and other necessary services.

- Workers performing housing and commercial construction related activities, including those supporting the sale, transportation, and installation of manufactured homes.

- Workers supporting government functions related to the building and development process, such as inspections, permitting, and plan review services that can be modified to protect the public health, but fundamentally should continue and enable the continuity of the construction industry (e.g., allow qualified private third-party inspections in case of federal government shutdown).

- Workers performing services in support of the elderly and disabled populations who coordinate a variety of services, including health care appointments and activities of daily living.

- Workers responsible for the movement and provisioning of household goods.

## HYGIENE PRODUCTS AND SERVICES

- Workers who produce hygiene products.

- Workers in laundromats, laundry services, and dry cleaners.

- Workers providing personal and household goods, repair, and maintenance.

- Workers providing disinfection services for all essential facilities and modes of transportation and who support the sanitation of all food manufacturing processes and operations from wholesale to retail.

- Workers necessary for the installation, maintenance, distribution, and manufacturing of water and space heating equipment and its components.

- Support required for continuity of services, including commercial disinfectant services, janitorial and cleaning personnel, and support personnel functions that need freedom of movement to access facilities in support of front-line workers.

- Workers supporting the production of home cleaning, pest control, and other essential products necessary to clean, disinfect, sanitize, and ensure the cleanliness of residential homes, shelters, and commercial facilities.

- Workers supporting agriculture irrigation infrastructure.

- Workers supporting the production of home cleaning and pest control products.

 



**EXECUTIVE ORDERS**

# Executive Order on Delegating Authority Under the DPA with Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19

**—** **LAND & AGRICULTURE**

Issued on: **April 28, 2020**

★ ★ ★

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Defense Production Act of 1950, as amended (50 U.S.C. 4501 *et seq.*) (the "Act"), and section 301 of title 3, United States Code, it is hereby ordered as follows:

Section 1.  Policy.  The 2019 novel (new) coronavirus known as SARS-CoV-2, the virus causing outbreaks of the disease COVID-19, has significantly disrupted the lives of Americans.  In Proclamation 9994 of March 13, 2020 (Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak), I declared that the COVID-19 outbreak in the United States constituted a national emergency, beginning March 1, 2020.  Since then, the American people have united behind a policy of mitigation strategies, including social distancing, to flatten the curve of infections and reduce the spread of COVID-19.  The COVID-19 outbreak and these necessary mitigation measures have taken a dramatic toll on the United States economy and critical infrastructure.



It is important that processors of beef, pork, and poultry ("meat and poultry") in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans.  However, outbreaks of COVID-19 among workers at some processing facilities have led to the reduction in some of those facilities' production capacity.  In addition, recent actions in some States have led to the complete closure of some large processing facilities.  Such actions may differ from or be inconsistent with interim guidance recently issued by the Centers for Disease Control and Prevention (CDC) of the Department of Health and Human Services and the Occupational Safety and Health Administration (OSHA) of the Department of Labor entitled "Meat and Poultry Processing Workers and Employers" providing for the safe operation of such facilities.

Such closures threaten the continued functioning of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency.  Given the high volume of meat and poultry processed by many facilities, any unnecessary closures can quickly have a large effect on the food supply chain.  For example, closure of a single large beef processing facility can result in the loss of over 10 million individual servings of beef in a single day.  Similarly, under established supply chains, closure of a single meat or poultry processing facility can severely disrupt the supply of protein to an entire grocery store chain.

Accordingly, I find that meat and poultry in the food supply chain meet the criteria specified in section 101(b) of the Act (50 U.S.C. 4511(b)).  Under the delegation of authority provided in this order, the Secretary of Agriculture shall take all appropriate action under that section to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA.  Under the delegation of authority provided in this order, the Secretary of Agriculture may identify additional specific food supply chain resources that meet the criteria of section 101(b).

Sec. 2.  Ensuring the Continued Supply of Meat and Poultry.  (a) Notwithstanding Executive Order 13603 of March 16, 2012 (National Defense Resources Preparedness), the authority of the President to require performance of contracts or orders (other than

contracts of employment) to promote the national defense over performance of any other contracts or orders, to allocate materials, services, and facilities as deemed necessary or appropriate to promote the national defense, and to implement the Act in subchapter III of chapter 55 of title 50, United States Code (50 U.S.C. 4554, 4555, 4556, 4559, 4560), is delegated to the Secretary of Agriculture with respect to food supply chain resources, including meat and poultry, during the national emergency caused by the outbreak of COVID-19 within the United States.

(b) Secretary of Agriculture shall use the authority under section 101 of the Act, in consultation with the heads of such other executive departments and agencies as he deems appropriate, to determine the proper nationwide priorities and allocation of all the materials, services, and facilities necessary to ensure the continued supply of meat and poultry, consistent with the guidance for the operations of meat and poultry processing facilities jointly issued by the CDC and OSHA.

(c) The Secretary of Agriculture shall issue such orders and adopt and revise appropriate rules and regulations as may be necessary to implement this order.

  Sec. 3. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its

departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

THE WHITE HOUSE,

April 28, 2020.